IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BILL MacCLARENCE, P.E.,                    )
                                           )
          Plaintiff,                       )
                                           )        Civ. No. 1:07-cv-00055(RWR)
v.                                         )
                                           )
STEPHEN L. JOHNSON, in his official        )
Capacity as Administrator, United States   )
Environmental Protection Agency,           )
                                           )
          Defendant.                       )
_____)

**PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS,**

**AND MEMORANDUM IN SUPPORT**

## I.    INTRODUCTION

Pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(d),

Plaintiff Bill MacClarence ("MacClarence") hereby moves for an award of attorneys'

fees and costs for this litigation.  This case compelled United States Environmental

Protection Agency Administrator Stephen L. Johnson ("EPA") to correct violations of the

Clean Air Act related to EPA's failure to grant or deny MacClarence's petition filed

under Title V of the Clean Air Act, 42 U.S.C. § 7661d(b)(2), within the mandatory 60-

day timeline provided by the Clean Air Act.  EPA's failure to respond to MacClarence's

Clean Air Act Title V petition is part of EPA's long standing pattern and practice of

willfully violating the 60-day mandatory deadline in 42 U.S.C. § 7661d(b)(2) until at

least a complaint is filed in federal court.  In this case, EPA did not respond to

MacClarence's petition until over two years and ten months had passed from the

mandatory 60-day deadline.  Moreover, EPA did not respond until after MacClarence had

MACCLARENCE'S MOTION FOR ATTORNEY FEES AND COSTS -- 1

sent a 60-day notice of intent to sue, waited over 60-days, and then filed the Complaint in this case had passed.

Defense counsel has stated that EPA agrees that MacClarence is entitled to recover his attorneys' fees and costs for this action pursuant to 42 U.S.C. § 7604(d). Defense counsel has also stated that EPA does not contest MacClarence's entitlement to $385.60 in out of pocket expenses, which is the amount that MacClarence is seeking.

However, MacClarence and EPA were not able to come to agreement on the appropriate hourly rate for fee recovery for MacClarence's attorneys, nor on the reasonable amount of time expended by MacClarence's attorneys. MacClarence submitted detailed billing records to EPA and a proposal to resolve the fee and cost award without use of further judicial resources. Despite the modest amount of fees and costs sought by MacClarence at that time, and the Supreme Court's caution that a "request for attorney's fees should not result in a second major litigation," Hensley v. Eckerhart, 461 U.S. 424, 437 (1983), MacClarence and EPA were unable to settle the issue of fees. Thus it is appropriate for the Court to resolve the issue of fees at this time, with the issues before the Court narrowed to: (a) the appropriate hourly rate to use in calculating attorney fees for MacClarence's attorneys and (b) the reasonable number of hours expended by MacClarence's attorneys.

## II.     SUMMARY OF ARGUMENT

Fee-shifting is key to strong environmental enforcement. The purpose of private attorney general fee-shifting statutes like the Clean Air Act's is to encourage

competent, skilled attorneys to take on Clean Air Act cases and in doing so, enforce the

Clean Air Act which is "Congress's response to well-documented scientific and social

concerns about the quality of the air that sustains life on earth and protects it from . . .

degradation and pollution caused by modern industrial society."  Delaware Valley

Citizens Council for Clean Air v. Davis, 932 F.2d 256, 260 (3rd Cir. 1991).  To

accomplish that purpose, attorneys who win such cases must be paid for all of their

reasonable efforts at the same level as their counterparts in the commercial market. See

Hensley, 461 U.S. at 430, n.4; Blum v. Stenson, 465 U.S. 886, 893-94 (1984). Without

the promise of a fully compensatory fee award, competent, skilled attorneys are less

likely to take these cases and enforcement of this critical public health and welfare statute

will be diminished.

In the instant case, MacClarences seeks 45.9 hours of lawyer time and 1.1 hours

of paralegal/law clerk time in his effort to preserve the goals of the Clean Air Act. See

Declarations of William M. Eddie ("Eddie Decl.") and Robert Ukeiley ("Ukeiley Decl.").

Plaintiff's counsel incurred almost half of this time on the fee recovery issue.  Had it not

been for Plaintiff's counsel commitment and dedication, the protections of the Clean Air

Act would have gone unenforced.  Having fulfilled the Act's purposes, MacClarence's

attorneys now are entitled to an award of reasonable attorneys' fees that compensates

them in full for their efforts.

EPA's principle objection seems to be that because one of MacClarences'

counsel, Robert Ukeiley, lives in Kentucky, he and his associate, law clerk and paralegal

should not be compensated at the forum hourly rate derived from the U.S. Department of

Justice's own "Laffey" Matrix for reasonable rates in the District of Columbia.  EPA's

argument represents a sudden and unexplained reversal of the U.S. Department of Justice's long standing approach of both settling cases in which Ukeiley is counsel based on the Laffey Matrix rate, and raising no objection to the use of Laffey Matrix rates even when fee awards are contested before the courts. EPA's argument will apparently be based on a misguided attempt to apply the facts of this case to <u>Davis County Solid Waste Mgmt. v. EPA</u>, 169 F.3d 755, 758 (D.C. Cir. 1999). Ukeiley actually charges and is paid based on the Laffey Matrix rates. Therefore, <u>Davis</u>, which was about a client receiving a windfall because it paid its Salt Lake City-based lawyers substantially less than the going D.C. rates, has no applicability here. Furthermore, Ukeiley lives in Kentucky but does not really have a Kentucky law practice. If anything, it would be most accurate to describe Ukeiley's practice as a highly specialized national or even federal court D.C. practice.

EPA may also argue that Ukeiley should be penalized because he represented the Plaintiff in this case on a *pro bono* basis and that his public interest environmental law practice does the majority of its work on a *pro bono* basis. The D.C. Circuit and other courts have soundly rejected this anti-public interest argument, which if adopted would undercut the very purpose of the federal fee-shifting statutes.

EPA may also argue that Plaintiff's co-counsel William Eddie, who is based in Portland, Oregon, should also not get the DOJ's Laffey Matrix rates. This argument, which finds no basis in <u>Davis</u> or any other case, is essentially an argument to abolish the well-established rule that the hourly rate to apply in fee shifting cases is the reasonable hourly rate in the forum where the case is being heard.

Finally, EPA may try to "nickel and dime" Plaintiff on the reasonable hours compensable for this case.  EPA's argument will likely be based not on evidence, but rather on the opinion of EPA's trial counsel.  For this reason alone, the argument must fail.  In any event, Plaintiff's counsel decision to exercise their billing discretion to reduce their billable hours by 15% should completely moot this argument.

As a result of Plaintiff's counsel's efforts, MacClarence has halted the EPA's ongoing violation of the Clean Air Act, requiring the EPA to fulfill its federal oversight role in implementing the Clean Air Act.   In doing so, MacClarence has ensured that the requirements of the Act have been fulfilled in this case. These results compel a fee that fully compensates MacClarence's counsel for their diligent and efficient lawyering. MacClarence's counsel here have performed a valuable public service. If they and others like them are to be able to enforce our Nation's vital environmental laws in the future, they must be fully compensated for those efforts. That is all MacClarence seeks by this motion.

## III.    FACTS

### A.    Background on the Clean Air Act

The Clean Air Act aims "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). To help meet this goal, the 1990 amendments to the Clean Air Act created an operating permit program that applies to all major sources of air pollution – the Title V permit program.  See 42 U.S.C. §§ 7661-7661f.

A primary purpose of the Title V permitting program is to reduce violations of the Clean Air Act and improve enforcement by recording in one document all of the air

pollution control requirements that apply to a major source of air pollution. See New York Public Interest Research Group v. Whitman, 321 F.3d 316, 320 (2d Cir. 2003). Major sources of air pollution cannot legally discharge pollutants into the air unless they have a valid Title V operating permit. 42 U.S.C. § 7661a(a).

The Clean Air Act provides that the Administrator of EPA may approve states' programs to administer the Title V permitting program with respect to sources within their borders. 42 U.S.C. § 7661a(d).   The Alaska Department of Environmental Conservation ("Alaska DEC") is responsible for issuing Title V permits in Alaska.

Before a Title V permit can be issued by a state with an approved Title V permit program, the State must forward the proposed Title V permit to EPA. 42 U.S.C. § 7661d(a)(1)(B).  EPA then has 45 days in which it can review the proposed permit. EPA must object to the issuance of the permit if EPA finds that the permit does not comply with all applicable provisions of the Clean Air Act. 42 U.S.C. § 7661d(b)(1). However, as a practical matter, EPA does not review most proposed Title V permits forwarded to it by state permitting agencies.  See Ukeiley Decl. at ¶ 55.  After EPA's 45-day review period, "any person may petition the Administrator within 60 days" to object to the Title V permit. 42 U.S.C. § 7661d(b)(2).  Once it receives a petition for objection to a Title V permit, EPA must grant or deny that petition within 60 days. Id.; New York Public Interest Research Group v. Whitman, 214 F. Supp. 2d 1, 2 (D.D.C. 2002).

EPA's record of compliance with the mandatory 60-day deadline in 42 U.S.C. § 7661d(b)(2) is abysmal.  In almost every single case, EPA does not respond to a Title V petition until after a citizen suit has been filed to force compliance with this mandatory duty.  See Ukeiley Decl. at ¶ 54.  Thus, there are a some petitions filed in 1998 which,

according to EPA's own web page, EPA has yet to respond to despite the passage of

closing in on a decade beyond the 60-day deadline.  See e.g.

http://www.epa.gov/region7/programs/artd/air/title5/petitiondb/petitiondb1999.htm (last

visited on June 15, 2007).

### B.     The Instant Action

This case involved a petition submitted to EPA by MacClarence on February 5

2004 pursuant to Title V of the Act, 42 U.S.C. § 7661d(b)(2).  MacClarence sought

EPA's objection to a Title V permit issued to a BP oil gathering facility ("Gathering

Center #1") located near Prudhoe Bay, Alaska.  In short, MacClarence asserted that all of

the oil production wells and related infrastructure which are contiguous and adjacent to

Gathering Center #1 must be aggregated into a single source for Clean Air Act purposes.

As noted above, EPA is required by the Clean Air Act to respond to all petitions

under 42 U.S.C. § 7661d(b)(2) within 60 days.  Thus, EPA was required to respond to

MacClarence's petition by April 8, 2004.  EPA did not issue any response within the

mandatory 60-day deadline, thus commencing EPA's unlawful failure to perform its

mandatory duty in this case.

On October 9, 2006, MacClarence (acting through counsel) sent a notice letter to

EPA under § 304(b)(2) of the Act, 42 U.S.C. § 7604(b)(2), stating MacClarence's intent

to file suit to compel a response to MacClarence's Title V petition.   EPA did not issue a

response to MacClarence's petition, nor even make an offer to issue a response to

MacClarence's petition, within the 60-day time period required by the Clean Air Act

before commencement of a citizen suit.

Thus, on January 10, 2007, MacClarence filed the Complaint in this matter. Shortly thereafter, EPA advised counsel for MacClarence that EPA intended to issue a response to MacClarence's Title V petition shortly after the time provided by the Federal Rules of Civil Procedure for EPA to answer the Complaint herein.   Therefore, MacClarence did not oppose two motions by EPA to extend the time in which to answer the Complaint.  Docket Nos. 10 and 11.   Finally, on April 20, 2007, after more than 3 years of unlawful delay, EPA issued a written order denying MacClarence's Title V petition.  MacClarence is presently considering whether to seek judicial review of EPA's decision on his Title V petition.

On May 21, 2007, MacClarence and EPA stipulated to partial dismissal of the Complaint.  Thus, the only the issue left for resolution is cost of litigation, including attorneys' fees.


## IV.    ARGUMENT

### A.    MacClarence Is Entitled To Recover Fees

As mentioned above, EPA's counsel has stated that EPA does not dispute that MacClarence is entitled to an award of costs of litigation, including attorneys' fees, pursuant to Clean Air Act § 304(d), 42 U.S.C. § 7604(d).  That provision provides:  "The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  Id.  An attorneys' fee award is "appropriate" to parties who "prevail" or "prevail in part": *i.e.*, who achieve "some degree of success on the merits." Ruckelshaus v. Sierra Club, 463

U.S. 680, 689, 694 (1982).  MacClarence has met both prongs of this test, having

obtained all the substantive relief sought by catalyzing EPA's decision on MacClarence's

Title V petition.

    **B.**    **Hourly Rate**

        1.    <u>Plaintiff's Counsel and Staff from the Law Office of Robert Ukeiley are Entitled to an Hourly Rate based on the Laffey Matrix Despite the</u> <u>Fact that Ukeiley lives in Kentucky.</u>

The amount of fees MacClarence is requesting is calculated by the "lodestar"

method: reasonable hourly rates multiplied by the number of hours reasonably spent on

the litigation. <u>Blanchard v. Bergeron</u>, 489 U.S. 87, 94 (1989).  The hourly rate charged

by MacClarence here is based on the "Laffey Matrix" as calculated by the U.S.

Department of Justice.  <u>See</u> Eddie Decl., ¶ 9 and Exh. 2 (image of District of Columbia

U.S. Attorney Office Laffey Matrix webpage).  In this Circuit, it is well established that

hourly rates for purposes of awards under fee-shifting statutes may be calculated based

on the rates set forth in <u>Laffey v. Northwest Airlines, Inc.</u>, 764 F.2d 4 (D.C. Cir. 1984),

for 1981-82, as adjusted by changes in Consumer Price Index for the Washington, D.C.

Metropolitan area.  <u>See</u>, <u>e.g.</u>, <u>Covington v. District of Columbia</u>, 57 F.3d 1101, 1105 &

n. 14, 1109 (D.C. Cir. 1995), <i>cert. denied</i>, 516 U.S. 1115 (1996); <u>Northwest Coalition for</u>

<u>Alternatives to Pesticides v. EPA</u>, 421 F.Supp.2d 123, 129 (D.D.C. 2006) (awarding fees

and noting: "[Plaintiff] requests, and defendant does not oppose, that hourly fees be

calculated under the Laffey Matrix); <u>Cobell v. Norton</u>, 407 F.Supp.2d 140, 169-170

(D.D.C. 2005) (awarding fees at Laffey Matrix rates under lodestar method); <u>Judicial</u>

<u>Watch v. Department of Commerce</u>,  384 F.Supp.2d 163, 170 (D.D.C. 2005), <u>aff'd in part</u>

<u>and rev'd in part on other grounds</u> <u>470 F.3d 363</u> (2006) (awarding fees and noting:

"[Defendant] does not oppose the use of the Laffey Matrix to determine the rates owed to

Judicial Watch and the Court finds the rates to be reasonable.").

As the Court of Appeals has explained, Laffey Matrix rates are within the market

rates for attorneys of comparable experience doing comparable work. See Covington, 57

F.3d at 1109 ("In order to demonstrate [the market rate], plaintiff may point to such

evidence as an updated version of the Laffey matrix or the U.S. Attorneys matrix").   A

copy of the Laffey Matrix available from the U.S. Attorney's Office for the District of

Columbia (updated for the years 2003-2007) is filed as Exhibit 2 to the Eddie

Declaration.  Eddie Declaration, ¶ 9 and Exh. 2.  The rates to be used are the rates which

were in effect for each year in which the work was performed. See Masonry Masters, Inc.

v. Nelson, 105 F.3d 708, 710 (D.C. Cir. 1997).

The correct legal market for calculating the award in this case is the Washington,

D.C. market:

> The proper rule is that the relevant community is the one in which the
> district court sits. This is a simple rule to follow. It requires the district court
> normally to determine only the prevailing market rate within its jurisdiction,
> an inquiry about which it should develop expertise. Moreover, it is a neutral
> rule which will not work to any clear advantage for either those seeking
> attorneys' fees or those paying them.

Donnell v. U.S., 682 F.2d 240, 251 (D.C. Cir. 1982), cert. denied 459 U.S. 1204 (1983)

(in voting rights case, awarding D.C. rates for Mississippi-based counsel, except for one

attorney who solely participated due to his knowledge of local conditions in Mississippi).

