## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BILL MACCLARENCE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 1:07-cv-00055(RWR) |
| STEPHEN L. JOHNSON,<br>Administrator, United States Environmental<br>Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460 | ) | |
| Defendant | ) | |

### EPA'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES

On January 10, 2007, Plaintiff Bill MacClarence filed the Complaint in this matter

pursuant to section 304(a)(2) of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a)(2).  In that

Complaint, MacClarence alleged that Defendant, Stephen L. Johnson, Administrator of the

United States Environmental Protection Agency ("EPA") failed to perform a duty mandated by

CAA section 505(b)(2), 42 § U.S.C. § 7661d, to grant or deny, within 60 days, MacClarence's

petition requesting that EPA object to CAA permits issued by the appropriate state agencies to

the BP Gathering Center #1, an oil facility in Prudhoe Bay, Alaska.  This claim was mooted on

April 20, 2007, when EPA issued its final decision on MacClarence's petition.

Plaintiff has requested an award of $16,498 in attorneys' fees.[1]  While this amount is not

large, it is excessive because it is based on District of Columbia hourly rates instead of rates from

---

[1]    Because this same counsel has filed numerous similar claims against EPA, *see infra* at
10,18, the value to the public fisc of resolving the appropriate rate goes beyond the amount at
issue here.

counsels' home legal markets. The only issue for the Court to resolve here is whether several

litigators who are based in markets that are less expensive than the District of Columbia are

entitled to the market rates for counsel within the District of Columbia market.[2]  Under the

principles established by the D.C. Circuit in *Davis County Solid Waste Management v. EPA*, 169

F.3d 755, 758 (D.C. Cir. 1999), the fee award here should be based on market rates for counsel in

the Eastern District of Kentucky, within which Mr. Ukeiley is located, and the District of

Oregon, where Mr. Eddie is located, rather than District of Columbia.  The fees sought by

MacClarence are not necessary to benefit the public's interest in enforcing the Clean Air Act by

ensuring the availability of counsel.  Instead, they would largely benefit Mr. Ukeiley, who stands

to reap a windfall in this case and in the many other Title V cases that he has filed in the District

of Columbia, and which he handles from his Kentucky office.

## I.    FEE SHIFTING UNDER THE CAA REQUIRES PLAINTIFF TO ESTABLISH THE "RELEVANT COMMUNITY" ON WHICH FEES ARE BASED.

CAA section 304(d), 42 U.S.C. § 7604(d) provides that "[t]he court, in issuing any final

order in any action brought pursuant to subsection (a) of this section, may award costs of

litigation (including reasonable attorney and expert witness fees) to any party, whenever the court

determines such award is appropriate."  In *Pennsylvania v. Delaware Valley Citizen's Council*

---

[2]    As noted in MacClarence's Motion for Award of Attorneys' Fees and Costs ("Motion"), EPA does not dispute that costs of litigation should be awarded in the amount of $385.60. *See* Motion at 2.  However, EPA does not agree that MacClarence is a "prevailing party," *see* Mot. at 8, within the meaning of *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1982). In *Sierra Club v. EPA*, 322 F.3d 718 (D.C. Cir. 2003), the court indicated that "prevailing party" refers to a party in whose favor judgment is rendered – which is not the case here. *Id.* at 723. The court further noted that the CAA permits an award of fees "whenever . . . appropriate," including a situation in which a plaintiffs' action has brought about a voluntary change in the defendant's conduct. *Id.* at 725 (citing 42 U.S.C. § 7604(d)).  EPA therefore does not contest that under the reasoning of *Sierra Club v. EPA*, an award of fees is "appropriate" in this case.

*for Clean Air*, 483 U.S. 711, 714 (1987) (*"Delaware Valley II"*), the Court recognized that the size of an award under this provision is to be determined by the district courts in the exercise of their equitable discretion. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("It remains for the district court to determine what fee is 'reasonable.'").

The Court has also explained that Congress' goal in enacting section 304(d) was the same as the goal of 28 U.S.C. § 1988, which authorizes fee awards in civil rights cases: to promote citizen enforcement of important federal policies. *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air*, 478 U.S. 546, 559 (1986) (*"Delaware Valley I"*). The Court cautioned, however, that

> [t]hese statutes were not designed as a form of economic relief to improve the
> financial lot of attorneys, nor were they intended to replicate exactly the fee an
> attorney could earn through a private fee arrangement with his client. Instead, the
> aim of such statutes was to enable private parties to obtain legal help in seeking
> redress for injuries resulting from the actual or threatened violation of specific
> federal laws. If plaintiffs . . . find it possible to engage a lawyer based on the
> statutory assurance that he will be paid a 'reasonable' fee, the purpose behind the
> fee-shifting statute has been satisfied.

*Id.* at 565 (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).

In *Blum*, the Court determined that fees should be based on the "prevailing market rates in the relevant community." 465 U.S. at 895. The Court has adopted this same standard to determine rates in CAA cases. *Delaware Valley I*, 478 U.S. at 559. The Supreme Court, however, has not defined "the relevant community." *See Davis County*, 169 F.3d at 757-58 (noting that § 7607(f) of the Clean Air Act does not specify whether to use "the situs of the law firm or the situs of the legal proceeding" to set hourly rates).

In most cases, federal courts typically set attorney fee awards according to the market rates in the litigation forum, a practice informally known as the "forum rule." *Donnell v. United*

3

*States*, 682 F.2d 240, 251–52 (D.C. Cir. 1982).  However, there are several exceptions to the forum rule that demonstrate the courts' assumption that cases will ordinarily be handled by attorneys from within the forum.  For example, courts may award attorney fees set according to a lawyer's "home town" rates rather than the forum's rates: (1) where a party demonstrates a need for an out-of-town attorney's special expertise, or (2) where a party shows that local counsel were unwilling to take the case.  *Id.* at 252.[3]

Another exception to the forum rule may apply even where a party does not seek home town rates under the *Donnell* criteria.  In *Davis County*, the D.C. Circuit held that the forum rule does not apply where "the bulk of the work is done outside the jurisdiction of the court *and* where there is a *very significant* difference in compensation favoring D.C."  169 F.3d at 758 (emphasis in original).  The court determined that the forum rule produces just awards for most attorneys, "except those few who practice in far less expensive legal markets and perform the bulk of their work on the case at home in those markets."  *Id.* at 759.  Thus, the presumption in favor of awarding forum rates does not apply when "the work done [in the forum] is minimal and the difference in rates is substantial."  *Id.*

The court concluded that this exception to the forum rule would prevent windfalls, while still ensuring that the plaintiffs would be able to find appropriate counsel.  *Id.* at 760.  The court ruled that petitioner would not be awarded fees based on D.C. rates for Utah counsel, whose market billing rates were substantially lower, where the work was largely performed in Utah.  *See*

---

[3]     MacClarence does not demonstrate in his Motion that the legal issues in this case required the special expertise that Mr. Ukeiley claims, nor does he allege that counsel in D.C. were unavailable or insufficiently skilled to take his case.  *See infra* pp. 15-17.  To the extent these factors may justify a higher fee award under the *Donnell* criteria, therefore, they are not relevant here.

4

*also Palmer v. Rice*, 2005 WL 1662130, at *20 (D.D.C. July 11, 2005) (Massachusetts counsel

would be limited to home forum billing rate of $140, rather than claimed D.C. rate of $370,

where most of her time on case was spent in Massachusetts).

In a case that is factually similar to this one, the Court of Federal Claims has adopted and

applied the rule of *Davis County.* In *Avera v. Secretary of HHS,* 75 Fed. Cl. 400, 405 (Fed. Cl.