In a later decision, the Court of Appeals confirmed the general rule set forth in Donnell

(that market rates in Washington, D.C. area are to be used in the Lodestar calculation of

fee awards in this District), but adopted a narrow exception "where the bulk of the work

is done outside the jurisdiction of the court *and* where there is a *very significant*

difference in compensation favoring D.C." <u>Davis County Solid Waste Mgmt. v. EPA</u>, 169 F.3d 755, 758 (D.C. Cir. 1999) (emphasis in original).   In <u>Davis</u>, the prevailing plaintiff sought recovery of attorney fees at D.C. rates for their Utah counsel – rates which were about 70% higher than the firm's Utah rates.   The basis for this new exception in <u>Davis</u> was to "prevent the occasional erratic result where the successful petitioner is vastly overcompensated given the amount he contracted to pay for legal services. In all other cases the D.C. forum rates would apply."  <u>Id.</u>   The <u>Davis</u> decision was plainly tied to the "extreme situation" presented by the facts of that case:  "We think the neutrality rationale in <u>Donnell</u> is still sufficient to justify forum rates in all but the **extreme situation** we face here."  <u>Id.</u> at 759. (emphasis added).[1]

Applying the rules to the case at bar, Robert Ukeiley is entitled to $375 per hour which is the rate provided for him in the U.S. Attorney Office for the District of Columbia's adjusted Laffey Matrix.[2]  The D.C. Circuit has explained that there are at least three factors to consider in determining a reasonable rate; billing practice of a

---

[1] The <u>Davis</u> decision, based on the rationale of preventing a windfall to a successful plaintiff is contrary to the Supreme Court's decision in *Missouri v. Jenkins*, 491 U.S. 274, 287 (1989) which rejected the anti-windfall rationale. ("Neither petitioners nor anyone else, to our knowledge, has ever suggested that the hourly rate applied to the work of an associate attorney in a law firm creates a windfall for the firm's partners or is otherwise improper under § 1988, merely because it exceeds the cost of the attorney's services.  If the fees are consistent with market rates and practices, the "windfall" argument has no more force with regard to paralegals than it does for associates.)  However, the Court need not address the legal validity of <u>Davis</u> because it is factual distinguishable from the present case where Plaintiff was represented on a *pro bono* basis so that he can have no windfall between what he paid and what he recovered and Plaintiff's counsels' actual rates are at or close to the U.S. Attorney's Office's revised Laffey Matrix rates.

[2] Mr. Ukeiley is using his billing discretion to only request $375 per hour, even for work done after May 31, 2007 for which the U.S. Attorney's Office's revised Laffey Matrix would provide a higher rate.

lawyer, the lawyer's experience, skill and reputation and the prevailing market rate. Covington, 57 F.3d at 1107.

Turning first to his billing practice, Ukeiley has a 100% public interest for-profit practice. He only represents groups or individuals in enforcing federal environmental laws or state laws or regulations implementing federal environmental laws. His practice only seeks injunctive or declaratory relief or civil penalties that go to the federal treasury rather than the plaintiffs.[3] Ukeiley's practice focuses predominately on the Clean Air Act with a lesser focus on the Endangered Species Act. Ukeiley's practice predominately involves representing non-profit organizations, with the occasional individual named as a co-plaintiff although on rare occasions, the practice does involve representing public interest minded individuals. Ukeiley Decl. ¶¶ 21-22.

Ukeiley's practice involves charging "variable rates (both at and below the market, with the latter attributable to public-spirited goals" of maximizing environmental and public health protection. See Covington, 57 F.3d at 1108. Ukeiley represents labor unions and individual members of labor unions regarding Clean Air Act permits issued by the Indiana Department of Environmental Management. In these matters, Ukeiley charges a rate based on the Laffey Matrix although in the latest matters, he has charged $360 per hour, which reflects last year's Laffey Matrix rate. Ukeiley charges his market rate to these clients because he believes charging this rate will not affect the degree of environmental protection, considering the relative resources available to the labor unions. Since incorporating his present law firm in December of 2003, Ukeiley has worked on 14 of these matters. He has billed and collected over $66,000 at Laffey Matrix rates for this

---

[3] This is not to imply that monetary damages cannot serve the public interest.

MACCLARENCE'S MOTION FOR ATTORNEY FEES AND COSTS -- 12

work. These are not fee shifting matters so the client is paying Ukeiley's market rate with no ability to recoup these fees. This represents a substantial portion of the firm's total income because of the firm's public interest nature. Ukeiley Decl. ¶¶ 23-25.

The rate is based on the Laffey Matrix because in reality, Ukeiley's firm has a nationwide practice but the majority of its work is in D.C. courts. For example, the firm currently has 16 cases in active litigation. Of these 16 cases, nine are in this Court (the U.S. District Court for the District of Columbia), one is in the U.S. Court of Appeals for the District of Columbia Circuit, one is in the U.S. District Court for the Northern District of Georgia, one is in the U.S. District Court for the Southern District of Ohio, one is in front of an Administrative Law Judge of the Kentucky Environment and Public Protection Cabinet, one is in the Pennsylvania Supreme Court, one is in the United States Court of Appeals for the Eleventh Circuit, and one is in the Franklin County, Kentucky Circuit Court. However, in the Franklin County Circuit Court, there is a Kentucky lawyer who serves the role of local counsel in this case. Ukeiley is involved in this last case, as well as the case in front of the Kentucky Administrative Law Judge because the cases involve Clean Air Act challenges to coal fired power plants, which is Ukeiley's specialty. He represents the Sierra Club in these two cases. The Sierra Club is a nation-wide environmental organization based in San Francisco, California. Thus, Ukeiley's practice is issue-based rather than place-based. Ukeiley lives in Kentucky simply for personal reasons. Ukeiley Decl. ¶¶ 26-27.

Ukeiley's bar membership also reflects the nation wide scope of his practice. Ukeiley is admitted to the Maryland (inactive status), Colorado (inactive status), Georgia and Kentucky state bars as well as to: U.S. Court of Appeals for the 10th Circuit, U.S.

District Court for the District of Colorado, U.S. Court of Appeals for the D.C. Circuit, U.S. District Court for the District of Arizona, U.S. District Court for the District of Maryland, Supreme Court of the United States, U.S. District Court for the District of Columbia, U.S. Court of Appeals for the 11th Circuit, U.S. District Court for the Southern District of Georgia, U.S. District Court for the Middle District of Georgia, U.S. District Court for the Northern District of Georgia, U.S. Court of Appeals for the 2d Circuit, U.S. District Court for the Eastern District of Kentucky, and the U.S. Court of Appeals for the 9th Circuit.  Although admitted to the Eastern District of Kentucky, Ukeiley has never filed or participated in a case in that court.  Ukeiley has also been admitted *pro hac vice* to: U.S. District Court for the Southern District of Ohio, and U.S. District Court for the Middle District of Pennsylvania.  Ukeiley Decl. ¶ 28.

Ukeiley's work in the D.C. District Court stretches back to his law school days. While attending George Washington University (GW) Law School in D.C., Ukeiley worked for Professor Jennifer Lyman at the GW Law School Clinic from 1993 to 1995. One of Ukeiley's principle responsibilities as Prof. Lyman's research assistant was to help litigate two civil rights cases in the D.C. District Court which Prof. Lyman had inherited from the previous clinical professor.  Ukeiley Decl. ¶ 29.

Ukeiley also interned at the Federal Public Defender's Office in D.C. during law school, thus increasing his early experience with the D.C. District Court.[4]  Over the course of his career, Ukeiley has practiced more cases in the D.C. District Court than in any other court.  Ukeiley Decl. ¶¶ 30-31.

---

[4] During law school, Ukeiley also interned for a semester with the U.S. Department of Justice's Environmental Crimes Section.  While this office was in D.C., none of Ukeiley's work involved cases in D.C. courts.

Ukeiley's law practice-related connection to Kentucky is very limited. For example, Ukeiley has never had a client physically in his office in Kentucky. Ukeiley does a considerable amount of his work outside his office and outside Kentucky. He spends much of the summer in Colorado and California working. Ukeiley has no cases in which he only represents Kentucky clients. Ukeiley has never filed a case in federal court in Kentucky. For the one and only case he filed in state court in Kentucky, he had a co-counsel from Kentucky who serves as local counsel as well as co-counsel from California. Ukeiley Decl. ¶¶ 32-33.

Besides for the labor unions, the rest of Ukeiley's firm's work is all on a *pro bono* basis. This *pro bono* work can be divided into three categories in terms of billing. The first category is *pro bono* work in which the firm receives no income at all and has no possibility of receiving any income. This includes work presenting clients as well as work consulting with other public interest lawyers on Clean Air Act work when they seek Ukeiley's opinions. For example, during the week of June 11 – 15, 2007, Ukeiley received an e-mail from a public interest lawyer working for a non-profit in D.C. (who is a former high ranking US EPA official) seeking his opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Alaska seeking his opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Colorado seeking his opinion on a Clean Air Act question, and an e-mail from Ukeiley's former associate, who is now a public interest lawyer working for a large non-profit environmental law firm in D.C., seeking his opinion on a Clean Air Act question. This level of *pro bono*

consultation with the public interest environmental bar on Clean Air Act issues is typical for Ukeiley.  Ukeiley Decl. ¶¶ 34-35.

The second type of *pro bono* arrangement is where Ukeiley's firm does not charge the client anything for their time but hopes to recovery under a statutory fee shifting provision.  This case is an example of this type of *pro bono* arraignment.  Full recovery at market rates in these cases is critical for the financial viability of Ukeiley's public interest firm.  Ukeiley Decl. ¶ 36.

The third type of *pro bono* is what public interest lawyers sometimes refer to as "low bono" or a reduced rate case.  Ukeiley's firm offers these reduced rates because, simply put, the work would not otherwise get done.  Ukeiley almost always strongly encourages and often facilitates the clients seeking free representation from a non-profit public interest law firm and only takes the case on a "low bono" basis when there is no representation available for free.  Ukeiley Decl. ¶ 37.

Ukeiley currently charges approximately $90 per hour for these low bono cases. This is not a market rate but rather a rate chosen to allow the public interest environmental work to get done.  Ukeiley's firm charges the same $90 for himself and for his first year associates in these cases.  In addition, Ukeiley's firm almost always agrees to a cap on the total amount that he will charge for lawyer time in these low bono cases. These caps results in the effective rate often ending up in the $45 range because the firm puts in almost as much unbillable time into the case as billable time.   Ukeiley Decl. ¶ 38.

As to experience, reputation and skill as it relates to this case, Ukeiley has spent his entire career working for non-profit public interest environmental law firms or for-profit public interest law firms.  His practice has been almost all public interest

environmental litigation although early on in his career, Ukeiley accepted some court-appointed civil rights cases and served as a court appointed alternative criminal defense counsel.  In addition, Ukeiley's initial position after law school was in the nature of a public interest, international environmental lobbyist, working on such treaties as the Inter-America Tropical Tuna Convention that governs the take of dolphins when fishing. Ukeiley Decl. ¶ 39.

Currently, Ukeiley is one of the most experienced Title V litigators on the public interest side in the country.[5]  In a Title V case Ukeiley litigated, the 11th Circuit noted that: "Navigating through the intricacies of the Clean Air Act is no task for the uninformed or the short-winded." Sierra Club v. Johnson, 436 F.3d 1269, 1272 (11th Cir. 2006).  Ukeiley Decl. ¶ 40.

Specifically, Ukeiley has drafted comments, or supervised others writing comments on dozens of Title V permits.  Ukeiley has drafted or supervised others writing approximately 16 Title V petitions for objections.  Ukeiley has litigated or is currently litigating approximately ten Title V petition deadline suits similar to this case.  This included one Title V petition deadline case in which Ukeiley unsuccessfully tried to end EPA's pattern and practice of failing to comply with the mandatory 60-day deadline to respond to Title V petitions.  See New York Public Interest Research Group v. Whitman, 214 F.Supp. 2d 1 (D.D.C. 2002).  Had EPA's vigorous defense not succeeded in that

---

[5] This may seek like quite a boast, considering that Ukeiley only graduated law school in 1995.  However, it is important to recall that Title V was only passed in 1990 and was not really implemented much before 1995 as the EPA delayed in promulgating the Title V regulations.  In addition, it is not a very frequently litigated provision, in the relative sense.

case, the present case would have never existed and thus Plaintiff would not be seeking fees. Ukeiley Decl. ¶ 41.

Ukeiley litigated, from drafting the comments on the State-issued Title V permit all the way through outlining the reply brief in the appellate courts two substantive challenges to EPA's response to Title V petitions, <u>Sierra Club v. Leavitt</u>, 368 F.3d 1300 (11th Cir. 2004) and <u>Sierra Club v. Johnson</u>, 436 F.3d 1269 (11th Cir. 2006).[6]  Ukeiley is currently litigating <u>Sierra Club v. Johnson</u>, 06-10714 in the 11th Circuit which is another challenge to EPA's response to a Title V petition.  Ukeiley has also spent close to 100 days in trials of state-issued Title V permits in front of Administrative Law Judges. Ukeiley has litigated one case against the State of Georgia for systemic delays in issuing Title V permits and one case against EPA for systemic problems with the Georgia Title V program.   As to enforcement, Ukeiley litigated for almost five years a federal Clean Air Act citizen suit that involved, in part, enforcing a Title V permit and resulted in several published opinions.  <u>See</u> <u>e.g.</u> <u>Sierra Club v. Georgia Power Company</u>, 365 F.Supp.2d 1287 (N.D. Ga. 2004); <u>Sierra Club v. Georgia Power Company</u>, 365 F.Supp.2d 1297 (N.D. Ga. 2004) <u>rev'd</u> 443 F.3d 1346 (11th Cir. 2006).  Ukeiley has also been litigating since 2004 an on-going Clean Air Act citizen suit involving, in part, enforcement of a Title V permit.  <u>See</u> <u>Sierra Club v. Dayton Power & Light</u>, 04-905 (S.D. Ohio).  Ukeiley Decl. ¶¶ 42-43.

EPA must recognize Ukeiley's Clean Air Act experience, skill and reputation for they have had him teach at least one of EPA's Clean Air Act Prevention of Significant

---

[6] Ukeiley's name does not appear on the published decisions because he did not participate in the oral argument, as he left his employment with the Georgia Center for Law in the Public Interest prior to those oral arguments.

Deterioration (PSD) and Non-Attainment New Source Review citizen trainings.  PSD and

NA NSR are other parts of the Clean Air Act which are applicable requirements which

must be included in Title V permits.  See 40 CFR § 70.2 *Applicable requirements* (2).

EPA and EPA's contractor also asked Ukeiley to edit EPA's citizen's guide to PSD and

NA NSR.  Finally, EPA's Title V Performance Task Force chose Ukeiley as one of the

people to interview to gain a better understanding of how the Title V program was

actually working.  Ukeiley's other teaching experience includes teaching Continuing

Legal Education (CLE) courses on the Clean Air Act and power plants at the Public

Interest Environmental Law Conference in Eugene, Oregon for at least the past three

years.  Ukeiley has also been a presenter on Clean Air Act issues at several Sierra Club

events in the last few years.  Ukeiley Decl. ¶¶ 44-45.

Over the years, Ukeiley has done more work for the Sierra Club than for any other

client.  Last year, the Sierra Club named Ukeiley as one of their "Legal Heroes."  See

http://www.sierraclub.org/environmentallaw/heroes/robert_ukeiley.asp (last visited

6/16/07).   Ukeiley Decl. ¶ 46.

Finally, turning to the prevailing market rates, Ukeiley is asking for the U.S.

Attorney's Office's own adjusted Laffey Matrix rate for D.C.  As explained above, courts

have long accepted use of an adjusted Laffey Matrix rate as an efficient way to determine

a reasonable rate.