2007), a party sought *Laffey* Matrix rates for counsel from Wyoming, who was alleged to have

special expertise in the Vaccine Act.[4] Like the present case, out-of-town counsel had

participated in no hearings in D.C. and had not traveled to D.C. for any purpose. Despite the

special expertise that counsel claimed, the Court refused to apply the forum rule:

> The applicable market rate is the community where the attorney maintains an
> office and practices law. As the Court emphasized during oral argument, a
> Cheyenne, Wyoming attorney would receive a significant windfall if compensated
> at Washington, D.C. hourly rates. In Cheyenne, a practicing lawyer does not have
> anywhere near the operational costs, such as office space, clerical support, and
> associate lawyers, as in Washington, D.C. The Court cannot justify the payment
> of $574 to $598 per hour to a Cheyenne lawyer who normally charges $200 per
> hour.

*Id.* at 405. This result is even more strongly compelled in the present case: Whereas in *Avera,*

plaintiffs alleged that no counsel in D.C. had the necessary expertise in the Vaccine Act,

MacClarence cannot and does not claim that the necessary Clean Air Act expertise is unavailable

in D.C.

Finally, judicial review of any fee claim against the government must be consistent with

the principles summarized in *American Petroleum Institute v. EPA,* 72 F.3d 907 (D.C. Cir.

---

[4]    The *Laffey* Matrix is a schedule of rates originally derived by this Court and then updated
by the United States Attorney for the District of Columbia. The Matrix has been accepted as
evidence of D.C. market rates. *Covington v. District of Columbia,* 57 F.3d 1101, 1105 (D.C. Cir.
1995).

1996). "[I]in evaluating the reasonableness of all the elements of billing, items of expense or

fees that may not be 'unreasonable between a first class law firm and a solvent client, are not

[always] supported by indicia of reasonableness sufficient to allow us justly to tax the same

against the United States.'"). *Id.* at 912 (internal citations omitted). Thus, the Court must

carefully scrutinize such claims for reasonableness.

## II.    IN THIS CASE, THE DISTRICT OF COLUMBIA IS NOT THE "RELEVANT COMMUNITY" FOR PURPOSES OF ATTORNEYS' FEES

### A.    MacClarence Has Not Met His Burden To Show That D.C. Rates Apply Despite the Rule of *Davis County*.

MacClarence claims that he is entitled to recover fees based on District of Columbia

market rates as set forth in the *Laffey* Matrix. He claims $375 per hour for Mr. Ukeiley, who is

based in Berea, Kentucky; $305 per hour for Mr. Eddie, who is based in Portland, Oregon; $205

for Aubrey Baldwin, a first-year lawyer based in Berea, Kentucky, and $120 for a paralegal and a

law clerk. MacClarence bears the burden of showing that these rates are appropriate and

consistent with D.C. Circuit case law, including the rule of *Davis County. See Hensley,* 461 U.S.

at 437 ("the fee applicant bears the burden of establishing entitlement to an award and

documenting the appropriate hours expended and hourly rates."); *In re North (Bush Fee*

*Application),* 59 F.3d 184, 189 (D.C. Cir. 1995) (petitioners bear the burden of demonstrating the

reasonableness of each element of their fee request); *Adolph Coors Co. v. Truck Ins. Exchange,*

383 F. Supp. 2d 93, 95 (D.D.C. 2005) ("While the [c]ourt is empowered to exercise its discretion

in determining the fee amount, the plaintiff still bears the burden of establishing all elements of

the requested fee award, including entitlement to an award, documentation of appropriate hours,

and justifications of the reasonableness of the billing.") (citation omitted).

Although the *Laffey* Matrix may be used as evidence of the market rate in the District of

6

Columbia, MacClarence has not met his burden to show that the District of Columbia is the relevant market in this case. For counsel from outside D.C., rates determined with respect to the D.C. market are only appropriate where *Davis County* does not apply. MacClarence concedes that no work in this case was done in the District of Columbia. Under *Davis County*, therefore, in order to establish entitlement to District of Columbia rates, MacClarence should have introduced evidence to show that the rates in the Eastern District of Kentucky and in the District of Oregon are not substantially lower than District of Columbia rates. With respect to the Kentucky market, Plaintiffs made no effort to meet this burden, despite clear evidence that the prevailing rates in the Eastern District of Kentucky are substantially lower. *See infra* p. 11-12. With respect to Mr. Eddie's home town market rate in Portland, Oregon, MacClarence has actually introduced evidence demonstrating that Mr. Eddie is seeking from the public fisc a rate that is more than 20% greater than the rate he commands on the market. *See* Mot. at 23. These are precisely the circumstances in which the D.C. Circuit has held that counsel's home town rates are appropriate.

None of the arguments that MacClarence uses to attempt to overcome *Davis County* establish that any location other than counsel's home market is the relevant "market" for determining fees. The Court must disregard MacClarence's irrelevant arguments based on the use of District of Columbia market rates in past cases, because those cases did not present the same question that is raised by MacClarence's fee petition. For example, in *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995), the Court allowed the use of the *Laffey* Matrix as evidence of the market rate, for D.C. attorneys in litigation against the District of Columbia, in complex federal litigation. In other cases that MacClarence cites, the use of the *Laffey* Matrix was not disputed at all, and those cases therefore provide no authority to support

7

MacClarence's argument. This point is particularly important with respect to Mr. Ukeiley's claim that this Court has previously awarded him attorneys' fees based on the *Laffey* Matrix. *See* Motion at 23 n.8; Ukeiley Dec. ¶ 53 (citing *Center for Biological Diversity v. Norton*, Slip op., Case No. 04-0156-JDB (D.D.C. Jan. 26, 2005). The opinion in that case clearly states that both parties relied on the *Laffey* Matrix. *Id.* at 5 n.4. Accordingly, the Court did not have to decide whether the use of *Laffey* rates was appropriate.[5]

MacClarence also argues that because Mr. Ukeiley has charged *Laffey* Matrix rates to some clients, he is entitled to charge those rates here. Fee awards are based on the reasonable hourly rate of an attorney in the relevant market. The D.C. Circuit has held that "the actual rate that applicant's counsel can command in the market is itself highly relevant proof of the prevailing community rate." *National Ass'n of Concerned Veterans*, 675 F.2d at 1326. *See Sierra Club v. EPA*, 769 F.2d 796, 808 (D.C. Cir. 1985) ("where firm receiving fees is a for-profit partnership with a long history of billings to private customers, the reasonable hourly rate is the firm's historical billing rate"). In his Motion, however, MacClarence argues that Mr. Ukeiley's rate does *not* reflect a reasonable rate prevailing in his home market. Also, the rate used to demonstrate prevailing market should not reflect "what the client paid in a single fortunate case, but what on average counsel has in fact received." *National Ass'n of Concerned Veterans*, 675 F.2d at 1326. MacClarence's citation of Mr. Ukeiley's labor union work is more

---

[5]   MacClarence also asserts that the U.S. Department of Justice has a longstanding approach of settling cases in which Mr. Ukeiley is counsel based on the *Laffey* Matrix rate. *See* Motion at 4. This assertion is inappropriate, as it contravenes both the requests for confidentiality in such settlement negotiations and the protections of Federal Rule of Evidence 408. Furthermore, it is substantively incorrect, as the settlements in question identify only the lump sum to be paid and do not address the hourly rate on which that sum was based. Nor did any settlement to which MacClarence may refer effect a waiver of any factual or legal argument in this or any other case.

likely to reflect the "single fortunate case" than Mr. Ukeiley's true market rate.[9]  In any event, MacClarence attempts to use rates actually paid by clients only where it would *increase* the size of the fee award:  Although Mr. Eddie's established billing rate for private clients is $250, MacClarence seeks $305 per hour for his services in this case.