It is important to note that use of the U.S. Attorney's Office adjusted Laffey

Matrix rate represents a major compromise by Plaintiff as Plaintiff is actually entitled to a

much higher rate.  This is because the manner in which the U.S. Attorney's Office adjusts

the Laffey Matrix substantially underestimates the appropriate rate.  Plaintiff is only

MACCLARENCE'S MOTION FOR ATTORNEY FEES AND COSTS -- 19

asking $375 for Ukeiley's time based on the U.S. Attorney's Office adjusted Laffey Matrix.  However, a properly adjusted Laffey Matrix would provide for $509 per hour or over 35% more than what Plaintiff is requesting.  See http://www.laffeymatrix.com/see.html (last visited 6/16/07) citing to McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000). See also Interfaith Community Organization v. Honeywell International, 336 F.Supp.2d 370, 386 – 388 (D.N.J. 2004) citing Salazar v. Dist. Of Col., 123 F.Supp.2d at 13-15 aff'd 426 F.3d 694 (3d Cir. 2005).  In Interfaith Community Organization, the 3rd circuit affirmed the rate of $456 as a reasonable rate in D.C. in 2003 for a lawyer with Ukeiley's range of experience.  Interfaith Community Organization, 426 F.3d at 708, ftnt. 11.  In comparison, Plaintiff is asking $375 for Ukeiley for work done in 2007.[7]

Plaintiff is also asking for U.S. Attorney's Office adjusted Laffey Matrix Rates for a first year associate in the Law Office of Robert Ukeiley, Aubrey Baldwin, as well as a paralegal/legal assistance, Elizabeth Perkins and a law clerk, Elizabeth Middleton.  The time requested for these three is so minimal that it is barely worth addressing their reasonable rate.  The analysis above with regard to Ukeiley generally applies to Baldwin, Perkins and Middleton and they are entitled to an hourly rate of $205, $120 and $120 respectively.  See Eddie Decl., Ex. 2.

Baldwin is a 2005 graduate of Lewis and Clark Law School.  She received a certificate in environmental and natural resources law.  She also received the

---

[7] Although irrelevant, it is interesting to note that the $375 rate for Ukeiley is within the range of rates charged by partners at law firms in and around Kentucky according to a National Law Journal article provided to Plaintiff's counsel by a DOJ counsel working on another Title V petition deadline suit.  See Ukeiley Decl. at ¶ 56 & Exhibit A.

environmental alumni association's Williamson Award which is awarded to one graduate per year who has demonstrated an outstanding commitment to public interest environmental work.  During law school, she had a summer position at a non-profit public interest environmental law firm and during the school year, she worked at the law school's environmental clinic.  Baldwin is actually paid at the U.S. Attorney's Office adjusted Laffey Matrix for Clean Air Act work for various labor unions or individual labor union members, although as of May 2007, she was still billing at last year's rate ($195 per hour).  The rest of her work is done on a *pro bono* basis as described above with regard to Ukeiley.  Ukeiley Decl. ¶¶ 47-49.

Ukeiley's firm has never had the occasion to charge market rates for Perkins' time as all of her time is spent on a *pro bono* basis or on unbillable administrative tasks. Ukeiley's firm has also never had the occasion to charge for Middleton's time because she is a summer law clerk who just started in May of this year.  However, the prevailing market rate according to the U.S. Attorney's Office, is $120 for paralegals and law clerks. Ukeiley Decl. ¶¶ 47, 50-51.

Although this case resolved rapidly, so counsel were not required to travel to D.C., this case does not even approximate the "extreme situation" faced in Davis. MacClarence's counsel are private attorneys with significant portions of their practice dedicated to representing non-profit organizations and individuals in cases of public importance.

With respect to Ukeiley, the Laffey Matrix rate of $375 reflects the rate he actually charges to his non-*pro bono* clients adjusted for the current year.    Because the

rates regularly charged by Ukeiley are only modestly below or equivalent to the Laffey

Matrix rates, the Davis exception is inapplicable.

Nor is the Davis analysis even applicable in this case, since all counsel

represented MacClarence here on a *pro bono* basis, with only the filing fee and other case

costs covered by Mr. MacClarence, and payment of attorneys' fees contingent upon

success.    This is the precise type of public interest-minded litigation Congress

contemplated in developing the Clean Air Act citizen suit provision (and similar fee-

shifting provisions in federal law).  See S. Rep. No. 94-1011, at 6, 1976 U.S.C.C.A.N.

5908, 5913 (Senate Report accompanying 42 U.S.C. § 1988), cited with approval in

Blum v. Stenson, 465 U.S. 886 (1984);  Pennsylvania v. Del. Valley Citizens Council for

Clean Air, 478 U.S. 546, 559 (1986) (purposes behind Clean Air Act § 304(d) and § 1988

are "nearly identical"); see also Covington, 57 F.3d at 1107-08.   As noted above, the

exception in Davis was to "prevent the occasional erratic result where the successful

petitioner is vastly overcompensated given the amount he contracted to pay for legal

services." Davis, 169 F.3d at 758.  There is zero risk of such overcompensation here,

since MacClarence did not compensate his counsel at all.  Ukeiley Decl. ¶ 52.

In sum, because Ukeiley and Baldwin's actual rate charged to non-*pro bono*

clients is almost the same as the U.S. Attorney's Laffey Matrix rate, because Ukeiley has

considerable experience and skill and enjoys a strong national reputation, even with EPA,

with regard to Clean Air Act and Title V litigation, and because the U.S. Attorney's

Laffey Matrix rate represents or actually under-represents the prevailing market rate in

the forum of this case, the Court should find the following rates reasonable: Ukeiley: $375; Baldwin: $205; Perkins: $120; Middleton: $120.[8]

> 2.    Plaintiff's Counsel William Eddie, who is based in Portland, Oregon, is Entitled to an Hourly Rate based on the Laffey Matrix.

MacClarence seeks an award of attorney fees for his counsel William Eddie at the Laffey Matrix rate of $305/hour.    For private business clients, Eddie presently charges a rate of $250 per hour; and typically charges public interest clients a rate of $65 per hour (and takes certain cases on full contingency).  Eddie Decl., ¶ 8 and Exh. 1.

The Laffey Matrix rate of $305 is not significantly higher than his present market rate of $250.   Compared to Mr. Eddie's normal Portland rate there is not a "very significant difference in compensation favoring D.C."  Davis, 169 F.3d at 758.  Rather this is a 22% difference rather than the 70% difference discussed in Davis.

As to Eddie's experience, skill and reputation, he previously served as staff attorneys for non-profit organizations, and has a long-standing commitment to protection of the environment and the public interest.   Eddie specializes in environmental and energy law, and is frequently asked to present on a range of topics in environmental law, including specifically the Clean Air Act.  Eddie Decl. ¶¶ 4-7.

As to the prevailing market rates, as discussed above, Plaintiff is requesting rates based on the U.S. Attorney's Office adjusted Laffey Matrix.  This represents or under-represents the prevailing rate in this forum for an attorney of Eddie's reputation and experience.

---

[8] This Court has previously granted rates for Ukeiley based on the U.S. Attorney's Office's adjusted Laffey Matrix in Center for Biological Diversity v. Norton, 04-0156 (JDB)(DDC Jan. 26, 2005) at 5.  Attached as Exhibit B to Ukeiley Decl.

MACCLARENCE'S MOTION FOR ATTORNEY FEES AND COSTS -- 23

### C.    Reasonable Hours Expended

The hours spent by the MacClarence's counsel on this matter are also reasonable. Under federal fee-shifting statutes, MacClarence's attorneys are entitled to be compensated for every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest. See Blanchard v. Bergerson, 489 U.S. 87, 94 (1989); Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense, 675 F.2d 1319, 1323-27 (D.C. Cir. 1982); see also Role Models America, Inc. v. Brownlee, 353 F.3d 962, 968 - 970 (D.C. Cir. 2004); Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516, 1522-24 (D.C. Cir. 1988).  As succinctly put forward by the Sixth Circuit:  "The question is not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved. Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." Wooldridge v. Marlene Industries Corp., 898 F.2d 1169, 1177 (6th Cir. 1990). The relevant issues are whether MacClarences' counsel exercised sound legal judgment under the circumstances and whether the success that was achieved warrants the full lodestar. See City of Riverside v. Rivera, 477 U.S. 561, 572 (1986); Moore v. Jas. H. Matthews, 682 F.2d at 839.

The hours claimed by MacClarence's attorneys here are described fully in their declarations and supporting contemporaneous time records. As such, counsel's hours are presumptively reasonable: "Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case." Perkins v. Mobile Housing Bd., 847 F.2d 735, 738 (11th Cir. 1988). To deny

MACCLARENCE'S MOTION FOR ATTORNEY FEES AND COSTS -- 24

compensation, therefore, "it must appear that the time claimed is obviously and convincingly excessive under the circumstances." Id.

To avoid wasting the Court's time with petty squabbles over minor entries, Plaintiff's counsel have exercised their billing discretion and reduced their hours by 15% across the board . See e.g. Center for Biological Diversity v. Norton, 04-0156 (JDB)(DDC Jan. 26, 2005) at 3-4(reducing hours by 15%) attached to Ukeiley Decl. as Exhibit B.  Using this method, the appropriate lodestar for MacClarence's counsel is as follows:

| Attorney/Staff | Yrs. Exp. | Rate | Hours | Total Fees |
|---|---|---|---|---|
| Robert Ukeiley | 12 | $375 | 19.3 | $ 7237.50 |
| William Eddie | 9 | $305 | 24.7 | $ 7533.50 |
| Aubrey Baldwin | 2 | $205 | 5.9 | $ 1209.50 |
| Elizabeth Perkins | -- | $120 | 0.7 | $   84 |
| Elizabeth Middleton | -- | $120 | 0.4 | $   48 |
| Total fees | | | | $16,112.50 |
| Agreed to Costs: | | | | $   385.50 |
| Total fees and costs: | | | | $16,498 |

V.      CONCLUSION

For the foregoing reasons, MacClarence respectfully requests that the Court grant its Motion for Fees and Costs in the amount of $16,112.50 in attorneys' fees and costs in the undisputed amount of $385.60. In accordance with INS v. Jean, 496 U.S. 154, 162-63 (1990), MacClarence will also seek recovery for the time spent on reply in the fee

litigation. MacClarence will submit a supplemental declaration with their reply brief

detailing the additional sums to which they are entitled.

Respectfully submitted,

**/s/**_____

Robert Ukeiley (MD 14062)
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
Telephone: (859) 986-5402
Facsimile: (866) 618-1017
E-mail: rukeiley@igc.org

Counsel for Plaintiff

Dated: June 21, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BILL MacCLARENCE, P.E. ) | |
| 10840 Glazanof Drive ) | |
| Anchorage, AK 99507, ) | |
| ) | Civ. No. 1:07-cv-00055(RWR) |
| v. ) | |
| ) | |
| STEPHEN L. JOHNSON, in his official ) | |
| Capacity as Administrator, United States ) | |
| Environmental Protection Agency, ) | |
| Ariel Rios Building ) | |
| 1200 Pennsylvania Avenue, N.W. ) | |
| Washington, DC 20460, ) | |
| ) | |
| EPA. ) | |

## DECLARATION OF WILLIAM M. EDDIE IN SUPPORT OF PLAINTIFF'S

## MOTION FOR AWARD OF ATTORNEY FEES AND COSTS

I, William M. Eddie, do declare and if called as a witness would testify as follows:

     1.    I am an attorney licensed to practice before the courts of Idaho and

Oregon and I am an attorney of record in this case. I am and have been the attorney of

record for the Plaintiff since the investigation and filing of this action. I agreed to

represent Plaintiff in this suit involving EPA's failure to issue any response to Plaintiff's

petition submitted under Title V of the Clean Air Act, 42 U.S.C. § 7661d(b)(2). I am

submitting this declaration in support of Plaintiff's motion for attorney fees and costs

(filed herewith). I have personal knowledge of the facts set forth herein and am

competent to testify as to them if called as a witness.

     2.    I am a member in good standing with the State Bars of Idaho and Oregon

and am admitted to practice before the U.S. District Court for the District of Idaho and

DECLARATION OF WILLIAM M. EDDIE -- 1

the Ninth Circuit Court of Appeals. This Court admitted me to practice *pro hac vice* in this case.

  3.  In 1998, I graduated from the Northwestern School of Law of Lewis and Clark College, and also obtained a Certificate in Environmental and Natural Resources Law.

  4.  In 1998, I began working as the Idaho Fellow attorney in the Boise office of for the Land and Water Fund of the Rockies, a non-profit organization dedicated to protecting the natural environment and promoting clean energy development in the Intermountain West. I later became a staff attorney and Idaho Office Director for the Land and Water Fund of the Rockies. In 2003, I joined several colleagues in founding Advocates for the West, a nonprofit environmental law firm based in Boise, Idaho. I served as Senior Staff Attorney for Advocates for the West until June 2006, when I went into private law practice. I relocated my practice to Portland, Oregon in August 2006. I recently joined the firm of Field Jerger, LLP as "of counsel," and I continue to handle some cases with my former employer, Advocates for the West.

  5.  About 75% of my practice is public interest environmental law, with a focus on air quality, toxics, and energy issues. I also represent private parties on renewable energy development issues. I have active cases in Idaho, Nevada, and Oregon, and represent clients based in each of those states, as well as in California, Washington, Alaska, and Washington D.C. Representative cases which I have handled as either the lead attorney or "second chair" capacity include: Idaho Conservation League v. Boer, 362 F.Supp.2d 1211 (D.Idaho 2004); The Ecology Center v. Kimbell, 2005 U.S. Dist. LEXIS 34416 (D.Idaho 2005); Idaho Watersheds Project v. Hahn, 307 F.3d 815 (9th Cir. 2002);

DECLARATION OF WILLIAM M. EDDIE -- 2

The Wilderness Society v. Bosworth, 118 F.Supp.2d 1082 (D.Mt. 2000); and Idaho
Watersheds Project v. Hahn, 187 F.3d 1035 (9th Cir. 1999).

6.      I frequently am asked to make presentations on environmental law at
seminars and conferences.   In recent years, I have made presentations specifically on the
Clean Air Act at the 2006 Annual Conference of the Western States Project (an
organization of state environmental regulatory agencies, attorneys general offices, law
enforcement agencies and local prosecutor organizations), the University of Oregon's
Public Interest Environmental Law Conference (2007), and Boise State University
(2006).

7.      I handle many of my public interest cases on a fully contingent basis; and
for some public interest clients I offer a below-market rate of $65 per hour.  I also
frequently offer public interest clients a cap on their total liability for attorney fees – a
practice which almost always results in my undertaking work on a *pro bono* basis.  I
charge business clients $250 per hour.  Attached hereto as Exhibit 1 is a true and correct
copy of Field Jerger's 2007 memo on billing procedure, provided to clients upon retainer.

8.      I served as the lead attorney in this case in preparing the notice letter and
complaint, and communicating with the client.   Although I have handled other Clean Air
Act matters, I had not previously handled a "deadline" case under the Clean Air Act.  I
was pleased that Robert Ukeiley agreed to co-counsel this matter with me because he has
an outstanding national reputation as an expert in the Clean Air Act, as fully set forth in
his declaration filed herewith.   Indeed, over the years I have frequently sought advice
from Mr. Ukeiley on a variety of Clean Air Act questions.


DECLARATION OF WILLIAM M. EDDIE -- 3

9.    I am requesting an hourly rate of $305 per billable hour based on the United States Attorney's Office Laffey Matrix, which can be accessed at http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_6.html.   A true and correct image of that web page, accessed June 5, 2007, is attached hereto as Exhibit 2.  Since I graduated in 1998, my work in 2006-2007 falls under the "8-10 years" row.  All of my billable hours in this case were expended in 2006 and 2007.

10.    I maintain contemporaneous records of the time spent in this case and have attached a true and copy of my hourly billing record as Exhibit 3 to this declaration.  I kept careful records throughout the course of this litigation, knowing that any compensation would be based on attorneys' fees recovered as part of settlement or judgment in this case.  However, my records do not capture some small tasks, such as the occasional brief email or phone call.   I have carefully inspected my time records and have exercised billing judgment to claim fees that were legitimate, necessary, and non-duplicative.  My records establish that I am entitled to a total of 29.1 hours.   However, to avoid wasting judicial resources arguing over trivial amounts, I am exercising my billing discretion and reducing my hours by approximately 15% to 24.7 hours.

11.    At a rate of $305 per billable hour, the lodestar for my work on this case comes to $7,533.50.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

6/18/07
Date

William M. Eddie

DECLARATION OF WILLIAM M. EDDIE — 4

# EXHIBIT 1

**FIELD JERGER LLP**
ATTORNEYS AT LAW
610 SW ALDER STREET, SUITE 910
PORTLAND, OR 97205
TELEPHONE: (503) 228-9115
FACSIMILE: (503) 225-0276
JOE@FIELDJERGER.COM

JOSEPH A. FIELD*
R. SCOTT JERGER**
MATTHEW A. ARBAUGH
WILLIAM M. EDDIE, of counsel***

* Also admitted in Washington
** Also admitted in Texas
*** Also admitted in Idaho

### 2007 MEMO RE: BILLING PROCEDURE

Each legal matter is assigned to a primary attorney. To take advantage of expertise within the office and to evenly distribute the workload, some of the work in your case may be assigned to another attorney in the office, or to law clerks or legal assistants. This allows us to provide services in the most efficient and economical manner.