Furthermore, the courts will not award a fee based on an attorney's billing rate unless that rate is reasonable and consistent with the market rate in the relevant community.  *See Kattan v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993).  Establishing that Mr. Ukeiley has actually collected *Laffey* rates in some cases does not indicate either that such rates are appropriate in the relevant community, or that the relevant community is the District of Columbia.  Although MacClarence describes at length Mr. Ukeiley's experience practicing in the District of Columbia federal courts, he cites no authority to suggest that the location of counsel's other cases is a factor in determining the relevant market for purposes of fee shifting. MacClarence also does not describe any similar D.C.-specific experience with respect to Mr. Eddie, but he nevertheless seeks D.C. rates for Mr. Eddie's work.

MacClarence also does not cite any authority to support his concept of a "nationwide practice" or an "issue-based" practice that can overcome the rule of *Davis County*.  *See* Motion at 13; Ukeiley Decl. ¶¶ 26-27.  If Plaintiffs believe that the national nature of Mr. Ukeiley's practice makes the forum rules inapplicable, they should have introduced some evidence to establish what "nationwide" rates would be.  The Court need not accept MacClarence's assertion that *Laffey*

---

[9]    Mr. Ukeiley states that he has billed $66,000 using *Laffey* rates to labor unions and individual union members to participate in fourteen matters between December 2003 and June 2007. Ukeiley Decl. ¶ 25. Assuming that Mr. Ukeiley has used the *Laffey* rate of $360 per hour, this amount would reflect approximately 183 hours, or 4.5 weeks, over a period of about 42 months.  This is not a large enough sample to be a meaningful indication of the average rate that Mr. Ukeiley would command on the market.

rates, which are explicitly designed to represent D.C. market rates, are appropriate for a "nationwide" attorney. *See National Ass'n of Concerned Veterans*, 672 F.2d at 1326 ("[W]hen the attorney states his belief as to the relevant market rate, he should be able to state, for example, that it was formed on the basis of several specific rates he knows are charged by other attorneys. The District Court's task . . . is aided little by an affidavit which just offers one attorney's conclusory and general opinion on what that rate is."). And once again, there is no evidence to suggest that Mr. Eddie has a "nationwide" practice that would support valuing his time at rates higher than those prevailing in Portland, Oregon.

If the appropriate rate is the forum rate in every case, regardless of where counsel is located, then a "nationwide practice" is no more than a license to shop for a forum in which local lawyers earn high fees, such as the District of Columbia. The Title V cases recently filed in this Court by Mr. Ukeiley demonstrate how such a rule could produce inequitable results. Although D.C. is a legal venue for each of these cases, none involve facilities in this forum; in fact, two facilities are located in Kentucky. In each case, however, Mr. Ukeiley and his clients have filed in D.C., rather than in the less-expensive forum where the facility and the plaintiff are located.

| Case Name and D.D.C. Docket No. | Site of subject of suit |
|---|---|
| Idaho Conservation League v. Johnson, 07-11396 | Idaho |
| Sierra Club v. Johnson, 07-00414 | Kentucky |
| MacClarence v. Johnson, No. 07-00055 | Alaska |
| Rocky Mountain Clean Air Action v. Johnson, 06-01992 | Colorado and South Dakota |
| Rocky Mountain Clean Air Action v. Johnson, 06-01419 | Colorado |
| Center for Biological Diversity v. Johnson, 06-1350 | Kentucky |
| Sierra Club v. Johnson, 05-02177 | Georgia |

| Nichols v. Johnson, 05-02215 | Colorado |
| --- | --- |
| Sierra Club v. Johnson, 05-00750 | Georgia |

**B.      Rates In the Home Forums for MacClarence's Counsel Are Substantially Lower Than Rates In D.C.**

Application of the *Davis County* rule is necessary and appropriate here because of the

disparity in fees that would be available in the home market for each of MacClarence's attorneys.

With respect to Mr. Ukeiley, Ms. Baldwin, and Mr. Ukeiley's non-attorney legal staff, the most

convincing indicator of the appropriate market rates are recent decisions from the United States

District Court for the Eastern District of Kentucky.  In a voting rights case in Ashland, Kentucky,

the court found that $175 per hour was a reasonable rate for an attorney with more than 26 years

of experience who had "extraordinary experience" in campaign finance law. *Anderson v. Wilson*,

357 F. Supp. 2d 991, 998 (E.D. Ky. 2005) (Ashland Division).  For an attorney with 16 years of

experience but "no particular expertise relevant to [the] case," the court refused the request for

$175, and allowed only $150 per hour.  Attorneys with 15 years experience were given this same

rate.  For associates with eight to ten years experience, the court awarded $125 per hour and for

associates with four to five years of experience, the rate was set at $110 per hour.

An opinion issued by the Lexington Division states: "The Court is aware that hourly rates

for litigators in the local market range from less than $100 to more than $250 per hour." *Dixie*

*Fuel Co. v. Callahan*, 136 F. Supp. 2d 659, 666 (E.D. Ky. 2001) (FOIA case).  The court

concluded that $125 was a reasonable rate for the particular attorney, but did not set forth his

qualifications.  In *McCoy v. Federal Bureau of Prisons*, 2005 WL 1,972,600 (E.D. Ky. Aug. 16,

2005) (Lexington Division), the court found that, based on its familiarity with the local market,

$200 is a reasonable hourly rate for counsel and $75 per hour is reasonable for a paralegal.  In

11

*Bryant v. Nighbert*, the court found that $195-$225 was reasonable for partners working on civil rights litigation. A partner with 15 years experience was allowed to charge $195 and an associate with seven years experience was limited to $150 per hour. 2005 WL 2234636 (E.D. Ky. Sept. 14, 2005) (Lexington Division).[7]

Based on these cases, EPA contends that a reasonable rate for an attorney of Mr. Ukeiley's experience in the Eastern District of Kentucky would be no more than $200 per hour; $175 less than the rate MacClarence claims here. For his associate, Ms. Baldwin, an appropriate rate would be $100 per hour, $105 less than claimed. Finally, for Ms. Middleton and Ms. Perkins, the reasonable rate should be $75, a reduction of $45 from the claimed rate of $120.[8]

With respect to Mr. Eddie, no such inquiry is necessary. MacClarence has submitted evidence that Mr. Eddie, whose practice is based in Portland, Oregon, charges his business clients $250 per hour for cases in locations such as Idaho, Nevada, and Oregon. *See* Motion at 23. EPA does not dispute that this is an appropriate market rate in Mr. Eddie's home forum, but it is $65 per hour lower than the rate MacClarence seeks to charge the United States for Mr. Eddie's time.

---

[7]    MacClarence suggests that a rate survey from the National Law Journal supports his rate by showing that "$375 rate for Ukeiley is within the range of rates charges by partners in and around Kentucky." Motion at 20 n.7; Decl. ¶ 56. In fact, this survey, which is based on the 100 largest firms in the country, does not include any firms from Kentucky. The survey does show that the rate that Mr. Ukeiley claims would place him among the most expensive partners in the largest firms in cities such as Nashville, Cincinnati, and Toledo.

[8]    EPA is not required to submit any evidence to prove that a specific rate is appropriate unless the plaintiff has submitted sufficient evidence to meet its burden of proof. *National Ass'n of Concerned Veterans*, 675 F.2d at 1326. Because MacClarence has failed to meet his burden of proof with respect to the reasonable rate for the Kentucky attorneys and staff, the appropriate remedy would be to deny the fee claim outright for those attorneys other than Mr. Eddie. EPA, however, is willing to accept the rates described in this section as the basis for an award, if the Court deems such an award to be appropriate.