We take into account many factors in billing for our services. The principal factor is usually our schedule of hourly rates. Most statements for services are simply the product of the hours worked multiplied by the hourly rates for the attorneys, law clerks, and legal assistants who did the work.

We almost exclusively bill hourly for our services.  For specific, discrete matters, by pre-arrangement in a written fee agreement only, we will bill on a contingency fee basis or a flat fee basis.  For all other matters, we bill hourly according to the schedule below.  Our hourly rates for attorneys and other members of the professional staff is based on years of experience, specialization in training and practice, and level of professional attainment.

| | Name | Function | 2007 Rate |
|---|---|---|---|
| 1. | Joseph A. Field, Esq. | Senior Partner | $320 |
| 2. | Scott Jerger, Esq. | Partner | $275 |
| 3. | Matt Arbaugh, Esq. | Associate | $235 |
| 4. | William M. Eddie | Of Counsel | $250 |
| 5. | Jonathan Smale | Litigation Paralegal | $125 |
| 6. | Matt Talley | Litigation & Bankruptcy Paralegal | $120 |
| 7. | Koren Dennis | Bankruptcy Paralegal | $120 |
| 8. | Pam Rojek | Legal Assistant | $100 |

These rates are reviewed and adjusted at least once each year.  Typically, we raise our rates each January and inform our clients of our increased rates.  Your monthly statement will indicate the amount of time spent and the charge for services based on the current rates. You will be billed for time spent on your behalf from initial consultation to closing of the matter.

Each month you will receive a billing statement that will indicate the amount of time spent and the charges for services based on the current rates. The monthly statement for some matters[1] where court approval is required for our fees or where we work on a contingency basis, will only

---

[1]  These cases are generally limited to bankruptcy estate work and Equal Access To Justice cases and do not include civil litigation matters where clients retain and pay us directly, and we litigate to recover attorney fees from an opposing party, pursuant to a statutory provision or a contractual right.

Field Jerger LLP: 2007 Memo on Billing Procedures
Page 2

be to keep you informed of the work we perform and the status of our charges.  In such cases, you will not pay for our services until the court approves them or unless we succeed in collecting on your behalf.  We try to ensure that our billings are accurate and understandable. If you have questions about your bill or our legal services, please contact us immediately.  We are happy to discuss any questions that you may have about this, whatsoever.

In instances, clients attempt to argue and negotiate over our work and bills after hiring us to provide legal representation.  In such instances, we reserve the right to charge our clients for our time.  We urge prospective clients not to hire us if they are not fully agreeable to our terms for legal representation.  We are selective in accepting new clients and endeavor to further our clients' interests as best we can.  In turn, we expect our clients to be fully forthcoming and open with us and to keep us informed about their questions and concerns as they arise, and not after the fact.

During our representation of you, please keep us advised of your current mailing and e mail addresses, work, home and mobile telephone numbers, and other relevant information so that we may stay in contact.  It is our goal to represent you in a professional manner. If you have any concern whatsoever regarding the progress of your matter, please contact us.

To finance our law firm and provide effective representation, we expect clients to pay us within 15 days of receipt of our bill.  We charge 9% interest, compounded monthly, on all payments more than 30 days overdue.  Payment plans are available upon prior written agreement.  Please let us know if you desire to enter into a written payment plan.

In the event our relationship breaks down, either of us has the right to terminate the relationship at any time. If there is any unresolved dispute over our representation or fees and it is necessary to initiate a claim, the prevailing party will be entitled to a reasonable attorney fee to be set by the court.

You should know that we endeavor to provide the best legal representation that we can for the best price possible.  Lacking crystal balls, we are unable to predict how opposing parties and courts will react in many situations.  Accordingly, it is difficult for us to accurately assess outcomes of cases in advance.  Likewise, it is difficult to assess attorney fees and costs in contested matters in advance.  We will keep you apprised of developments and anticipated outcomes and costs at each significant juncture in your case and we will provide you with the necessary legal advice so you can prudent business decisions on how to proceed.

We endeavor to work for you in the most efficient and cost-effective manner that we can.  You may see chunks of time entered as "no charge" on your monthly fee statement, which we periodically do to reflect general background work for which we chose not to bill.  Likewise, at times it is more efficient for us to work in groups than alone.  In such instances, we will bill for more than one person from our firm at times when each person is concurrently working on value-added tasks, such as legal analysis or strategic planning or document review and analysis or trial preparation.  When a group of us communicate with each other or with a client on an issue, we typically only charge for the time of the most senior person present.  We may have more than one of us present in such situations for our own efficiency, but we will not bill for more than one

Field Jerger LLP: 2007 Memo on Billing Procedures
Page 3

person's time unless the additional people are adding value for our client.  For major billable events such as court appearances, we will clear it with you prior to sending more than one attorney to court when we intend to bill for more than one attorney.  In large and complex commercial litigation matters, it can be most efficient for us to have two attorneys and or one paralegal in court.  In such scenarios, we often have one of us focused and prepared to argue on procedural and evidentiary issues and one of us serving as lead trial lawyer focused on substantive issues and factual issues and conducting the trial.

We will be happy to discuss any of this with you in further detail, should you desire.  Please feel free at all times to ask us any questions that you may have whatsoever.  Our legal representation is only as good as your understanding of the advice we provide to you. We appreciate your business and look forward to serving you.

# # #

# EXHIBIT 2



# UNITED STATES ATTORNEY'S OFFICE
## FOR THE DISTRICT OF COLUMBIA

555 4TH STREET, NW
WASHINGTON, DC 20530
(202) 514-7566

SEARCH

HOME

U.S. ATTORNEY

ABOUT US

DIVISIONS

COMMUNITY PROSECUTION

PROGRAMS FOR YOUTH

VICTIM WITNESS ASSISTANCE

PARTNERSHIPS

PRESS RELEASES

EMPLOYMENT

ESPAÑOL

CONTACT US

LINKS

SITE MAP

## LAFFEY MATRIX 2003-2007

| Experience | 03-04 | 04-05 | 05-06 | 06-07 |
|---|---|---|---|---|
| 20+ years | 380 | 390 | 405 | 425 |
| 11-19 years | 335 | 345 | 360 | 375 |
| 8-10 years | 270 | 280 | 290 | 305 |
| 4-7 years | 220 | 225 | 235 | 245 |
| 1-3 years | 180 | 185 | 195 | 205 |
| Paralegals & Law Clerks | 105 | 110 | 115 | 120 |

Years (Rate for June 1 - May 31, based on prior year's CPI-U)

**Explanatory Notes**

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412 (b) (Equal Access to Justice Act). The matrix does not apply in cases in which the hourly rate is limited by statute. See 28 U.S.C. § 2412(d).

2. This matrix is based on the hourly rates allowed by the District Court in *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds,* 746 F.2d 4 (D.C. Cir. 1984), *cert. denied,* 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The column headed "Experience" refers to the years following the attorney's graduation from law school. The various "brackets" are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). *See Laffey,* 572 F. Supp. at 371.

3. The hourly rates approved by the District Court in *Laffey* were for work done principally in 1981-82. The Matrix begins with those rates. *See Laffey,* 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4. Use of an updated *Laffey* Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel,* 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area. See *Covington v. District of Columbia,* 57 F.3d 1101, 1105 & n. 14, 1109 (D.C. Cir. 1995), *cert. denied,* 516 U.S. 1115 (1996). Lower federal courts in the District of Columbia have used this updated *Laffey* Matrix when determining whether fee awards under fee-shifting statutes are reasonable. *See, e.g., Blackman v. District of Columbia,* 59 F. Supp. 2d 37, 43 (D.D.C. 1999); *Jefferson v. Milvets System Technology, Inc.,* 986 F. Supp. 6, 11 (D.D.C. 1997); *Ralph Hoar & Associates v. Nat'l Highway Transportation Safety Admin.,* 985 F. Supp. 1, 9-10 n.3 (D.D.C. 1997); *Martini v. Fed. Nat'l Mtg Ass'n,* 977 F. Supp. 482, 485 n.2 (D.D.C. 1997); *Park v. Howard University,* 881 F. Supp. 653, 654 (D.D.C. 1995).

**Last Updated on
04/13/2007**

**Department of
Justice**   | **USAGov** | **USA** | **Privacy Policy** | **PSN** | **PSN Grants** | **www.regulations.gov** | **DOJ/Kids**

# EXHIBIT 3

**Hours Expended by William M. Eddie**
**MacClarence v. Johnson Title V Petition Matter**
**(through 6/18/07)**

| Date | Service | Hours |
|---|---|---|
| 9/21/2006 | draft email to Bill M. re: possible case on BP petition | 0.2 |
| 9/22/2006 | tc w/ Bill M. re: proposed litigation, background; draft email to Bill M. re: same | 0.7 |
| 9/26/2006 | draft notice letter; draft rep. agreement; draft email to B.MacClarence re: same and potential issues in litigation | 1.7 |
| 9/29/2006 | draft email to B.MacClarence re: proposed litigation, possible issues | 0.2 |
| 10/9/2006 | finalize notice letter and attn re send; draft email to B.MacClarence re: same | 0.7 |
| 11/14/2006 | legal research on citizen suit/nondiscretionary duty, jurisdictional issues; draft email to B. MacClarence re: same; send FOIA to EPA seeking date-stamp copy of petition | 1.2 |
| 12/13/2006 | tc w/ B.MacClarence re: status, timing, etc | 0.3 |
| 12/31/2006 | review file; draft complaint; draft email to B.MacClarence re: status | 1.8 |
| 1/2/2007 | draft and edit complaint; web research on dates, and BP permit; email corresp w/ B. MacClarence and R.Ukeiley re: draft complaint, filing, etc | 3.4 |
| 1/3/2007 | review and make final edits to complaint; email to R.Ukeiley and B.MacClarence re: same | 1.5 |
| 1/16/2007 | email re: key documents to R.Ukeiley | 0.3 |
| 3/21/2007 | tc w/ A.Baldwin re: extension for EPA; draft email to B.MacClarence re: same and status | 0.3 |
| 4/16/2007 | email w/ A.Baldwin re: status of petition response, fees claim, etc | 0.1 |
| 4/19/2007 | review email corresp. b/tw A.Baldwin and EPA; draft email to A.Baldwin re: same | 0.2 |
| 4/23/2007 | review EPA response to petition; misc email w/ A.Baldwin, B.MacClarence re: same and next steps | 0.3 |
| 5/30/2007 | review D.Gunter response on fees; draft response email | 0.2 |
| 6/4/2007 | begin outline and draft motion for fees | 0.5 |
| 6/5/2007 | draft motion for fees; conf w/ J.Field re: same; misc email w. R.Ukeiley re: same | 2.5 |
| 6/7/2007 | draft and motion for fees; legal research re: forum and appropriate fee | 6 |
| 6/8/2007 | complete final draft of fees motion and email same to R. Ukeiley; draft stipulation on fees and costs; prepare Eddie Declaration | 3.2 |
| 6/11/2007 | follow-up legal research on Davis case | 0.3 |

| | | |
|---|---|---|
| 6/18/2007 | review and edit draft fees motion from R. Ukeiley; review and edit Eddie Decl.; misc. emails to R.Ukeiley re: same | 3.5 |
| | **Total=** | **29.1** |
| | **Total less 15%=** | **24.7** |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BILL MacCLARENCE, P.E., )<br><br>　　　　Plaintiff, )<br><br>v. )<br><br>STEPHEN L. JOHNSON, in his official )<br>Capacity as Administrator, United States )<br>Environmental Protection Agency, )<br><br>　　　　Defendant. )<br> ) | Civ. No. 1:07-cv-00055(RWR) |

## DECLARATION OF ROBERT UKEILEY IN SUPPORT OF PLAINTIFF'S

## MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

I, Robert Ukeiley, do declare and if called as a witness would testify as follows:

　　　1.　　　I am an attorney licensed to practice before the courts of the States of

Maryland (Inactive status), Colorado (Inactive status), Georgia and Kentucky.  I am an

attorney of record in this case.  I am and have been an attorney of record for the Plaintiff

since the filing of this action.  I agreed to represent Plaintiff in this suit against the

Administrator of the U.S. Environmental Protection Agency for violations of the Clean

Air Act in regards to the Clean Air Act Title V petition filed by Bill MacClarence, P.E.  I

am submitting this declaration in support of Plaintiff's motion for reasonable attorneys'

fees and costs for work conducted in the District Court.   I have personal knowledge of

the facts set forth herein and am competent to testify as to them if called.

　　　2.　　　I am a member in good standing with the State Bars of Maryland (inactive

status), Colorado (inactive status), Georgia, and Kentucky.  I am admitted to practice in

1

this Court as well as the United States District Courts for the Districts of Maryland and

Colorado and the Northern, Middle and Southern Districts of Georgia and the Eastern

District of Kentucky. Although admitted to the Eastern District of Kentucky, I have never

filed or participated in a case in that court.  I have also been admitted *pro hac vice* to:

U.S. District Court for the Southern District of Ohio and U.S. District Court for the

Middle District of Pennsylvania.

I am also admitted to the Supreme Court of the United States as well as the

United States Courts of Appeals for the District of Columbia, the Second, the Tenth, the

Eleventh and the Ninth Circuits.  I am not admitted to the Sixth Circuit.

3.    In 1995 I graduated from George Washington University Law School,

with honors, in Washington, D.C.  During law school, I was a member of the

Environmental Lawyer, a law journal that focuses exclusively on environmental law

issues.  During law school I interned for the United States Department of Justice's

Environmental Crimes Section and participated in a clinic in which I worked part-time at

the Office of the Federal Public Defender's in Washington, D.C.  I also worked for two

years as the research assistant to Professor Jennifer Lyman.

4.    Upon graduation I began working on international environmental law

issues on behalf of conservation and animal welfare organizations as a law clerk at the

Law Offices of Leesteffy Jenkins in Washington, D.C.  Upon being admitted to the bar in

Maryland, I worked for one year for a non-profit public interest environmental law firm

called Greenlaw.  I then spent approximately three and a half years in solo practice or

with one partner in a private, public interest environmental law firm.  During this time, I

also did a limited amount of court-appointed criminal defense work and court-appointed

civil rights work. I then spent approximately three years working for another non-profit public interest environmental law firm called the Georgia Center for Law in the Public Interest. At the Georgia Center for Law in the Public Interest, I was the Director and Staff Attorney for the Georgia Clean Air Project.

5.    Since, October of 2003, I have been in my own private, public interest environmental law firm. Although I am located in Berea, Kentucky, I do not represent any Berea based clients and do not have any cases in courts in Berea or Madison County, Kentucky. In fact, I only have one case in a Kentucky court. I live and work in Berea, Kentucky for personal reasons.

6.    My practice is 100% public interest environmental law with a focus on Endangered Species Act and Clean Air Act litigation. I mainly represent clients at no charge in the hopes of recovering fees under the environmental statutes' fee shifting provisions. However, I do represent some clients while charging them a public interest rate which is substantially below my market rate. I will describe my billing practices in more detail below.

7.    My work in this Court began while I was in law school at George Washington University. In 1993, when I began working for Prof. Lyman, the Clinic that Prof. Lyman ran had two civil rights cases in this Court in front of Judge Jackson. These cases were left over from the previous Clinical Director and Prof. Lyman chose not to assign the cases to Clinic Students. Therefore, one of my primary tasks was assisting Prof. Lyman in litigating these cases. In addition, as mentioned above, I also worked part time in the Federal Public Defender's office in Washington, D.C as part of a law school clinic. While in private practice in Colorado, I represented numerous clients in several

3

cases in this Court. Representative cases included <u>San Juan Audubon Society v. Wildlife Services</u>, 00-cv-785(RMU)(Endangered Species Act case); <u>Fund for Animals v. Reno</u>, 99-cv-3316(EGS)(case challenging federal government's killing of black tailed prairie dogs); <u>Animal Protection Institute v. Wildlife Services</u>, 99-cv-3149(PLF).