**C.     The Use of D.C. Rates In This Case Would Create a Potential Windfall For Plaintiff's Counsel.**

Assuming for the moment that the number of hours claimed by MacClarence is reasonable, recalculating the claim using the appropriate rates shows that the use of D.C. rates produces a significant windfall to MacClarence's counsel.

|            | Hours | D.C. Rates | Home Forum Rates |
|------------|-------|------------|------------------|
| Ukeiley    | 19.3  | $ 7,237.50 | $ 3,860.00       |
| Eddie      | 24.7  | $ 7,533.50 | $ 6,175.00       |
| Baldwin    | 5.9   | $ 1,209.50 | $   590.00       |
| Perkins    | .7    | $     84.00 | $     52.50      |
| Middleton  | .4    | $     48.00 | $     30.00      |
| Total fees |       | $16,112.50 | $10,707.50       |

Thus, the use of D.C. rates for MacClarence's out-of-town counsel in this case would increase the justifiable fee award by approximately 50%. This qualifies as the sort of "extreme situation" that necessitated an exception to the forum rule in *Davis County*.

MacClarence attempts to minimize the effect of *Davis County* by suggesting that it violates the Supreme Court's rule in *Missouri v. Jenkins*, 491 U.S. 274 (1989). *See* Motion at 11 n.1. That is not a judgment for this Court to make, and is in any case incorrect: The Supreme Court in *Jenkins* allowed the award of a market rate for associates and paralegals rather than a "cost" rate. *Id.* at 287. Here, EPA does not claim that MacClarence is not entitled to market rates for the counsel of Mr. Ukeiley or his associates and staff, but rather that calculating those rates with respect to the wrong market produces an unjustified windfall.

It makes no difference under the reasoning of *Davis County* that MacClarence's counsel

13

did not charge him for the representation. The right to seek attorneys' fees under the CAA

belongs to the "party," not to counsel, *see* 42 U.S.C. § 7604(d), and the distribution of a fee

award that client and counsel have agreed upon is therefore irrelevant to the appropriate size of

the award. In any event, the fact that MacClarence's counsel alone would benefit from this fee

award weakens, rather than strengthens, the argument that higher-than-appropriate rates should

apply, because it only shifts the potential windfall from MacClarence to his counsel. By his own

admission, Mr. Ukeiley operates a for-profit legal practice, and he agreed to represent

MacClarence in the expectation of a fee award from the United States. *See* Motion at 12;

Ukeiley Dec. at ¶ 10. The courts have also been most emphatic, however, in holding that fee-

shifting statutes are not intended to provide financial advantage to counsel. *See Delaware Valley*

*I*, 478 U.S. at 559 ("[t]hese statutes were not designed as a form of economic relief to improve

the financial lot of attorneys."); *Hensley*, 461 U.S. at 430 n.4 (fee-shifting statutes were not

intended to "produce windfalls to attorneys").

  Mr. Ukeiley claims that he lives in Kentucky for personal reasons, rather than to take

advantage of lower business costs. *See* Motion at 13. But an attorney's decision to live in one

market for personal reasons does not mean he can effectively claim to be part of another, more

advantageous market, for compensation purposes. Regardless of why Mr. Ukeiley has chosen to

open his office in Kentucky, that is where his business is located for the purpose of analyzing the

appropriate rate under *Davis County*. Moreover, by locating in Kentucky, Mr. Ukeiley has been

able to take advantage of lower costs for office space, personnel, and other necessary elements

for a law practice. *See Avera v. Secretary of HHS*, 75 Fed. Cl. at 405 (Wyoming-based fees are

justified in part because Wyoming attorney has lower operating costs than counsel in D.C.).[9]

**D.    No Other Factors Exist Which Justify Awarding D.C. Rates To MacClarence's Out-Of-Town Counsel.**

In his Motion, MacClarence offers several justifications for a high fee award that have

nothing to do with defining the appropriate market for determining reasonable hourly rates. Even

if they were relevant to the only disputed issue in this fee motion, none of these justifications

would demonstrate that the Court should disregard the anti-windfall rationale of *Davis County*

and award fees based on the D.C. market rate to MacClarence's out-of-town counsel.

MacClarence contends that fee awards based on market rates are necessary to ensure that

competent counsel will be available to take cases that vindicate the public interest in the Clean

Air Act. *See* Motion at 2-3. Although the case law supports this proposition in the abstract, it

has no application here because EPA does not contend that any counsel should be awarded

below-market rates. Instead, EPA contends that counsel should be paid at the market rates in the

relevant market, as determined under the principles of *Davis County*. MacClarence has not

shown or even suggested that competent, skilled attorneys are unavailable in Washington, D.C.,

to handle his routine Title V deadline suit. If MacClarence had hired any of those D.C. attorneys,

they would be presumptively entitled to an award of D.C. rates – and he presumably would have

been able to find a D.C. lawyer willing to accept his case on that basis. EPA contends only that

where the circumstances of *Davis County* apply, it is inappropriate to base a fee award on the

rates for legal representation that prevail in the far more expensive legal market.

---

[9]       Where it would *increase* the amount of his fee award, Mr. Ukeiley apparently agrees that
the cost of living is relevant to the appropriate hourly rate. *See Center for Biological Diversity*,
slip op. at 5 (noting that the plaintiff, represented by Mr. Ukeiley, sought an increase in the
hourly rate awarded to one attorney due partially to the "cost of living in San Francisco, CA," but
rejecting this argument as an "undeveloped last-minute request").

The unreasonable nature of MacClarence's request here is demonstrated by the lack of any evidence he would have chosen to file in the District of Columbia, rather than in Alaska, if he would actually have had to pay substantially higher fees as a consequence. As explained by the Second Circuit, "We presume, however, that a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 2007 WL 2,004,106, *8 (2d Cir. July 12, 2007) (Federal Reporter citation not yet available) (upholding district court's refusal to allow out-of-town attorneys to charge higher rates). Accordingly, there is no reason that the government should have to pay for MacClarence's (or his counsel's) decision to file in a forum where attorneys' fees are substantially higher. Nor is it necessary to ensure adequate representation: If MacClarence had hired an Alaska attorney to handle his suit relating to an Alaska facility, that attorney would be entitled to an award of market rates appropriate to Alaska, which would ordinarily be sufficient to attract adequate representation.

MacClarence also attempts to justify a higher rate than would be justified in his counsels' home markets by touting Mr. Ukeiley's experience in handling Clean Air Act cases. *See* Motion at 17-19.[10] Many lawyers gain expertise in a particular area of the law as they practice, a fact which is reflected, in virtually every market, in higher billing rates (and higher fee award rates) for more experienced attorneys. However, even if Mr. Ukeiley's skill and expertise goes beyond that of other attorneys with his years of experience, it is not clear why it is reasonable or necessary to demand and pay for that expertise on the present case. The only legal issue in the

---

[10]     Although he seeks D.C. rates for Mr. Eddie, MacClarence does not attempt to demonstrate that Mr. Eddie is unusually experienced or skilled in CAA matters. Indeed, Mr. Eddie admits that the reason he sought Mr. Ukeiley as co-counsel in this case is that he has not previously handled a similar case. *See* Eddie Decl. ¶ 8.

Complaint was whether EPA had met a particular deadline under the Clean Air Act, an issue

which is not so complex as to require the services of, or to justify a high billing rate for, "one of

the most experienced Title V litigators on the public interest side in the country."[11] *See*

*Covington*, 57 F.3d at 1108 (noting that fee applicants should justify their claim by showing

"their attorneys' experience, skill, reputation, *and the complexity of the case they handled*"

(emphasis added)).  As Mr. Ukeiley himself acknowledges, cases of this kind ordinarily are

resolved before EPA files an answer, *see* Ukeiley Decl. ¶ 19, and he expects to prevail in such

cases so that he can collect fees from the United States, *see id.* ¶ 10.  Moreover, much of the

work performed by counsel in this case, particularly the work that was performed by Mr. Ukeiley

at the highest claimed billing rate among MacClarence's counsel, does not relate to complex

Title V issues at all, but rather to the issue of attorneys' fees.