8.     While working for the Georgia Center for Law in the Public Interest, I represented several clients in several cases in this Court. Representative cases included <u>Sierra Club v. Whitman</u>, 01-cv-1991(ESH); <u>NYPIRG v. Whitman</u>, 02-cv-337(ESH) consolidated with <u>Sierra Club v. Whitman</u>, 02-cv-338(ESH).

9.     Overall, I have successfully represented conservation and environmental non-profit organizations in approximately 20 "deadline" suits against the federal government.

10.     In this case I represent the Plaintiff in the role of local counsel. I also provide input as the more experienced lawyer representing the Plaintiff. The Plaintiff is not paying me for my time working on this case. Rather, I took this case based on an expectation of the likelihood of recovering fees under the Clean Air Act's fee shifting provision.

11.     I am requesting an hourly rate of $375 per billable hour based on the United States Attorney's Office Laffey Matrix which is available at http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_6.html. I graduated law school in the summer of 1995. This would put me in the 11-19 year row. Although some of my billable time was spent after June 1, 2007, I am willing to exercise my billing discretion and request that all of my time be compensated in the 2006-2007 column. Thus, the fair market rate for my billable time is $375 per hour.

4

12.    I maintain contemporaneous records of the time spent and expenses incurred on this case, and have set forth my billing record for myself as well as my associate, Aubrey Baldwin, my law clerk Liz Middleton and my Legal Assistant Beth Perkins, which details the time spent on this case, in Exhibit C.   In Exhibit C, entries that start with "RU" are for me, entries that start with "AB" are for Aubrey Baldwin, entries that start with "EP" are for Beth Perkins and entries that start with "Liz Middleton" are for Liz Middleton.  Throughout the course of this litigation, my staff and I kept careful time records, knowing from the initiation of the action that any compensation would be based on attorneys' fees recovered as part of the judgment or settlement.  However, my billing records actually underestimate the amount of time I have spent on this case because sometime I do not record short tasks like certain telephone calls and e-mails.  I have carefully inspected the time records in this case and have exercised billing judgment to claim hours that were legitimate, non-duplicative and necessary for this case.  My records establish that I am entitled to a total of 22.7 billable hours, Aubrey Baldwin is entitled to 6.9 billable hours, Beth Perkins is entitled to 0.8 billable hours and Liz Middleton is entitled to 0.5 billable hours.

13.    However, in order to avoid wasting judicial resources arguing over trivial amounts, I am exercising my billing discretion and reducing our billable hours requested by approximately 15% to 19.3 for myself, 5.9 for Aubrey Baldwin, 0.7 for Beth Perkins and 0.4 for Liz Middleton.

14.    At a rate of $375 per hour, after reducing my hours pursuant to my billing discretion, the lodestar for my work on this case comes to $7237.50.

15.    At $205 per hour, Ms. Baldwin's loadstar comes to $1209.50.

5

16.    At $120 per hour, Ms. Perkins' load star comes to $84 and Ms. Middleton's loadstar comes to $48.

17.    All together, I am requesting $8579 in costs of litigation, including reasonable attorneys' fees, for my law firm's work on this case. This is a reasonable amount considering the work we have done on this case and our experience.

18.    The United States Environmental Protection Agency (EPA) has a clear pattern and practice of not complying with the mandatory 60-day deadline in 42 U.S.C. § 7661d(b)(2) to respond to petitions for objections to Title V permits. As far as I am aware, EPA has claimed that they have responded to only one Title V petition without action by the petitioner. As far as I am aware, EPA has only responded to one Title V petition after a 60-day notice of intent to sue for violation of the mandatory duty in 42 U.S.C. § 7661d(b)(2) was sent. For every other Title V petition, EPA has either not responded or EPA only responded after the petitioner filed a complaint alleging a violation of EPA's mandatory duty in 42 U.S.C. § 7661d(b)(2).

19.    EPA typically responds or reaches an agreement to respond to the petition shortly before EPA's answer to the complaint in the mandatory duty citizens suit is due. Thus, EPA is in effect using litigation in which it knows that it has no defense as a means of gaining at least a 120 day extension to comply with its mandatory duty in 42 U.S.C. § 7661d(b)(2).

20. A reasonable rate for my time in this case is $375 per hour which is the rate provided for a lawyer with my level of experience in the U.S. Attorney Office for the District of Columbia's adjusted Laffey Matrix.[1]

21. Turning first to my firm's billing practices, my firm has a 100% environmental public interest for-profit practice. We only represent groups or individuals in enforcing federal environmental laws or state laws or regulations implementing federal environmental laws. Our practice only seeks injunctive or declaratory relief or civil penalties that go to the federal treasury rather than the plaintiffs.[2]

22. Our practice focuses predominately on the Clean Air Act with a lesser focus on the Endangered Species Act. Our practice predominately involves representing non-profit organizations, with the occasional individual named as a co-plaintiff although on rare occasions, the practice does involve representing public interest minded individuals.

23. Our practice involves charging "variable rates (both at and below the market, with the latter attributable to public-spirited goals" of maximizing environmental and public health protection. See Covington, 57 F.3d at 1108. We represent labor unions and individual members of labor unions regarding Clean Air Act permits issued by the Indiana Department of Environmental Management. In these matters, we charge a rate based on the Laffey Matrix although in the latest matters, we have charged $360 per hour, which reflects last year's Laffey Matrix rate. This is mainly inadvertent and I

---

[1] I am using my billing discretion to only request $375 per hour, even for work done after May 31, 2007 for which the U.S. Attorney's Office's revised Laffey Matrix would provide a higher rate.

[2] This is not to imply that monetary damages cannot serve the public interest.

anticipate that we will adjust our rates up to the current Laffey Matrix rate in our next bill.

24.    I charge my market rates to these clients because I believe charging this rate will not affect the degree of environmental protection, considering the relative resources available to the labor unions.

25.    Since incorporating my present law firm in December of 2003, we have worked on 14 of these matters. We has billed and collected over $66,000 at the Laffey Matrix rates for this work. These are not fee shifting matters so the client is paying our market rate with no ability to recoup these fees. This represents a substantial portion of the firm's total income because of the firm's public interest nature.

26.    The rate is based on the Laffey Matrix because in reality, my firm has a nationwide practice but the majority of its work is in D.C. courts. For example, the firm currently has 16 cases in active litigation. Of these 16 cases, nine are in this Court (the U.S. District Court for the District of Columbia), one is in the U.S. Court of Appeals for the District of Columbia Circuit, one is in the U.S. District Court for the Northern District of Georgia, one is in the U.S. District Court for the Southern District of Ohio, one is in front of an Administrative Law Judge on the Kentucky Environment and Public Protection Cabinet, one is in the Pennsylvania Supreme Court, one is in the United States Court of Appeals for the Eleventh Circuit, and one is in the Franklin County, Kentucky Circuit Court. However, in the Franklin County Circuit Court, there is a Kentucky lawyer who serves the role of local counsel in this case. We are involved in this last case, as well as the case in front of the Kentucky Administrative Law Judge because the cases involve Clean Air Act challenges to coal fired power plants, which is my specialty. I

represented the Sierra Club in these two cases. The Sierra Club is a nation-wide environmental organization based in San Francisco, California.

27.     I live in Kentucky simply for personal reasons. Thus, my practice is issue-based rather than place-based.

28.     My bar membership also reflects the nation wide scope of my practice. I am admitted to the Maryland, Colorado, Georgia and Kentucky state bars as well as to: U.S. Court of Appeals for the 10th Circuit, U.S. District Court for the District of Colorado, U.S. Court of Appeals for the D.C. Circuit, U.S. District Court for the District of Arizona, U.S. District Court for the District of Maryland, Supreme Court of the United States, U.S. District Court for the District of Columbia, U.S. Court of Appeals for the 11th Circuit, U.S. District Courts for the Southern, Middle and Northern Districts of Georgia, U.S. Court of Appeals for the 2d Circuit, U.S. District Court for the Eastern District of Kentucky, and the U.S. Court of Appeals for the 9th Circuit. Although admitted to the Eastern District of Kentucky, I have never filed or participated in a case in that court. I have also been admitted *pro hac vice* to: U.S. District Court for the Southern District of Ohio and U.S. District Court for the Middle District of Pennsylvania.

29.     My work in the D.C. District Court stretches back to my law school days. While attending George Washington University (GW) Law School in D.C., I worked for Professor Jennifer Lyman at the GW Law School Clinic from 1993 to 1995. One of my principle responsibilities as Prof. Lyman's research assistant was to help litigate two civil rights cases in the D.C. District Court which Prof. Lyman had inherited from the previous clinical professor.

30.     I also interned at the Federal Public Defender's Office in D.C. during law school, thus increasing my early experience with the D.C. District Court.[3]

31.     Over the course of my career, I have practiced far more cases in the D.C. District Court than in any other court.

32.     My law practice-related connection to Kentucky is very limited. For example, I have never had a client physically in his office in Kentucky. I do a considerable amount of my work outside of my office and outside Kentucky. I spend much of the summer months in Colorado and California.

33.     I have no cases in which I only represent Kentucky clients. I have never filed a case in federal court in Kentucky. For the one and only case I filed in state court in Kentucky, I had a co-counsel from Kentucky who serves as local counsel as well as co-counsel from California. I spend two to four weeks per year in Berkeley, California each year. I work during this entire time. As my personal situation allows, I will spend less and less time in Berea and more and more time doing my work while physically located in other locations such as Berkeley or Colorado.

34.     Besides for the labor unions, the rest of my firm's work is all on a *pro bono* basis. This *pro bono* work can be divided into three categories in terms of billing. The first category is *pro bono* work in which the firm receives no income at all and has no possibility of receiving any income. This includes work presenting clients as well as work consulting with other public interest lawyers on Clean Air Act work when the other public interest lawyers are seeking my opinions.

---

[3] During law school, I also interned for a semester with the U.S. Department of Justice's Environmental Crimes Section. While this office was in D.C., none of my work involved cases in D.C. courts.

35.    For example, during the week of June 11 – 15, 2007, I received an e-mail from a public interest lawyer working for a non-profit in D.C. (who is a former high ranking EPA official) seeking my opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Alaska seeking my opinion on a Clean Air Act question, an e-mail from a public interest lawyer working for a non-profit environmental law firm in Colorado seeking my opinion on a Clean Air Act question, and an e-mail from my former associate, who is now a public interest lawyer working for EarthJustice in D.C., seeking my opinion on a Clean Air Act question. This is a typical level for me of *pro bono* consultation with the public interest environmental bar on Clean Air Act issues.

36.    The second type of *pro bono* arrangement is where my firm does not charge the client anything for their time but hopes to recovery under a statutory fee shifting provision. This case is an example of this type of *pro bono* arraignment. Full recovery at market rates in these cases is critical for the financial viability of my public interest firm.

37.    The third type of *pro bono* is what public interest lawyers often refer to as "low bono" or a reduced rate case. My firm offers these reduced rates because, simply put, the work would not otherwise get done. I almost always strongly encourages and often facilitates the clients seeking free representation from a non-profit public interest law firm and only takes the case on a "low bono" basis when there is no representation available for free.

38.    We currently charges approximately $90 per hour for these low bono cases. This is not a market rate but rather a rate chosen to allow the public interest

11

environmental work to get done. My firm charges the same $90 for myself and for my first year associates in these cases. In addition, my firm almost always agrees to a cap on the total amount that we will charge for lawyer time in these low bono cases. These caps results in the effective rate often ending up in the $45 range because the firm ends up putting in almost as much unbillable time into the case as billable time.

39.    As to experience, reputation and skill as it relates to this case, I have spent my entire career working for non-profit public interest environmental law firms or for-profit public interest law firms. My practice has been almost all public interest environmental litigation although early on in his career, Ukeiley accepted some court appointed civil rights cases and served as a court appointed alternative criminal defense counsel. In addition, my initial position after law school was in the nature of a public interest, international environmental lobbyist, working on such treaties as the Inter-America Tropical Tuna Convention that governs the take of dolphins when fishing.

40.    Currently, I am one of the most experienced Title V litigators on the public interest side in the country.[4] In a Title V case I litigated, the 11th Circuit noted that: "Navigating through the intricacies of the Clean Air Act is no task for the uninformed or the short-winded." Sierra Club v. Johnson, 436 F.3d 1269 (11th Cir. 2006).

41.    Specifically, I have drafted comments, or supervised others writing comments on dozens of Title V permits. I have drafted or supervised others writing approximately 16 Title V petitions for objections. I haves litigated or am currently

---

[4] This may seek like quite a boast, considering that I only graduated law school in 1995. However, it is important to recall that Title V was only passed in 1990 and was not really implemented much before 1995 as the EPA delayed in promulgating the Title V regulations. In addition, it is not a very frequently litigated provision, in the relative sense.

litigating approximately ten Title V petition deadline suits similar to this case. This included one Title V petition deadline case in which I unsuccessfully tried to end EPA's pattern and practice of failing to comply with the mandatory 60-day deadline to respond to Title V petitions. See New York Public Interest Research Group v. Whitman, 214 F.Supp. 2d 1 (D.D.C. 2002). Had EPA's vigorous defense not succeeded in that case, the present case would have never existed and thus Plaintiff would not be seeking fees.

42.    I handled, from drafting the comments on the State-issued Title V permit all the way through outlining the reply brief in the appellate courts two substantive challenges to EPA's response to Title V petitions, Sierra Club v. Leavitt, 368 F.3d 1300 (11th Cir. 2004) and Sierra Club v. Johnson, 436 F.3d 1269 (11th Cir. 2006).[5] I am currently litigating Sierra Club v. Johnson, 06-10714 in the 11th Circuit which is another challenge to EPA's response to a Title V petition. I have also spent close to 100 days in trials of state issued Title V permits in front of Administrative Law Judges. I litigated one case against the State of Georgia for systemic delays in issuing Title V permits and one case against EPA for systemic problems with the Georgia Title V program as a whole.

43.    As to enforcement, I litigated for almost five years a federal Clean Air Act citizen suit that involved, in part, enforcing a Title V permit and resulted in several published opinions. See e.g. Sierra Club v. Georgia Power Company, 365 F.Supp.2d 1287 (N.D. Ga. 2004); Sierra Club v. Georgia Power Company, 365 F.Supp.2d 1297 (N.D. Ga. 2004) rev'd 443 F.3d 1346 (11th Cir. 2006). I have also been litigating since

---

[5] My name does not appear on the published decisions because he did not participate in the oral argument, as he left his employment with the Georgia Center for Law in the Public Interest prior to those oral arguments.

2004 an on-going Clean Air Act citizen suit involving, in part, enforcement of a Title V permit. See Sierra Club v. Dayton Power & Light, 04-905 (S.D. Ohio).

44.    EPA appears to recognize my Clean Air Act experience, skill and reputation for they have had me teach at least one of EPA's Clean Air Act Prevention of Significant Deterioration (PSD) and Non-Attainment New Source Review citizen trainings.[6] PSD and NA NSR are other parts of the Clean Air Act which are applicable requirements which must be included in Title V permits. See 40 CFR § 70.2 *Applicable requirements* (2).    EPA and EPA's contractor also asked me to edit EPA's citizen's guide to PSD and NA NSR.  Finally, EPA's Title V Performance Task Force chose me as one of the people to interview to gain a better understanding of how the Title V program was actually working.

45.    My other teaching experience includes teaching Continuing Legal Education (CLE) courses on the Clean Air Act and power plants at the Public Interest Environmental Law Conference in Eugene, Oregon for at least the past three years.  I have also been a presenter on Clean Air Act issues at several Sierra Club events in the last few years.

46.    Over the years, I have done more work for the Sierra Club than for any other client.  Last year, the Sierra Club named me as one of their "Legal Heroes."  See http://www.sierraclub.org/environmentallaw/heroes/robert_ukeiley.asp (last visited 6/16/07).

47.    $205 per hour is a reasonable rate for a first year associate in the Law Office of Robert Ukeiley, Aubrey Baldwin.  $120 per hour is a reasonable rate for Beth

---

[6] I may have taught at two of these trainings but I cannot recall for certain.

Perkins, a Legal Assistant/Paralegal and Liz Middleton, a law student Law Clerk in my

Office. The facts above with regard to my firm and I generally applies to Ms. Baldwin,

Ms. Perkins, and Ms. Middleton.