Finally, MacClarence is simply wrong when he supposes that EPA may attempt to

penalize his counsel for working on a *pro bono* basis.  *See* Motion at 4.  Setting aside the

question of whether a case in which the party's counsel expects to be compensated by fees

collected from another party deserves the appellation "*pro bono*," none of EPA's arguments

concerning this Motion are based on any reduced rates or waived rates that Mr. Ukeiley may

provide to certain clients.  EPA contends that MacClarence's counsel should be awarded market

rates in the properly defined market under *Davis County*; i.e., the market where counsel is located

---

[11]     This characterization of Mr. Ukeiley's experience is taken from his own Declaration, at
¶ 40.  That Declaration is the only evidence here of Ukeiley's level of skill and expertise.  This
evidence is not sufficient to justify a higher billing rate in this case, as a fee applicant "must
produce evidence – *in addition to the attorney's own affidavits* – that the requested rates are in
line with those prevailing in the community for similar services by lawyers of reasonably
comparable skill, experience, and reputation."  *Covington*, 57 F.3d at 1108 (quoting *Blum*, 465
U.S. at 896 n.11) (emphasis added).

and where all the work in this case took place. Counsel's public interest motivation does not justify an award out of the public fisc that is based on a rate greater than D.C. Circuit precedent would allow.

**III.    MACCLARENCE HAS NOT JUSTIFIED HIS CLAIM OF "REASONABLE HOURS."**

The total amount of hours that MacClarence claims for his attorneys' work is fairly small. Nonetheless, a further reduction of 10% from each attorney is appropriate. The documents filed by MacClarence in this case, particularly the Complaint, were largely based on Mr. Ukeiley's filings in other Title V cases. For example, the time entries involved in researching, drafting and editing the Complaint in this matter total 7.9 hours for Mr. Eddie and 2.5 hours for Mr. Ukeiley. Nonetheless, except for the few allegations that relate directly to the plaintiff and facility at issue in this case, the Complaint is essentially identical to the Complaint that Mr. Ukeiley filed for another plaintiff in *Rocky Mountain Clean Air Action v. Johnson*, No. 06-cv-01419(RMC). These two Complaints are attached hereto as Exhibits 1 and 2 for the Court's comparison. The United States should not have to pay repeatedly for the same work. In addition, other inefficiencies exist in this case that are similar to the inefficiencies that were found to justify an across-the-board reduction in a case that Mr. Ukeiley litigated and attaches to his Declaration. *See Center for Biological Diversity v. Norton*, Slip op., Case No. 04-0156-JDB (D.D.C. Jan. 26, 2005). That case, like this one, was relatively simple and was settled early, and it involved multiple out-of-town attorneys. *See id.*, slip op. at 3-4. Such factors warranted a reduction of the fee claim in *Center for Biological Diversity*, over and above the reduction that Mr. Ukeiley made to reflect "sound billing judgment," and do so again here.

18

## IV.  SUMMARY

A reasonable award of attorneys' fees in this case, reflecting the proper hourly rate based on the Eastern District of Kentucky and Portland, Oregon legal markets, and reflecting a 10% reduction of hours to ensure that only reasonable hours are counted, is $9,980.60.  This recommendation is based on the following calculation:

|           | Adjusted Hours | Adjusted Rates | Total |
|-----------|---------------|----------------|-------|
| Ukeiley   | 17.4          | $    200.00    | $ 3,480.00 |
| Eddie     | 22.2          | 250.00         | 5,550.00 |
| Baldwin   | 5.3           | 100.00         | 530.00 |
| Perkins   | .6            | 75.00          | 45.00 |
| Middleton | .4            | 75.00          | 30.00 |
| Agreed-to costs |         |                | 385.60 |
| Total recommended award: |  |             | $ 9,980.60 |

## CONCLUSION

For these reasons, Plaintiff's Motion for Award of Attorneys' Fees and Costs should be denied, and MacClarence should recover no more than $9,980.60 in costs of litigation, including attorneys' fees, pursuant to section 304(d) of the CAA, 42 U.S.C. § 7604(d).

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

DAVID GUNTER
United States Department of Justice
Environmental Defense Section
P.O. Box 23986

19

Washington, D.C. 20026-3986
Phone (202) 514-3785
david.gunter2@usdoj.gov

August 6, 2007

## CERTIFICATE OF SERVICE

I certify that the following counsel is registered to receive filings in this case from the Court's electronic filing system, and will receive a copy of EPA's Opposition to Motion for Attorneys' Fees upon its filing on August 3, 2007.

Robert Ukeiley
Law Office of Robert Ukeiley
433 Chestnut Street
Berea, KY 40403
859-986-5402 (ph)
859-986-1299 (fax)
rukeiley@igc.org

I further certify that notice of this Motion will be delivered via first-class U.S. Mail, sent on August 3, 2007, to the following counsel:

William M. Eddie
610 SW Alder Street
Suite 910
Portland, OR 97205
(503) 542-5245
(503) 225-0276 (fax)

David Gunter

*MacClarence v. Johnson*, No. 07-cv-00055 (RWR)

# EXHIBIT 1

*to* EPA'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BILL MacCLARENCE, P.E.       )
10840 Glazanof Drive         )
Anchorage, AK 99507,         )
                             )       Civil No. ___07-55___
    v.                       )
                             )
STEPHEN L. JOHNSON, in his official    )
Capacity as Administrator, United States    )
Environmental Protection Agency,    )
Ariel Rios Building          )
1200 Pennsylvania Avenue, N.W.    )
Washington, DC 20460,        )
                             )
    Defendant.               )
                             )

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### I. INTRODUCTION

1.    Plaintiff Bill MacClarence, P.E., challenges the failure of Defendant

Stephen L. Johnson, in his official capacity as Administrator of the Environmental

Protection Agency ("EPA"), to perform his non-discretionary duties under the Clean Air

Act, 42 U.S.C. §§ 7401-7671q.  Specifically, Title V of the Clean Air Act establishes a

mandatory 60-day deadline for Defendant to grant or deny a citizen petition for an

objection to a Clean Air Act Title V permit. 42 U.S.C. § 7661d(b)(2).  Defendant has

failed to meet this deadline with respect to a petition seeking EPA's objection to a Clean

Air Act operating permit for the BP Exploration (Alaska) Inc. Gathering Center #1 ("BP

permit") issued by the Alaska Department of Environmental Conservation.  Such petition

\* **NEW** \*

SEND TO FILE
PROMPTLY AFTER ACTION
S ITEM AUTHORIZES JACKET-
OF FILE MATERIAL
NOT FILE IN OFFICE FILE

COMPLAINT -- 1

90-5-2-4—18041

DEPARTMENT OF JUSTICE
Feb.
ENVIR

was dated February 5, 2004; and EPA received the petition on February 5, 2004. Despite

the passage of over 60 days, Defendant has not responded to Plaintiff's petition.

## II. JURISDICTION, VENUE AND NOTICE

2.      This is a Clean Air Act citizen suit. Thus, this Court has subject matter

jurisdiction over the claim set forth in this complaint pursuant to 42 U.S.C. § 7604(a)(2),

and has authority to award attorney fees pursuant to 42 U.S.C. § 7604(d). The Clean Air

Act is a federal statute. Thus, this Court also has subject matter jurisdiction over the

complaint pursuant to 28 U.S.C. § 1331 (federal question). An actual controversy exists

between the parties. This case does not concern federal taxes, is not a proceeding under

11 U.S.C. §§ 505 or 1146, and does not involve the Tariff Act of 1930. Thus this Court

has authority to order the declaratory relief requested under 28 U.S.C. § 2201. If the

Court orders declaratory relief, 28 U.S.C. § 2202 authorizes this Court to issue injunctive

relief.