48.     Ms. Baldwin is a 2005 graduate of Northwestern School of Law of Lewis

and Clark College in Portland, Oregon. She received a certificate in environmental and

natural resources law. She also received the environmental alumni association's

Williamson Award which is awarded to one graduate per year who has demonstrated an

outstanding commitment to public interest environmental work. During law school, she

had a summer position at a non-profit public interest environmental law firm and during

the school year, she worked at the law school's environmental clinic.

49.     Ms. Baldwin is actually paid at the U.S. Attorney's Office adjusted Laffey

Matrix for Clean Air Act work for various labor unions or individual labor union

members, although as of May 2007, she was still billing at last year's rate ($195 per

hour). The rest of her work is done on a *pro bono* basis as described above with regard to

myself.

50.     My firm has never had occasion to charge market rates for Ms. Perkins'

time as all of her time is spent on a *pro bono* basis or on unbillable administrative tasks.

51.     My firm has also never had occasion to charge for Middleton's time

because she is a summer law clerk who started in May of this year. However, the

prevailing market rate according to the U.S. Attorney's Office, is $120 for law clerks.

52.     My firm represented Mr. MacClarence in this case on a *pro bono* basis,

with only the filing fee and other case costs covered by Mr. MacClarence, and payment

of fees contingent upon success.

53.    This Court has previously granted rates for my time based on the U.S. Attorney's Office's adjusted Laffey Matrix in <u>Center for Biological Diversity v. Norton</u>, 04-0156 (JDB)(DDC Jan. 26, 2005) at 5.  Attached as Exhibit B.

54.    EPA's record of compliance with the mandatory 60-day deadline in 42 U.S.C. § 7661d(b)(2) is abysmal.  In almost every single case, EPA does not respond to a Title V petition until after a citizen suit has been filed to force compliance with this mandatory duty.

55.    EPA does not review most proposed Title V permits forwarded to it by state permitting agencies.

56.    Attached as Exhibit A to this declaration is a firm by firm sampling of billing rates from the National Law Journal.  Eileen McDonough, an attorney with the U.S. Department of Justice's Environmental Defense Section provided this document to Aubrey Baldwin of my firm via a May 10, 2007 e-mail in connection with a fee dispute regarding another Title V petition deadline suit.  The highlighted entries were on the document when we received it.  I assume Ms. McDonough or someone else in her Section highlighted these entries.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


6/21/07                          _____
Date                             Robert Ukeiley

# EXHIBIT A

12/11/2006 Nat'l L.J. S2, (Col. 1)

The National Law Journal
Vol. 29, No. 15
Copyright 2006 by American Lawyer Media, ALM, LLC

December 11, 2006

In Focus: Billing

FIRM-BY-FIRM SAMPLING OF **BILLING RATES** NATIONWIDE

The National Law Journal asked the respondents to its 2006 **survey** of the nation's 250 largest law firms to provide a range of hourly **billing rates** for partners and associates. The firms that supplied this information--including some firms that are not in the NLJ 250--are listed below in alphabetical order. We also asked firms to provide average and median **billing rates**; several firms provided this information as well. The number after a firm's name indicates the total number of attorneys at the firm. The city listed below the name of a firm is the location of its principal or largest office.

ABC
Adams and Reese (301)
(New Orleans)
Partners $215-$470 (average $287) (median $270)
Associates $165-$250 (average $191) (median $190)
Firmwide (average $267) (median $235)
Andrews Kurth (404)
(Houston)
Partners $380-$745
Associates $180-$400
Arent Fox (288)
(Washington)
Partners $375-$610
Associates $215-$405
Armstrong Teasdale (266)
(St. Louis)
Partners $255-$425 (average $347) (median $342)
Associates $135-$275 (average $227) (median $225)
Firmwide (average $278) (median $270)
Baker, Donelson, Bearman, Caldwell & Berkowitz (454)
(Memphis, Tenn.)
Partners $220-$500
Associates $135-$310
Ballard Spahr Andrews & Ingersoll (486)
(Philadelphia)
Partners $320-$680
Associates $190-$390
Barnes & Thornburg (421)
(Indianapolis)
Partners $245-$455 (average $333)
Associates $170-$285 (average $212)
Firmwide (average $260)
Bass, Berry & Sims (214)
(Nashville, Tenn.)
Partners $230-$495
Associates $150-$245
Bell, Boyd & Lloyd (256)
(Chicago)
Partners $310-$690
Associates $215-$300

Best Best & Krieger (196)
(Riverside, Calif.)
Partners $275-$450 (median $375)
Associates $145-$335 (average $186) (median $225)
Firmwide (average $211) (median $240)
Blackwell Sanders Peper Martin (310)
(Kansas City, Mo.)
Partners $265-$395 (average $302) (median $320)
Associates $155-$255 (average $200) (median $195)
Firmwide (average $241) (median $270)
Blank Rome (460)
(Philadelphia)
Partners $325-$735
Associates $220-$495
Bond, Schoeneck & King (160)
(Syracuse, N.Y.)
Partners $200-$425 (average $252)(median $285)
Associates $140-$305 (average $177) (median $175)
Firmwide (average $231) (median $275)
Briggs and Morgan (165)
(Minneapolis)
Partners $250-475 (average $357) (median $360)
Associates $185-$275 (average $214) (median $205)
Firmwide (average $319) (median $325)
Brinks Hofer Gilson & Lione (151)
(Chicago)
Partners $275-$625 (average $465)(median $460)
Associates $200-$390 (average $280) (median$285)
Firmwide (average $381) (median $390)
Broad and Cassell (173)
(Orlando, Fla.)
Partners $235-$425 (average $339)(median $325)
Associates $155-$295 (average $217) (median $210)
Firmwide (average $272) (median $265)
Brown Raysman Millstein Felder & Steiner (246)
(New York)
Partners $450-$740 (average $495) (median $550)
Associates $250-$400 (average $325) (median $370)
Firmwide (average $385) (median $465)
Brown Rudnick Berlack Israels (208)
(Boston)
Partners $505-$870
Associates $275-$495
Bryan Cave (763)
(St. Louis)
Partners $315-$665 (average $476)
Associates $150-$460 (average $289)
Firmwide (average $331)
Buchalter Nemer (139)
(Los Angeles)
Partners $325-$550 (average $432) (median $445)
Associates $215-$450 (average $256) (median $275)
Firmwide (average $344) (median $350)
Buchanan Ingersoll & Rooney (573)
(Pittsburgh)
Partners $210-$750
Associates $140-$375
Buckingham, Doolittle & Burroughs (171)

(Akron, Ohio)
Partners $230-$425 (average $296) (median $295)
Associates $185-$290 (average $220) (median $215)
Firmwide (average $240) (median $240)
Bullivant Houser Bailey (191)
(Portland, Ore.)
Partners $225-$450 (average $288)(median $285)
Associates $175-$300 (average $204) (median $195)
Firmwide (average $254) (median $230)
Burr & Forman (188)
(Birmingham, Ala.)
Partners $250-$400 (average $324) (median $325)
Associates $160-$315 (average $218) (median $215)
Firmwide (average $234) (median $245)
Butzel Long (217)
(Detroit)
Partners $220-$490 (average $290)
Associates $165-$270 (average $202)
Firmwide (average $243)
Carlton Fields (242)
(Tampa, Fla.)
Partners $285-$545 (average $383) (median $390)
Associates $190-$375 (average $233) (median $233)
Firmwide (average $293) (median $290)
Cooley Godward Kronish (541)
(Palo Alto, Calif.)
Partners $425-$795 (average $539)
Associates $240-$585 (average $371)
Firmwide (average $431)
Covington & Burling (645)
(Washington)
Partners $470-$760
Associates $210-$490
Cozen O'Connor (501)
(Philadelphia)
Partners $185-$750 (average $325) (median $310)
Associates $130-$495 (average $218) (median $210)
Firmwide (average $245) (median $235)
Curtis, Mallet-Prevost, Colt & Mosle (196)
(New York)
Partners $570-$700 (average $625) (median $652)
Associates $250-$510 (average $390) (median $380)
Firmwide (average $508) (median $465)
DEF
Davis Wright Tremaine (405)
(Seattle)
Partners $285-$655 (average $399.34)
(median $395)
Associates $140-$370 (average $251.72) (median $250)
Firmwide (average $350.51) (median $350)
Day, Berry & Howard (251)
(Hartford, Conn.)
Partners $335-$620
Associates $200-$440
Dickinson Wright (226)
(Detroit)
Partners $250-$520
Associates $155-$260

Dickstein Shapiro (360)
(Washington)
Partners $400-$700 (average $530) (median $535)
Associates $210-$415 (average $315) (median $340)
Firmwide (average $300) (median $300)
Dinsmore & Shohl (306)
(Cincinnati)
Partners $220-$440 (average $323) (median $320)
Associates $145-$240 (average $185) (median $180)
Firmwide (average $252) (median $233)
Dorsey & Whitney (600)
(Minneapolis)
Partners $300-$650 (average $431)
Associates $180-$430 (average $273)
Firmwide (average $360)
Duane Morris (581)
(Philadelphia)
Partners $300-$705 (average $436) (median $435)
Associates $200-$425 (average $283) (median $279)
Firmwide (average $379) (median $374)
Dykema Gossett (341)
(Detroit)
Partners $235-$580
Associates $170-$330
Eckert Seamans Cherin & Mellott (227)
(Pittsburgh)
Partners $195-$525 (average $343) (median $340)
Associates $145-$250 (average $190) (median $190)
Firmwide (average $287)
Edwards Angell Palmer & Dodge (516)
(Boston)
Partners $300-$675
Associates $150-$440
Firmwide (average $466)
Epstein Becker & Green (378)
(New York)
Partners $300-$650 (average $468.29)
Associates $160-$395 (average $270.32) (median $260)
Firmwide (average $346.34)
Fenwick & West (234)
(Mountain View, Calif.)
Partners $465-$750 (average $570) (median $575)
Associates $245-$475 (average $355) (median $395)
Firmwide (average $430) (median $450)
Fisher & Phillips (187)
(Atlanta)
Partners $300-$440
Associates $175-$320
Foley & Lardner (981)
(Milwaukee)
Partners (average $517) (median $513)
Associates (average $356) (median $360)
Firmwide $240-$810 (average $446) (median $440)
Ford & Harrison (171)
(Atlanta)
Partners $290-$445
Associates $210-$370
Fowler White Boggs Banker (227)

(Tampa, Fla.)
Partners $280-$500 (average $350) (median $335)
Associates $190-$275 (average $225) (median $220)
Firmwide (average $315) (median $315)
Fox Rothschild (381)
(Philadelphia)
Partners $265-$525
Associates $195-$335
Fredrikson & Byron (209) (Minneapolis)
Partners $250-$525
Associates $175-$275
Frost Brown Todd (376) (Cincinnati)
Partners $205-$435 (average $287) (median $280)
Associates $140-$280 (average $181) (median $180)
Firmwide (average $220) (median $240)
GHI
Gardere Wynne Sewell (282)
(Dallas)
Partners $345-$665 (average $446) (median $450)
Associates $205-$400 (average $273) (median $270)
Firmwide (average $381) (median $345)
Gardner Carton & Douglas (195)
(Chicago)
Partners $275-$650 (average $433) (median $425)
Associates $200-$350 (average $278) (median $250)
Firmwide (average $376) (median $395)
Gordon & Rees (309)
(San Francisco)
Partners $325-$450
Associates $200-$325
GrayRobinson (190)
(Orlando, Fla.)
Partners $200-$500
Associates $140-$200
Greenberg Traurig (1,667) (Miami)
Partners $270-$850 (average $460) (median $475)
Associates $160-$450 (average $289) (median $290)
Firmwide (average $381) (median $395)
Harris Beach (182) (Rochester, N.Y.)
Partners $250-$425
Associates $140-$275
Hiscock & Barclay (160) (Syracuse, N.Y.)
Partners $220-$375 (average $269) (median $250)
Associates $160-$250 (average $183) (median $180)
Firmwide (average $243) (median $250)
Hodgson Russ (229)
(Buffalo, N.Y.)
Partners $220-$625 (average $310) (median $315)
Associates $150-$300 (average $201) (median $195)
Firmwide (average $272) (median $275)
Hogan & Hartson (1,043)
(Washington)
Partners $300-$775 (average $550) (median $550)
Associates $150-$485 (average $350) (median $350)
Firmwide (average $450) (median $475)
Holland & Knight (1,102)
(New York)
Partners $250-$710 (average $396) (median $390)

Associates $165-$400 (average $232) (median $225)
Firmwide (average $344) (median $350)
Holme Roberts & Owen (206)
(Denver)
Partners $260-$575
Associates $185-$390
Howard Rice Nemerovski Canady, Falk & Rabkin (102)
(San Francisco)
Partners $440-$750
Associates $250-$420
Husch & Eppenberger (331)
(St. Louis)
Partners $200-$410 (average $285.35) (median $275)
Associates $130-$250 (average $170.27) (median $165)
Firmwide (average $235.18) (median $230)
Ice Miller (249)
(Indianapolis)
Partners $275-$425 (average $352) (median $345)
Associates $185-$310 (average $218) (median $220)
Firmwide (average $293) (median $220)
JKL
Jackson Lewis (375)
(White Plains, N.Y.)
Partners $290-$525
Associates $190-$395
Jenkens & Gilchrist (268) (Dallas)
Partners $340-$610 (average $420)
Associates $220-$390 (average $270)
Jenner & Block (467) (Chicago)
Partners $410-$800 (average $513) (median $495)
Associates $230-$395 (average $292) (median $285)
Jones, Walker, Waechter, Poitevent, Carrère & Denègre (208) (New Orleans)
Partners $200-$425
Associates $135-$210
Kelley Drye & Warren (375) (New York)
Partners $375-$750
Associates $230-$475
Knobbe Martens, Olson & Bear (193)
(Irvine, Calif.)
Partners $335-$625
Associates $205-$340
Lane Powell (167) (Seattle)
Partners $275-$490 (average $328) (median $330)
Associates $205-$295 (average $236) (median $237)
Firmwide (average $273) (median $270)
Lathrop & Gage (264)
(Kansas City, Mo.)
Partners $220-$375
Associates $140-$220
Lewis, Rice & Fingersh (165)
(St. Louis)
Partners $225-$410
Associates $135-$290
Littler Mendelson (527)
(San Francisco)
Partners $205-$605
Associates $160-$400
Locke Liddell & Sapp (370)

(Houston)
Partners $360-$850 (average $471) (median $460)
Associates $190-$390 (average $244) (median $260)
Firmwide (average $373) (median $410)
Loeb & Loeb (240)
(Los Angeles)
Partners $425-$825
Associates $215-$475
Lord, Bissell & Brook (328)
(Chicago)
Partners $305-$665 (average $448) (median $450)
Associates $200-$375 (average $272) (median $260)
Firmwide (average $368) (median $355)
Lowenstein Sandler (250)
(Roseland, N.J.)
Partners $335-$645
Associates $185-$375
Luce, Forward, Hamilton & Scripps (178)
(San Diego)
Partners $320-$725 (average $440)
Associates $205-$425 (average $265)
MNO
Manatt, Phelps & Phillips (299)
(Los Angeles)
Partners $460-$750 (average $574) (median $560)
Associates $250-$460 (average $359) (median $360)
Firmwide (average $490) (median $520)
Marshall, Dennehey, Warner, Coleman & Goggin (368)
(Philadelphia)
Partners $145-$350
Associates $130-$275
McAndrews, Held & Malloy (89)
(Chicago)
Partners $260-$600
Associates $195-$240
McCarter & English (407)
(Newark, N.J.)
Partners $310-$625
Associates $190-$330
McElroy, Deutsch, Mulvaney & Carpenter (230)
(Morristown, N.J.)
Partners $225-$450 (average $250) (median $235)
Associates $135-$295 (average $180) (median $165)
Firmwide (average $195) (median $200)
McKee Nelson (172)
(Washington)
Partners $595-$875 (average $725) (median $720)
Associates $355-$575 (average $436) (median $430)
McKenna Long & Aldridge (400)
(Atlanta)
Partners $330-$700
Associates $175-$410
Michael Best & Friedrich (255)
(Milwaukee)
Partners $245-$530 (average $341) (median $335)
Associates $175-$325 (average $225) (median $225)
Firmwide (average $305) (median $300)
Miles & Stockbridge (210)