3.      A substantial part of the alleged events or omissions giving rise to

Plaintiff's claims occurred in the District of Columbia. In addition, Defendant Stephen

Johnson officially resides in the District of Columbia. Thus, venue is proper in this Court

pursuant to 28 U.S.C. § 1391(e).

4.      On October 9, 2006, Plaintiff mailed a letter via certified mail to

Defendant Stephen L. Johnson stating that Plaintiff intended to sue Defendant for failure

to respond to Plaintiff's petition for an objection to the BP permit within 60 days. On

November 1, 2006 EPA sent Plaintiff a letter confirming EPA received Plaintiff's letter

dated October 9, 2006, and assigned Plaintiff's letter Citizen Suit No. NCS-06-19.

5.      More than 60 days have passed since Defendant received Plaintiff's notice

of intent to sue letter. Defendant has not acted to remedy the violations alleged in this

Complaint. Therefore, an actual controversy exists between the parties.

### III. PARTIES

6.      Plaintiff Bill MacClarence is an individual residing in Anchorage, Alaska.

Mr. MacClarence is an avid outdoor enthusiast. Mr. MacClarence is deeply concerned

about air quality and its effects on the health and welfare of people, plants, and animals.

7.      EPA's failure to respond to his petition adversely affects Mr.

MacClarence. Mr. MacClarence suffers from ocular melanoma in the left eye, the

occurrence of which is correlated with high exposure to ultraviolet light. Pollution from

BP Exploration (Alaska) Inc.'s Gathering Center #1 contributes to the destruction of

stratospheric ozone, thus increasing medical risks for Mr. MacClarence. In addition,

Mr. MacClarence regularly visits areas of northern Alaska which are impacted by

pollution from the BP Exploration (Alaska) Inc.'s Gathering Center #1. Mr.

MacClarence is adversely affected by pollution from this facility because such pollution

impairs visibility, endangers his health, impairs water quality and has other adverse

impacts, and because such pollution diminishes his enjoyment of these areas. Further,

Mr. MacClarence invested his personal time in preparing the petition. However, Mr.

MacClarence will not realize the benefit of his investment of his personal time, including

the benefit of obtaining information in the form of a response, until EPA responds to his

petition. Thus, Mr. MacClarence's scientific, educational and informational interests in

his petition are adversely affected by EPA's failure to timely respond to his petition.

8.      Mr. MacClarence's interests in protecting air quality and limiting pollutants which degrade stratospheric ozone are adversely affected by EPA's failure to timely respond to his petition.  Moreover, if the BP Exploration (Alaska) Inc.'s Gathering Center #1 does not comply with the Clean Air Act, Mr. MacClarence will be exposed to pollutants from those facilities which are in excess of legal levels. EPA's failure to respond thus prevents Mr. MacClarence from being certain that the BP permit protects him from exposure to pollutants emitted by that facility which are in excess of legal limits.

9.      EPA's failure to respond to Plaintiff's petition has caused, is causing, and unless this Court grants the requested relief, will continue to cause Plaintiff concrete injuries, which are traceable to EPA's failure to act and will be redressed by EPA's action.

10.      Defendant STEPHEN L. JOHNSON is the Administrator of the Environmental Protection Agency. The Administrator is responsible for implementing the Clean Air Act, including the requirement to grant or deny Plaintiff's petition within 60 days.  Mr. Johnson is sued in his official capacity.

## IV. LEGAL BACKROUND

### Title V

11.      The Clean Air Act aims "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). To help meet this goal, the 1990 amendments to the Clean Air Act created an operating permit program that applies to all major sources of air pollution – the Title V permit program.  See 42 U.S.C. §§ 7661-7661f.

COMPLAINT -- 4

12.     A primary purpose of the Title V permitting program is to reduce violations of the Clean Air Act and improve enforcement by recording in one document all of the air pollution control requirements that apply to a source of emissions. See New York Public Interest Research Group v. Whitman, 321 F.3d 316, 320 (2d Cir. 2003). Major sources of air pollution cannot legally discharge pollutants into the air unless they have a valid Title V operating permit. 42 U.S.C. § 7661a(a).

13.     The Clean Air Act provides that the Administrator of EPA may approve states' programs to administer the Title V permitting program with respect to sources within their borders. 42 U.S.C. § 7661a(d). The Administrator has approved Alaska's Title V permit program.   The Alaska Department of Environmental Conservation ("Alaska DEC") is responsible for issuing Title V permits in Alaska.

14.     Before a Title V permit can be issued by a state with an approved Title V permit program, the State must forward the proposed Title V permit to EPA. 42 U.S.C. § 7661d(a)(1)(B).  EPA then has 45 days in which it can review the proposed permit. EPA must object to the issuance of the permit if EPA finds that the permit does not comply with all applicable provisions of the Clean Air Act. 42 U.S.C. § 7661d(b)(1). However, as a practical matter, EPA does not review most proposed Title V permits forwarded to it by state permitting agencies.

15.     After EPA's 45-day review period, "any person may petition the Administrator within 60 days" to object to the Title V permit. 42 U.S.C. § 7661d(b)(2).

16.     Once it receives a petition for objection to a Title V permit, EPA must grant or deny that petition within 60 days. Id.; New York Public Interest Research Group v. Whitman, 214 F. Supp. 2d 1, 2 (D.D.C. 2002).

## VI. STATEMENT OF FACTS

17.    BP Exploration (Alaska) Inc.'s Gathering Center #1 processes crude oil from production wells in the vicinity of Prudhoe Bay, Alaska.

18.    BP Exploration (Alaska) Inc.'s Gathering Center #1 emits volatile organic compounds, carbon monoxide, nitrogen oxides, sulfur dioxide, and hazardous air pollutants.

19.    On or about February 21, 2002, Alaska DEC issued a draft Title V operating permit to BP Exploration (Alaska) Inc.'s Gathering Center #1 (Permit No. 182TVP01) and requested public comments on this draft permit.

20.    Mr. MacClarence submitted written comments to Alaska DEC on the draft BP permit on March 23, 2002. Mr. MacClarence criticized the draft BP permit, in part, because it did not aggregate all of BP's contiguous and adjacent facilities into one permit, as required by the Clean Air Act and federal regulations.

21.    Alaska DEC subsequently published a revised draft BP permit on March 7, 2003. This revised draft permit favorably responded to Mr. MacClarence's comments, and aggregated all of BP's contiguous and adjacent facilities into the draft permit.

22.    On July 23, 2003, Alaska DEC reversed its March 7, 2003 draft BP permit, and submitted to EPA another version of the BP permit that disaggregated contiguous and adjacent BP facilities from the Gathering Center #1 permit. There was no public notice of this reversal. On August 14, 2003 EPA expressed their concern to Alaska DEC over the reversal.

23.    On October 20, 2003, Alaska DEC published final permit 182TVP01 for BP Exploration (Alaska) Inc. Gathering Center #1. Like the July 23, 2003 version of the

COMPLAINT -- 6

permit, the final permit disaggregated contiguous and adjacent BP facilities from the Gathering Center #1 permit.

24.    EPA did not object on its own initiative to the BP permit during its 45-day review period following receipt of the October 20, 2003 final permit.

25.    Pursuant to 42 U.S.C. § 7661d(b)(2), via letter dated February 5, 2004, Mr. MacClarence timely submitted his petition to EPA seeking EPA's objection to the permit. EPA's office in Anchorage, Alaska, received the petition on February 5, 2004.

26.    The petition raised the issue of Alaska DEC's failure to aggregate all BP facilities which are contiguous and adjacent to Gathering Center #1. This argument was raised specifically in Mr. MacClarence's comments to Alaska DEC during the public comment period for the BP permit.

27.    Via electronic mail sent March 29, 2004, EPA notified Mr. MacClarence that Alaska DEC had made a minor revision to the BP permit and had provided such revision to EPA on December 31, 2003. Such revision did not address disaggregation, which was the basis of Mr. MacClarence's petition. However, on April 14, 2004, Mr. MacClarence resubmitted his February 5, 2004 petition to EPA.