(Baltimore)
Partners $300-$475
Associates $200-$375
Miller, Canfield, Paddock and Stone (355)
(Detroit)
Partners $245-$540 (average $398) (median $405)
Associates $150-$300 (average $215) (median $210)
Firmwide (average $305) (median $310)
Miller & Martin (175)
(Chattanooga, Tenn.)
Partners $210-$430 (average $313) (median $320)
Associates $140-$280 (average $185) (median $180)
Firmwide (average $281) (median $300)
Montgomery, McCracken, Walker & Rhoads (133)
(Philadelphia)
Partners $300-$550 (average $402)
Associates $195-$315 (average $248)
Firmwide (average $338)
Morgan, Lewis & Bockius (1,315)
(Philadelphia)
Partners $375-$800
Associates $200-$550
Morris, Manning & Martin (174)
(Atlanta)
Partners $320-$530 (average $412) (median $403)
Associates $170-$390 (average $246) (median $290)
Firmwide (average $322) (median $350)
Neal, Gerber & Eisenberg (170)
(Chicago)
Partners $350-$695 (average $463) (median $450)
Associates $230-$400 (average $300) (median $300)
Firmwide (average $413) (median $400)
Nelson Mullins Riley & Scarborough (379)
(Columbia, S.C.)
Partners $215-$600
Associates $175-$300
Ogletree, Deakins, Nash, Smoak & Stewart (331)
(Greenville, S.C.)
Partners $250-$550 (average $328)
Associates $165-$330 (average $234)
Firmwide (average $289)
PQR
Patton Boggs (431)
(Washington)
Partners $295-$850 (average $480) (median $570)
Associates $170-$405 (average $305) (median $325)
Firmwide (average $403) (median $510)
Pepper Hamilton (445)
(Philadelphia)
Partners $305-$695
Associates $190-$385
Perkins Coie (576)
(Seattle)
Partners $175-$650
Associates $130-$480
Phelps Dunbar (260)
(New Orleans)
Partners $175-$400 (average $224) (median $323)

Associates $125-$190 (average $165) (median $158)
Firmwide (average $191) (median $263)
Phillips Lytle (173)
(Buffalo, N.Y.)
Partners $225-$410 (average $298) (median $290)
Associates $130-$285 (average $197) (median $185)
Firmwide (average $251) (median $260)
Pitney Hardin (170)
(Florham Park, N.J.)
Partners $365-$625 (average $447) (median $445)
Associates $210-$360 (average $269) (median $270)
Firmwide (average $353) (median $355)
Polsinelli Shalton Welte Suelthaus (276)
(Kansas City, Mo.)
Partners $225-$575
Associates $160-$225
Powell Goldstein (282)
(Atlanta)
Partners $300-$575 (average $435.10) (median $435)
Associates $150-$360 (average $254.44) (median $245)
Firmwide (average $357.88) (median $360)
Preston Gates & Ellis (419)
(Seattle)
Partners $190-$635 (average $399.41) (median $395)
Associates $100-$385 (average $236.39) (median $230)
Firmwide (average $329) (median $325)
Quarles & Brady (442)
(Milwaukee)
Partners $240-$550 (average $360) (median $310)
Associates $185-$310 (average $228) (median $225)
Firmwide (average $306) (median $285)
Reed Smith (1,038)
(Pittsburgh)
Partners $305-$725 (average $492) (median $480)
Associates $170-$630 (average $309) (median $295)
Firmwide (average $322) (median $310)
Robinson & Cole (217)
(Hartford, Conn.)
Partners $270-$550 (average $400) (median $400)
Associates $175-$400 (average $235) (median $240)
Firmwide (average $316) (median $320)
Roetzel & Andress (208)
(Akron, Ohio)
Partners $200-$425 (average $255) (median $275)
Associates $150-$275 (average $180) (median $190)
Firmwide (average $225) (median $235)
Rutan & Tucker (140)
(Costa Mesa, Calif.)
Partners $310-$515
Associates $200-$335
STU
Saul Ewing (238)
(Philadelphia)
Partners $290-$700 (average $402) (median $395)
Associates $185-$440 (average $258) (median $235)
Firmwide (average $336) (median $345)
Schnader Harrison Segal & Lewis (174)
(Philadelphia)

Partners $305-$650
Associates $155-$295
Schulte Roth & Zabel (449)
(New York)
Partners $580-$800 (average $672) (median $675)
Associates $225-$550 (average $410) (median $393)
Seward & Kissell (142)
(New York)
Partners $460-$695 (average $589) (median $590)
Associates $190-$460 (average $300) (median $290)
Sheppard, Mullin, Richter & Hampton (424)
(Los Angeles)
Partners $415-$650 (average $504)(median $495)
Associates 250-410 (average $342) (median $330)
Firmwide (average $419) (median $420)
Shook, Hardy & Bacon (476)
(Kansas City, Mo.)
Partners $240-$720 (average $374) (median $358)
Associates $190-$405 (average $238) (median $225)
Firmwide (average $291) (median $250)
Shughart Thomson & Kilroy (170)
(Kansas City, Mo.)
Partners $210-$410
Associates $165-$225
Shumaker, Loop & Kendrick (162)
(Toledo, Ohio)
Partners $185-$450 (average $290) (median $290)
Associates $165-$345 (average $205) (median $200)
Firmwide (average $270)
Sills Cummis Epstein & Gross (180)
(Newark, N.J.)
Partners $300-$595
Associates $185-$360
Smith, Gambrell & Russell (191)
(Atlanta)
Partners $275-$550
Associates $150-$330
Snell & Wilmer (448)
(Phoenix)
Partners $265-$625 (average $356)
Associates $160-$360 (average $205)
Firmwide (average $277)
Steptoe & Johnson PLLC (168)
(Clarksburg, W.Va.)
Partners $220-$300
Associates $165-220
Stinson Morrison Hecker (313)
(Kansas City, Mo.)
Partners $230-$495 (average $310) (median $310)
Associates $155-$230 (average $185) (median $180)
Firmwide (average $274) (median $280)
Stoel Rives (345)
(Portland, Ore.)
Partners $270-$475 (average $361) (median $360)
Associates $160-$400 (average $242) (median $230)
Firmwide (average $309) (median $320)
Strasburger & Price (182)
(Dallas)

Partners $295-$525
Associates $195-$310
Sullivan & Worcester (192)
(Boston)
Partners $400-$650
Associates $220-$450
Sutherland Asbill & Brennan (477)
(Atlanta)
Partners $350-$845 (average $477) (median $475)
Associates $200-$530 (average $265) (median $265)
Firmwide (average $373) (median $375)
Thacher Proffitt & Wood (313)
(New York)
Partners $525-$775 (average $603) (median $575)
Associates $265-$485 (average $372) (median $355)
Firmwide (average $430) (median $420)
Thompson Coburn (279)
(St. Louis)
Partners $255-$525 (average $346) (median $345)
Associates $150-$345 (average $208) (median $215)
Firmwide (average $252) (median $255)
Thompson & Knight (388)
(Dallas)
Partners $330-$695 (average $428) (median $450)
Associates $190-$330 (average $265) (median $260)
Firmwide (average $360) (median $380)
Ulmer & Berne (179)
(Cleveland)
Partners $230-$430 (average $303)
Associates $150-$280 (average $202)
Firmwide (average $250)
VW
Vedder, Price, Kaufman & Kammholz (233)
(Chicago)
Partners $315-$560 (average $406) (median $400)
Associates $190-$410 (average $258) (median $255)
Firmwide (average $339) (median $340)
Whiteford, Taylor & Preston (155)
(Baltimore)
Partners $330-$480 (average $401) (median $400)
Associates $295-$345 (average $278) (median $295)
Firmwide (average $364) (median $370)
Wiggin & Dana (144)
(New Haven, Conn.)
Partners $276-$510
Associates $185-$355
Wiley Rein & Fielding (268)
(Washington)
Partners $375-$700 (average $475) (median $465)
Associates $225-$395 (average $300) (median $300)
Firmwide (average $395) (median $395)
Williams Mullen (244)
(Richmond, Va.)
Partners $225-$550
Associates $160-$290
Winstead Sechrest & Minick (286)
(Dallas)
Partners $325-$595

Associates $195-$370
Winston & Strawn (879)
(Chicago)
Partners $365-$800 (average $513.17) (median $510)
Associates $190-$605 (average $328.57) (median $325)
Firmwide (average $357.65) (median $360)
Womble Carlyle Sandridge & Rice (520)
(Winston-Salem, N.C.)
Partners $250-$550 (average $370) (median $400)
Associates $180-$340 (average $254) (median $250)
Firmwide (average $350) (median $350)
Wyatt, Tarrant & Combs (224)
(Louisville, Ky.)
Partners $225-$400 (average $322) (median $320)
Associates $170-$275 (average $207) (median $190)
Firmwide (average $285) (median $290)
12/11/2006 NLJ S2, (Col. 1)
END OF DOCUMENT

Copyright (C) 2007 The New York Law Pub. Co.

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**CENTER FOR BIOLOGICAL**
**DIVERSITY, et al.,**

      **Plaintiffs,**

      **v.**

**GALE NORTON,**

      **Defendant.**

**Civil Action No.  04-0156 (JDB)**

---

## ORDER

Following the successful outcome of this "deadline" case under Section 4 of the Endangered Species Act ("ESA"), and an unsuccessful attempt to resolve the issue of fees and costs, plaintiffs have moved for an award of $38,108.88 in attorneys' fees and costs.[1]  Defendant has opposed the motion, arguing instead that the fee award should be reduced by over 75% to $8,726.22, which defendant maintains is at the "high end" of fee awards in Section 4 cases.  The Court agrees that some reduction is appropriate, but rejects the bulk of defendant's objections.

Plaintiffs prevailed on their claims that defendant violated the ESA by failing to designate critical habitat for the Hine's emerald dragonfly, and obtained a settlement agreement requiring defendant to designate critical habitat for the species by a date certain.  The agreement provided plaintiffs with what effectively was full substantive relief, recognized that plaintiffs are prevailing parties and that defendant would pay plaintiffs reasonable attorneys' fees and costs, but reserved

---

[1]  That total includes plaintiffs' "fees on fees":  that is, fees and costs that are attributable to plaintiffs' work on the motion for fees and costs.

-1-

the amount of fees and cost.  When discussions did not resolve that issue, plaintiffs' motion followed.

Plaintiffs are entitled to reasonable attorneys' fees and costs under the settlement agreement and the law.  See 16 U.S.C. § 1540(g)(4); Ruckelshaus v. Sierra Club, 463 U.S. 680, 689, 694 (1983).  The parties agree that the appropriate fee award is to be determined under the lodestar method of multiplying the number of hours reasonably expended by a reasonable hourly rate.  See Blanchard v. Bergeron, 489 U.S. 87, 94 (1989); Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense, 675 F.2d 1319, 1323 (D.C. Cir. 1982); see also Role Models America, Inc. v. Brownlee, 353 F.3d 962, 968 (D.C. Cir. 2004); Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516, 1522-24 (D.C. Cir. 1988).  Fee applicants bear the burden of presenting well-documented claims justifying the reasonableness of the hourly rate claimed and the hours worked. See Role Models, 353 F.3d at 970; Covington v. District of Columbia, 57 F.3d 1101, 1105-10 (D.C. Cir. 1995); Concerned Veterans, 675 F.2d at 1323-27.  Courts must review fee applications carefully to ensure that taxpayers only reimburse prevailing parties for reasonable fees and expenses that contributed to the results achieved, see Role Models, 353 F.3d at 970; Am. Petroleum Inst. v. EPA, 72 F.3d 907, 912 (D.C. Cir. 1996), and that appropriate deductions are made for excessive or duplicative hours, see, e.g., In re Mullins, 84 F.3d 459, 467-68 (D.C. Cir. 1996); In re North, 59 F.3d 184, 189 (D.C. Cir. 1995).

The Court notes that plaintiffs have exercised billing judgment by reducing their fee application by 10% and by not seeking fees for certain tasks (e.g., the first 60-day notice). Nonetheless, the Court concludes under the legal standards referenced above that additional modest deductions are appropriate to delete certain hours, to reduce the hourly rate for one

-2-

attorney, and to increase the across-the-board percentage reduction. The explanation, in brief, of the Court's conclusions is as follows:

1.    Although the parties appear to disagree on the number of hours expended on preparing plaintiffs' second 60-day notice, the Court concludes that the duplication of effort in the two 60-day notices, and particularly the fact that plaintiffs probably should have realized the need for a more expanded second notice before the complaint and first notice were filed, warrants a deduction of five hours of Mr. Plater's time.

2.    The compilation of regional listing data on other species through 16 hours of attorney time was, the Court concludes, of only marginal relevance to this action, and six hours of Mr. Plater's time on that effort will be deducted.

3.    Such inefficiencies, together with several other objections raised by defendant, warrant an additional 5% across-the-board reduction in the fee award (on top of the 10% reduction reflecting plaintiffs' sound billing judgment). The Court's concerns include the relative simplicity and early settlement of this case; the time (12.4 hours) spent reviewing what was identified by plaintiffs' counsel as the administrative record but was apparently materials received

under FOIA; the inefficiency caused by having two separate
out-of-town counsel (although the Court is not convinced
that any greater or more specific reduction is appropriate for
this fact); and the generality (and hence lack of required
specificity) of several billing entries (although, again, no
further reduction is warranted).  An across-the-board
percentage reduction is justified when a court determines
that the total claim is unreasonable.  See Democratic Cent.
Comm. v. Washington Metro. Area Transit Comm'n, 12
F.3d 269, 272 (D.C. Cir. 1994).

4.      On the other hand, the Court concludes that no deduction on
the fee application is warranted for defendant's objections
based on the travel to and research at several dragonfly
habitats, which was a reasonable expenditure of attorney
time; the time spent drafting the complaint, which also was
reasonable; or the time spent working on the case after
defendant's offer of judgment, which appears to be largely
reasonable settlement and fee litigation time that is not
precluded by an offer of judgment pursuant to Fed.R.Civ.P.
68.[2]

---

[2]  Defendant has made no effort to differentiate between fees that might be precluded and
those that clearly are not.

5.      Finally, defendants object to the $220 hourly rate claimed by
Mr. Plater.  The Court concludes that the objection is well-
taken, and that the materials submitted by plaintiffs only
support a $180 hourly rate for Mr. Plater under the 2003
Laffey matrix[3] because he had three (rather than four) years
experience during the relevant period.  The Court declines
plaintiffs' undeveloped last-minute requests to "adjust all
hours upward based on the consumer price index" and then
"consider further upward adjustments based on Mr. Plater's
expertise and the cost of living in San Francisco, CA."  Pls.'
Reply Mem. at 15.  The hourly rate for Mr. Plater will be
adjusted to $180 before the across-the-board 5% reduction
discussed above.

Accordingly, based on the entire record, the Court will award $28,850.63 in attorney's fees
and costs.  That award consists of 132.8 hours[4] for Mr. Plater at $180/hour ($23,904.00) and 18.3
hours[5] for Mr. Ukeiley at $270/hour ($4941.00), reduced by 5% to $27,402.75, plus costs of
$1447.88.

---

[3]  Both parties have relied on the Laffey matrix to determine the reasonable hourly rate.

[4]  This figure includes 131.2 hours for work performed prior to the reply to the fee petition,
plus 12.6 hours for work on the reply (both of these numbers already incorporate the initial 10%
reduction), minus the 11.0 hours excluded by this Order.

[5]  This figure includes 16.7 hours for work performed prior to the reply to the fee petition,
plus 1.6 hours for work on the reply (both of these numbers already incorporate the initial 10%
deduction).

SO ORDERED.