28.    As of the date of filing of this Complaint, EPA's online database lists Mr. MacClarence's petition as dated February 5, 2004, and lists the petition's status as "pending."

29.    EPA had until on or about April 8, 2004, to grant or deny Plaintiff's original petition. 42 U.S.C. § 7661d(b)(2). However, EPA neither granted nor denied the petition within the statutory 60 day period. EPA still has not granted or denied the petition as of date of filing this Complaint.

COMPLAINT -- 7

## VII. CLAIM FOR RELIEF

### FAILURE TO RESPOND TO PLAINTIFF'S PETITION FOR OBJECTION TO THE BP EXPLORATION (ALASKA) INC. GATHERING CENTER #1 TITLE V PERMIT (42 U.S.C. § 7661d(b)(2))

30.     Each allegation set forth in the Complaint is incorporated herein by reference.

31.     EPA has a mandatory duty to respond within 60 days to Plaintiff's petition requesting that EPA object to the BP permit pursuant to 42 U.S.C. § 7661d(b)(2) ("The Administrator shall grant or deny such petition within 60 days after the petition is filed").

32.     It has been more than 60 day since EPA received Plaintiff's petition requesting EPA object to the BP permit.

33.     Defendant has not granted or denied Plaintiff's petition regarding the BP permit.

34.     Defendant's failure to grant or deny the petition constitutes a failure to perform an act or duty that is not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2). 42 U.S.C. § 7604(a)(2).

35.     Therefore, EPA has violated, and remains in violation of, its non-discretionary duty to grant or deny Plaintiff's petition within 60 days, as required by 42 U.S.C. § 7661d(b)(2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A) Declare that Defendant's failure to grant or deny Plaintiff's petition for an objection to the BP Exploration (Alaska) Inc. Gathering Center #1 Title V permit

constitutes a failure to perform an act or duty that is not discretionary with the Defendant

within the meaning of 42 U.S.C. § 7604(a)(2);

B) Order the Defendant to grant or deny Plaintiff's petition for an objection to the

BP Exploration (Alaska) Inc. Gathering Center #1 Title V permit in accordance with an

expeditious schedule prescribed by the Court;

C) Retain jurisdiction over this action to ensure compliance with the Court's

Order;

D) Award Plaintiff his costs of litigation, including reasonable attorney fees; and

E) Grant such other relief as the Court deems just and proper.

Respectfully submitted,

___/s_____
Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
433 Chestnut Street
Berea, KY 40403
Tel: (859) 986-5402
Fax: (866) 618-1017
E-mail: rukeiley@igc.org

Counsel for Plaintiff

DATED: January 9, 2007.

Of Counsel:

William M. Eddie (Oregon State Bar No. 066860)
Law Office of William M. Eddie
610 SW Alder St., Suite 910
Portland, OR 97205
Tel: (503) 542-5245
Fax: (503) 225-0276
E-mail: bill@eddielawfirm.com

COMPLAINT -- 9

*MacClarence v. Johnson,* No. 07-cv-00055 (RWR)

# EXHIBIT 2

*to* EPA'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROCKY MOUNTAIN CLEAN AIR ACTION<br>1536 Wynkoop, Suite B501<br>Denver, Colorado 80202,<br><br>JEREMY NICHOLS<br>1536 Wynkoop, Suite B501<br>Denver, Colorado 80202,<br><br>    Plaintiffs,<br><br>        v.<br><br>STEPHEN L. JOHNSON, in his official<br>Capacity as Administrator, United States<br>Environmental Protection Agency,<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460,<br><br>    Defendant. | Civil Action No.  06 - 01419 |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**I.      INTRODUCTION**

1.

Plaintiffs Rocky Mountain Clean Air Action ("Clean Air Action") and Jeremy Nichols

challenge the failure of Defendant Stephen L. Johnson, in his official capacity as Administrator

of the Environmental Protection Agency ("EPA"), to perform his non-discretionary duties under

the Clean Air Act, 42 U.S.C. §§ 7401-7671q.  Specifically, Title V of the Clean Air Act

establishes a mandatory 60-day deadline for Defendant to grant or deny a citizen petition for an

objection to a Clean Air Act Title V permit.  42 U.S.C. § 7661d(b)(2).  Defendant has failed to

meet this deadline with respect to a petition filed by Plaintiffs seeking EPA's objection to a Clean Air Act operating permit that the Colorado Department of Public Health and Environment, Air Pollution Control Division ("APCD") issued to the Denver Regional Landfill (South) Inc. ("Denver Landfill").    Plaintiffs originally filed their Denver Landfill petition on March 8, 2006. Despite the passage of over five months at the time Plaintiffs filed this Complaint, EPA has not responded to Plaintiffs' petition.

## II.    JURISDICTION, VENUE AND NOTICE

2.

This is a Clean Air Act citizen suit.  Thus this Court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a)(2), and has authority to award attorney fees pursuant to 42 U.S.C. § 7604(d). The Clean Air Act is a federal statutes. Thus this Court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 28 U.S.C. § 1331 (federal question).  Defendant Stephen Johnson is an officer of the United States.  An actual controversy exists between the parties.  This case does not concern federal taxes, is not a proceeding under 11 U.S.C. §§ 505 or 1146, and does not involve the Tariff Act of 1930.  Thus this Court has authority to order the declaratory relief requested under 28 U.S.C. § 2201.  If the Court orders declaratory relief, 28 U.S.C. § 2202 authorizes this Court to issue injunctive relief, and 28 U.S.C. § 2412 authorizes this Court to award Plaintiffs their costs and attorney fees.

3.

A substantial part of the alleged events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.   In addition, Defendant Steven Johnson officially resides in the District of Columbia.  Thus, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

2

4.

On May 22, 2006, Plaintiffs mailed a letter via certified first-class mail to Defendant

Stephen L. Johnson stating that Plaintiffs intended to sue Defendant for failure to respond to

Plaintiffs' petition for an objection to the Denver Landfill Title V permit within 60 days. EPA

sent Plaintiffs a letter confirming EPA received Plaintiffs' letter dated May 22, 2006 on May 30,

2006.

5.

More than 60 days have passed since Defendant received Plaintiffs' notice of intent to

sue letter. Defendant has not acted to remedy the violations alleged in this complaint.

Therefore, an actual controversy exists between the parties.

### III.    PARTIES

6.

Plaintiff ROCKY MOUNTAIN CLEAN AIR ACTION ("Clean Air Action") is a non-

profit corporation with its headquarters in Denver, Colorado. Clean Air Action is actively

involved in environmental protection advocacy as part of its mission to protect clean air in

Colorado and the surrounding Rocky Mountain region for the health and sustainability of local

communities. As one method of achieving its organizational mission, Clean Air Action

participates in permitting procedures for facilities that emit pollution. Clean Air Action provided

comments on the Denver Landfill Title V permit. Clean Air Action's organizational interest in

participating in and influencing the permit decision making process is injured by EPA's failure to

respond to Clean Air Action's Denver Landfill petition.

7.

Clean Air Action's members and volunteers live, work, recreate, garden and engage in economic activities in and around Metro-Denver, and will continue to do so on a regular basis in the future. As a result, Clean Air Action's members and volunteers breathe air and recreate in an environment containing pollutants released by Denver Landfill. Emissions from Denver Landfill are causing harm to their health and to the ecosystems in which they live, work and recreate, and will continue to do so in the future. Because Defendant has not responded to their petition, Clean Air Action's members and volunteers cannot be certain that Denver Landfill's Title V permit conforms with the Clean Air Act's requirements. EPA's failure to respond thus prevents Clean Air Action's members and volunteers from being certain that the Denver Landfill Title V permit protects them from exposure to pollutants emitted by that facility which are in excess of legal limits.