                                          _____/s/ John D. Bates_____
                                                     JOHN D. BATES
                                      United States District Judge


Dated: ___January 26, 2005___

Copies to:

Robert Steven Ukeiley
507 Center Street
Berea, KY 40403
(859) 986-5402
Fax : (859) 986-2695
Email: rukeiley@igc.org

Brent Plater
Center for Biological Diversity
370 Grand Avenue
Suite 5
Oakland, CA 94610
(510) 663-0616
Fax : (510) 663-0272
E-mail: bplater@biologicaldiversity.org

Coby Howell
AARP Foundation Litigation
601 E Street, NW
Washington, DC 20049
(202) 305-0201
Fax : (202) 305-0275
Email: coby.howell@usdoj.gov

# EXHIBIT C

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/21/2007 | 213 |

| BILL TO |
|---------|
|         |

| DUE DATE | PROJECT |
|----------|---------|
| 7/21/2007 | BP |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 1/2/2007 | 0.3 | E-mail | RU: e-mail w/Bill Eddie re: co-counseling and strategy. | 375.00 | 112.50 |
| 1/3/2007 | 0.8 | Legal Writing | RU: edit complaint.  E-mail to Bill E. and Bill MacClarence re: same. | 375.00 | 300.00 |
|  | 0.2 | E-mail | RU: e-mails w/client and co-counsel re: complaint. | 375.00 | 75.00 |
|  | 0.4 | Legal Writing | RU: edit complaint.  E-mail to Bill E. and Bill M. re: same. | 375.00 | 150.00 |
| 1/4/2007 | 0.6 | E-mail | RU: e-mails re: complaint.  Edit same sent next draft to Bill and Bill. | 375.00 | 225.00 |
|  | 0.2 | E-mail | RU: e-mails w/Bill and Bill re: complaint. | 375.00 | 75.00 |
| 1/9/2007 | 0.3 | Legal Writing | RU: final edit of complaint.  Meeting w/Beth Perkins, Legal Assistant, re: filing same | 375.00 | 112.50 |
|  | 0.1 | E-mail | RU: e-mail w/clients re: meeting. | 375.00 | 37.50 |
|  | 0.6 | Paralegal | EP: complaint filing prep | 120.00 | 72.00 |
| 1/12/2007 | 0.8 | E-mail | RU: e-mail w/Bill re: petition and EPA acknowledgement ltr.  E-mail w/Bill M. re: schedule. Reviewed filings.  E-mail w/clients and Bill re: next step.  Research Judge Roberts forTitle V decisions. | 375.00 | 300.00 |
| 1/16/2007 | 0.1 | Doc Review | RU:  complaint, gave to Beth to serve. | 375.00 | 37.50 |
|  | 0.4 | E-mail | RU: e-mails w/Bill M. and Bill E. re: next steps. Forward complaint to Sara Laumann of EPA Office of General Counsel. | 375.00 | 150.00 |
| 1/30/2007 | 0.1 | T/C & Meeting | RU: Meeting w/Beth re: filing executed summons. | 375.00 | 37.50 |
|  | 0.1 | E-mail | RU: E-mail w/Bill E. re: status of case. | 375.00 | 37.50 |
|  | 0.1 | Doc Review | RU: review pro hac motion, dec & proposed order. File same.  Send same to Bill M., Bill E., and EPA OGC Sara Laumann. | 375.00 | 37.50 |

| | **Total** |
|--|--|
| | |

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/21/2007 | 213 |

| BILL TO |
|---------|
|         |

| DUE DATE | PROJECT |
|----------|---------|
| 7/21/2007 | BP |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 2/1/2007 | 0.1 | Doc Review | RU: reviewed executed summons.  Forward to Bills, and Sara Laumann.  T/C from Jacqueline Frances, clerk's office, re: filing green cards with summons online. | 375.00 | 37.50 |
|  | 0.2 | Paralegal | EP: Filing summons online. | 120.00 | 24.00 |
| 2/12/2007 | 0.1 | T/C & Meeting | RU: meeting w/Aubrey Baldwin re: division of labor. | 375.00 | 37.50 |
| 2/13/2007 | 0.1 | E-mail | AB: e-mail to Apple Chapman, EPA Office of General Counsel  re: counsel assigned to case. | 205.00 | 20.50 |
|  | 0.2 | T/C & Meeting | AB: D.C. District Clerk re: filing return of service. | 205.00 | 41.00 |
|  | 0.3 | T/C & Meeting | AB: David Orlin and Sara Laumann re: settlement. | 205.00 | 61.50 |
| 2/20/2007 | 0.1 | T/C & Meeting | RU: meeting w/Aubrey re: status of case. | 375.00 | 37.50 |
|  | 0.1 | T/C & Meeting | AB: meeting w/Robert re: status of case. | 205.00 | 20.50 |
| 3/21/2007 | 0.2 | E-mail | RU: e-mail from David Gunter, DOJ re: 30 day extension.  Meeting w/Aubrey re: what to do. E-mail to David saying Aubrey will respond. | 375.00 | 75.00 |
|  | 0.1 | T/C & Meeting | AB: call to Kristi Smith re: petition response. | 205.00 | 20.50 |
|  | 0.1 | T/C & Meeting | AB: mtg w/Robert re: e-mail from DOJ requesting 30 day extension. | 205.00 | 20.50 |
|  | 0.1 | T/C & Meeting | RU: mtg w/Aubrey re: e-mail from DOJ requesting 30 day extension. | 375.00 | 37.50 |
|  | 0.1 | T/C & Meeting | AB: call to Bill Eddie re: request and he will contact Bill MacClarence re: same. | 205.00 | 20.50 |
|  | 0.2 | E-mail | AB: e-mail to David Gunter re: extension. | 205.00 | 41.00 |
| 3/26/2007 | 0.2 | Doc Review | AB: EPA motion for extension of time to answer. | 205.00 | 41.00 |
|  | 0.1 | Doc Review | RU: review motion for extension. | 375.00 | 37.50 |
| 4/3/2007 | 0.1 | Doc Review | AB: Minute Order granting extension of time for EPA to answer. | 205.00 | 20.50 |
| 4/5/2007 | 0.1 | Doc Review | RU: Review order granting extension. | 375.00 | 37.50 |
| 4/13/2007 | 0.2 | E-mail | AB: to David Gunter, DOJ, cc Bill Eddie co-counsel re EPA's progress on petition. | 205.00 | 41.00 |

# Total

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/21/2007 | 213 |

| BILL TO |
|---------|
| |

| DUE DATE | PROJECT |
|----------|---------|
| 7/21/2007 | BP |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 4/16/2007 | 0.2 | E-mail | AB: RU and Bill Eddie re: strategy. | 205.00 | 41.00 |
| | 0.2 | E-mail | AB: David Gunter, DOJ, re Settlement | 205.00 | 41.00 |
| 4/17/2007 | 0.1 | Doc Review | RU: review e-mails from David and Aubrey re: resolution of case | 375.00 | 37.50 |
| 4/19/2007 | 0.3 | Doc Review | AB: 2nd motion for extension to answer. | 205.00 | 61.50 |
| | 0.3 | E-mail | AB: RU and Bill Eddie re same and fee rates. | 205.00 | 61.50 |
| 4/23/2007 | 1.1 | Doc Review | AB: response to petition, 2nd motion for extension of time. | 205.00 | 225.50 |
| | 0.1 | E-mail | AB: David Gunter re: consent to file motion for extension of time. | 205.00 | 20.50 |
| | 0.6 | Doc Review | RU: review order denying petition and motion for extension | 375.00 | 225.00 |
| 4/27/2007 | 0.4 | E-mail | AB: Bill Eddie and RU re: fee settlement offer. Prepare fee settlement offer. | 205.00 | 82.00 |
| 4/30/2007 | 0.7 | E-mail | AB: Bill Eddie and RU re: stipulation, fee settlement. E-mail DOJ re: fees settlement and Stipulated Dismissal. | 205.00 | 143.50 |
| | 0.2 | Legal Writing | RU: Edit fee settlement offer and stipulation of dismissal of merits. | 375.00 | 75.00 |
| 5/8/2007 | 0.2 | Doc Review | AB: Review E-mail from David Gunter re: need for more information re: fee settlement. | 205.00 | 41.00 |
| 5/10/2007 | 0.5 | E-mail | AB: Bill Eddie re: fee settlement, Dave Gunter re: fee settlement. | 205.00 | 102.50 |
| 5/11/2007 | 0.1 | E-mail | AB: Dave Gunter re: rates. | 205.00 | 20.50 |
| 5/14/2007 | 0.2 | Doc Review | AB: Publication of decision in Fed Reg. Forward to Bill Eddie. | 205.00 | 41.00 |
| | 0.1 | Doc Review | RU: Reviewed Aubrey's e-mail to Bill Eddie re: Fed. Reg. notice. | 375.00 | 37.50 |
| 5/15/2007 | 0.3 | E-mail | AB: Bill Eddie and RU re: fee settlement. | 205.00 | 61.50 |
| 5/17/2007 | 0.1 | T/C & Meeting | AB: Dave Gunter re: fee counteroffer and stipulated partial dismissal. | 205.00 | 20.50 |

| | **Total** | |
|--|-----------|--|

Robert Ukeiley, P.S.C

# Invoice

435R Chestnut Street
Suite 1
Berea, KY 40403

| DATE | INVOICE # |
|------|-----------|
| 6/21/2007 | 213 |

| BILL TO |
|---------|
|  |

| DUE DATE | PROJECT |
|----------|---------|
| 7/21/2007 | BP |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 5/18/2007 | 0.5 | Doc Review | AB: Counteroffer from DOJ.  Meeting w/RU re: same. | 205.00 | 102.50 |
| 5/21/2007 | 0.2 | Doc Review | RU: Review David's proposed stip of dismissal.  E-mail to David re: same. | 375.00 | 75.00 |
|  | 0.4 | Doc Review | RU: Review David's ltr re: counter offer on fees.  Research same. | 375.00 | 150.00 |
|  | 0.2 | T/C & Meeting | RU: t/c w/Bill Eddie re: how to proceed. | 375.00 | 75.00 |
|  | 0.2 | Doc Review | RU: Review new stip of dismissal. Review Rule 54 and Local Rule 54.  E-mail to David saying ok to sign and file. | 375.00 | 75.00 |
| 5/22/2007 | 0.6 | Legal Writing | RU: draft settlement counter offer. | 375.00 | 225.00 |
| 5/23/2007 | 1.1 | Legal Writing | RU: draft and e-mail counter offer to David Gunter. | 375.00 | 412.50 |
|  | 0.3 | E-mail | RU: e-mail to Bill w/e-mails from fee offer exchanges in other cases. | 375.00 | 112.50 |
|  | 0.1 | E-mail | RU: e-mail from Bill re: DOJ laffey matrix. | 375.00 | 37.50 |
| 6/4/2007 | 0.7 | Doc Review | RU: review Amicus brief in 2nd circuit fee case. | 375.00 | 262.50 |
|  | 0.1 | Legal Writing | RU: draft outline of fee offer. | 375.00 | 37.50 |
| 6/5/2007 | 0.1 | E-mail | RU: e-mail to Bill re: stipulation of dismissal. | 375.00 | 37.50 |
| 6/7/2007 | 0.1 | E-mail | RU: e-mail from Bill re: timing of filing motion for fees. | 375.00 | 37.50 |
|  | 0.3 | E-mail | RU: e-mail to Bill Eddie re: merits of EPA's order. | 375.00 | 112.50 |
| 6/13/2007 | 0.2 | Doc Review | RU: reviewed stipulation re: fees.  E-mail to Bill Eddie re: same. | 375.00 | 75.00 |
|  | 0.1 | T/C & Meeting | RU: t/c w/Bill re: same.  Edit same to include costs.  E-mail to David. | 375.00 | 37.50 |
|  | 0.8 | Legal Writing | RU: edit motion for fees. | 375.00 | 300.00 |
| 6/14/2007 | 0.5 | Legal Writing | RU: edit and draft motion for fees. | 375.00 | 187.50 |
| 6/15/2007 | 3.9 | Legal Writing | RU: edit and draft motion for fees. | 375.00 | 1,462.50 |
| 6/16/2007 | 3.2 | Legal Writing | RU: edit and draft motion for fees.  E-mail to Bill re: same. | 375.00 | 1,200.00 |

| | **Total** |
|--|--|

Robert Ukeiley, P.S.C

435R Chestnut Street
Suite 1
Berea, KY 40403

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/21/2007 | 213 |

| BILL TO |
|---------|
|         |

| DUE DATE | PROJECT |
|----------|---------|
| 7/21/2007 | BP |

| DATE | TIME | ACTION | DESCRIPTION | RATE | AMOUNT |
|------|------|--------|-------------|------|--------|
| 6/18/2007 | 0.5 | Paralegal | Liz Middleton: find District Court and 3rd Circuit Case re: DC rates. | 120.00 | 60.00 |
| 6/20/2007 | 1.4 | Doc Review | RU: review Interfaith decision and edit same into motion for fees. | 375.00 | 525.00 |
| | 0.1 | Doc Review | RU: review Aubrey E-mail re: experience and edit same into motion for fees. | 375.00 | 37.50 |
| | 0.3 | Legal Writing | RU: edit motion for fees. | 375.00 | 112.50 |
| 6/21/2007 | 0.3 | Legal Writing | RU: draft and edit declaration. | 375.00 | 112.50 |
| | 1.2 | Legal Writing | RU: edit motion for fees. | 375.00 | 450.00 |

| **Total** | $10,083.00 |
|-----------|------------|

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BILL MacCLARENCE, P.E.   )
             )  Civil No. 1:07-cv-55 (RWR)
v.             )
             )
STEPHEN L. JOHNSON, in his official )
Capacity as Administrator, United States )
Environmental Protection Agency,  )
             )
Defendant.       )
_____)

## [proposed] ORDER

   Before the Court is Plaintiff's Motion for Award of Attorneys' Fees and Costs ("Motion"). The Motion has been fully briefed. The Court finds and concludes that this is another Title V petition deadline case in which Defendant, the Administrator of the United States Environmental Protection Agency, has violated the Congressional mandated 60-day deadline for responding to petitions seeking objections to Clean Air Act Title V permits. This mandatory duty is found in 42 U.S.C. § 7661d(b)(2). EPA has a disturbing propensity to violate this mandatory duty until the Court's jurisdiction is invoked pursuant to the Clean Air Act's so called citizen suit provision. See 42 U.S.C. § 7604(a)(2). See also, e.g. New York Public Interest Research Group v. Whitman, 214 F. Supp. 2d 1, 2 (D.D.C. 2002); Center for Biological Diversity v. Johnson, 06-CV-1350 (GK); Rocky Mountain Clean Air Action v. Johnson, 1:06-cv-01419-RMC; Idaho Conservation League v. Johnson, 1:07-cv-00396-RBW; Rocky Mountain Clean Air Action v. Johnson, 1:06-cv-01992-JR.

In this case, Plaintiff sought and obtained an order granting or denying his petition for an objection to the Clean Air Act Title V permit for the BP oil gathering facility ("Gathering Center #1") located near Prudhoe Bay, Alaska which Defendant had failed to provide in violation of 42 U.S.C. § 7661d(b)(2). Thus, having obtained all the relief he was seeking, Plaintiff is entitled to costs of litigation, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 7604(d).

In determining the reasonable attorneys' fees, the Court employees the loadstar method of multiply the reasonable hourly rate for attorneys and professional staff times the reasonable billable hours expended. As to the reasonable rate, the Court finds that the rates provided in the U.S. Attorney's Office's revised Laffey Matrix are appropriate. Davis County Solid Waste Mgmt. v. EPA, 169 F.3d 755, 758 (D.C. Cir. 1999) has no applicability to the present case because Plaintiff's counsel in this case bill at or reasonably close to the Laffey Matrix rates for matters that they have not chosen to provide *pro bono* representation. Furthermore, because Plaintiff's counsel are representing Plaintiff in this case on a *pro bono* basis, there is no chance that the Plaintiff will receive an extreme windfall from the difference between the price he contracted to pay his attorneys and the amount he is awarded by this Court.

As to the reasonable number of hours, Plaintiff's requested hours, especially in light of their reduction of 15% as an exercise of billing discretion, are reasonable. The Court notes that the total of less than $17,000 is very reasonable for the work done in this case.

[proposed] ORDER -- 2

Therefore it is hereby ORDERED that Plaintiff's Motion is GRANTED.  It is

hereby FURTHER ORDERED that Defendant shall promptly pay Plaintiff $16,498 plus

[cost of reply briefing] for the costs of litigation, including attorneys' fees.

Dated: _____

_____
RICHARD W. ROBERTS
United States District Judge

[proposed] ORDER -- 3