8.

Plaintiff JEREMY NICHOLS is a resident of Denver Colorado who is an avid bicyclist, outdoor enthusiast, and father of a four year old son. Mr. Nichols is deeply concerned about air quality and its effects on the health and welfare of people, plants, and animals.

9.

Mr. Nichols is adversely affected by EPA's failure to respond to the petition. Denver Landfill adversely affects, and will continue to do so on a regular basis, the air that Mr. Nichols and his son breathe by releasing nitrogen oxides, volatile organic compounds, and other pollutants. EPA has identified these pollutants as threats to human health and welfare.

10.

Mr. Nichols' interest in protecting the air that he and his son breathe, in bicycling and recreating in a healthy environment, and in protecting clean air for other people, plants, and animals are adversely affected by EPA's failure to timely respond to his petition. Moreover, if the Denver Landfill Title V permit does not comply with the Clean Air Act, Mr. Nichols will be exposed to pollutants from that facility which are in excess of legal levels. EPA's failure to respond thus prevents Mr. Nichols from being certain that the Denver Landfill Title V permit protects him from exposure to pollutants emitted by that facility which are in excess of legal limits.

11.

For the foregoing reasons, EPA's failure to respond to Plaintiffs' petition has caused, is causing, and unless this Court grants the requested relief, will continue to cause Plaintiffs concrete injuries, which are traceable to EPA's failure to act and will be redressed by EPA's action.

12.

Defendant STEPHEN L. JOHNSON is the Administrator of the Environmental Protection Agency. The Administrator is responsible for implementing the Clean Air Act, including the requirement to grant or deny Plaintiffs' petition within 60 days.

## IV. LEGAL BACKROUND

### Title V

13.

The Clean Air Act aims "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). To help meet this goal, the 1990 amendments to the Clean Air Act created an operating permit program that applies to all major sources of air pollution – the Title V permit program. See 42 U.S.C. §§ 7661-7661f.

14.

A primary purpose of the Title V permitting program is to reduce violations of the Clean Air Act and improve enforcement by recording in one document all of the air pollution control requirements that apply to a source of emissions. See New York Public Interest Research Group v. Whitman, 321 F.3d 316, 320 (2d Cir. 2003). Major sources of air pollution cannot legally discharge pollutants into the air unless they have a valid Title V operating permit. 42 U.S.C. § 7661a(a).

15.

The Clean Air Act provides that the Administrator of EPA may approve states' programs to administer the Title V permitting program with respect to sources within their borders. 42 U.S.C. § 7661a(d). The Administrator approved Colorado's Title V permit program. 65 Fed. Reg. 49,919 (Aug. 16, 2000). The Colorado Department of Public Health and Environment, Air Pollution Control Division ("APCD") is responsible for issuing Title V permits in Colorado.

16.

Before a Title V permit can be issued by a state with an approved Title V permit program, the State must forward the proposed Title V permit to EPA. 42 U.S.C. §

7661d(a)(1)(B). EPA then has 45 days in which it can review the proposed permit. EPA must object to the issuance of the permit if EPA finds that the permit does not comply with all applicable provisions of the Clean Air Act. 42 U.S.C. § 7661d(b)(1). However, EPA does not review most Title V permits forwarded to it by state permitting agencies.

17.

After EPA's 45-day review period, "any person may petition the Administrator within 60 days" to object to the proposed permit. 42 U.S.C. § 7661d(b)(2).

18.

Once it receives a petition for objection to a proposed Title V permit, EPA must grant or deny that petition within 60 days. Id.; New York Public Interest Research Group v. Whitman, 214 F. Supp. 2d 1, 2 (D.D.C. 2002).

## VI. STATEMENT OF FACTS

### BACKGROUND

19.

Denver Regional Landfill (South) Inc. ("Denver Landfill") is a municipal solid waste landfill located in Erie, Weld County, Colorado. Denver Landfill is located within 100 kilometers of the Rocky Mountain National Park and the Rawah Wilderness Area, which are Federal Class I areas.

20.

Denver Landfill emits volatile organic compounds, hazardous air pollutants including mercury, particulate matter, sulfur dioxide and nitrogen oxides.

21.

Colorado APCD issued a draft Title V operating permit to Denver Landfill (Permit No. 03OPWE254) and granted the public a 30- day period to comment on this draft permit.

22.

Plaintiffs submitted written comments on the Denver Landfill Title V permit to Colorado APCD on July 29, 2005 and December 9, 2005.

23.

Colorado APCD subsequently proposed the Denver Landfill Title V permit to EPA for review on December 28, 2005.

24.

EPA did not object on its own initiative to the Denver Landfill Title V permit during its 45-day review period.  This 45-day period expired on or around February 11, 2006.

25.

Pursuant to 42 U.S.C. § 7661d(b)(2), Plaintiffs thus had until on or around April 11, 2006, to petition EPA for an objection to the permit.  EPA received Plaintiffs' petition for an objection to the permit on no later than March 17, 2006.

26.

The petition raised four issues with respect to the Denver Landfill Title V permit; (1) insufficient public comment procedures, (2) failure to ensure compliance with new source performance standards, (3) inadequacies in startup, shutdown and malfunction plan requirements for hazardous air pollutants and (4) flaws in APCD's analysis of the emission limitations' impacts on ambient air quality.  Each of Plaintiffs' four arguments was raised with reasonable specificity in Plaintiffs' comments to Colorado APCD during the initial public comment period.

27.

EPA had until no later than May 16, 2006 to grant or deny the Denver Landfill Title V

petition. 42 U.S.C. § 7661d(b)(2). However, EPA neither granted nor denied the petition within

the statutory period. EPA still has not granted or denied the petition as of date of filing this

Complaint.

### VII. CLAIM FOR RELIEF

FAILURE TO RESPOND TO PLAINTIFFS' DENVER LANDFILL PETITION FOR

OBJECTION

(42 U.S.C. § 7661d(b)(2))

28.

Each allegation set forth in the Complaint is incorporated herein by reference.

29.

EPA has a mandatory duty to respond within 60 days to Plaintiffs' petition requesting

that EPA object to the Denver Landfill Title V Operating Permit pursuant to 42 U.S.C. §

7661d(b)(2)("The Administrator shall grant or deny such petition within 60 days after the

petition is filed.").

30.

It has been more than 60 day since EPA received Plaintiffs' petition requesting EPA

object to the Denver Landfill Title V permit.

31.

Defendant has not granted or denied the petition.

9

32.

Defendant's failure to grant or deny the petition constitutes a failure to perform an act or duty that is not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2). 42 U.S.C. § 7604(a)(2).

33.

Therefore, EPA has violated, and remains in violation of, its non-discretionary duty to grant or deny Plaintiffs' petition within 60 days, as required by 42 U.S.C. § 7661d(b)(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A)    Declare that Defendant's failure to grant or deny Plaintiffs' petition for an objection to the Denver Landfill Title V permit constitutes a failure to perform an act or duty that is not discretionary with the Defendant within the meaning of 42 U.S.C. § 7604(a)(2);

B)    Order the Defendant to grant or deny Plaintiffs' petition for an objection to the Denver Landfill Title V permit in accordance with an expeditious schedule prescribed by the Court;

C)    Retain jurisdiction over this action to ensure compliance with the Court's Order;

D)    Award Plaintiffs their costs of litigation, including reasonable attorney fees; and

E)    Grant such other relief as the Court deems just and proper.

Respectfully submitted,


___/s/_____
Robert Ukeiley (MD14062)
Law Office of Robert Ukeiley
433 Chestnut Street
Berea, KY 40403
Tel: (859) 986-5402
Fax: (859) 986-1299
E-mail: rukeiley@igc.org

Counsel for Plaintiffs

DATED:  August 10, 2006