IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BILL MACCLARENCE,                              ) | |
|                               ) | |
|           Plaintiff,                        ) | |
|                               ) | |
|      v.                                  ) | Civ. No. 1:07-cv-00055 (RWR) |
|                               ) | |
| STEPHEN L. JOHNSON,                          ) | |
| Administrator, United States                    ) | |
| Environmental Protection                         ) | |
| Agency                                         ) | |
|                               ) | |
|           Defendant.                        ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR AWARD OF**

**ATTORNEYS' FEES AND COSTS**

## I.      INTRODUCTION

With regard to Plaintiff's motion for attorneys' fees and costs under the Clean Air Act citizen suit provision, the central issue left for the Court to decide is the reasonable hourly rate for Plaintiff's attorneys.   Plaintiff's requested rates are substantially below the actual market rates for federal court practice in the District of Columbia but are the rates that the United States Department of Justice itself puts forth on its website, known as the U.S. Attorney's Office Laffey Matrix rate, as reasonable rates for federal court practice in the District of Columbia.  For attorney Robert Ukeiley and his staff, the U.S. Attorney's Office Laffey Matrix rates are Mr. Ukeiley's and his staff's actual market rates as evidenced by what they actually charge and are paid in all of their non-*pro bono* cases.   For attorney William Eddie, the Laffey Matrix rate is modestly higher than the

rate he commands in the Portland, Oregon market ($250 per hour in Portland, versus $305 per hour under the Laffey Matrix).

Defendant argues that Mr. Ukeiley and his staff should not be paid at their actual billing rate, which is the same rate deemed reasonable by the U.S. Attorney's Office Laffey Matrix; and Defendant quibbles over the requested rate for Mr. Eddie. Defendant's approach effectively penalizes Plaintiff's attorneys for taking this public interest case, involving protecting the public from dangerous air pollution, on a *pro bono* basis. Defendant argues that the Court should reject the well-established "forum rate" rule and base Plaintiff's attorneys' rates on rates in the Eastern District of Kentucky (for Mr. Ukeiley), and Portland, Oregon (for Mr. Eddie). In making this argument, Defendant does not directly address the issue that Mr. Ukeiley's "home forum" is not the Eastern District of Kentucky because Mr. Ukeiley has never filed a single case in that forum. Defendant also fails to offer any cogent reason why Mr. Ukeiley should be awarded less than the rate he actually charges to non-*pro bono* clients on a regular basis. The Court should decline Defendant's invitation to become the first court to penalize public interest counsel representing a party on a *pro bono* basis by setting a rate that is very substantially below counsel's actual rates charged to non-*pro bono* clients.

## II.    ARGUMENT

### A.    DEFENDANT HAS FAILED TO SHOW WHY PLAINTIFF'S COUNSEL SHOULD NOT RECOVER FEES AT THE U.S. ATTORNEY'S OFFICE LAFFEY MATRIX RATES.

#### 1.    THE <u>DAVIS</u> EXCEPTION TO THE FORUM RATE RULE DOES NOT APPLY TO THIS CASE.

Plaintiff will provide below a detailed reply to EPA's Opposition to Motion for Attorneys' Fees (EPA Opp.) in the interest of completeness and to show the irrationality of EPA's position. However, ultimately, the Court's analysis need not trouble with EPA's inaccurate details for they are irrelevant.

The relevant argument is this. EPA invokes <u>Davis County Solid Waste Mgmt. v. EPA</u>, 169 F.3d 755, 758 (D.C. Cir. 1999) to claim an exception to the otherwise well established rule that "forum rates" are to be applied. <u>See</u> EPA Opp. at 2. The D.C. Circuit held in <u>Davis</u> that the exception to the forum rates rule was to "prevent the occasional erratic result where the successful petitioner is vastly overcompensated given the amount he <u>contracted to pay</u> for legal services. In <u>all</u> other cases the D.C. forum rates would apply." <u>Id.</u> (emphasis added). It is undisputed Plaintiff's counsel are representing Plaintiff on a *pro bono* basis in this case; that is, Plaintiff has not contracted to pay anything for legal services except out of pocket expenses. <u>See, e.g.</u> 6/21/07 Declaration of Robert Ukeiley in Support of Plaintiff's Motion for Award of Attorneys' Fees and Costs (1st Ukeiley Decl.), ¶ 10. Thus, because it is impossible for Plaintiff to be vastly overcompensated given that Plaintiff did not contract to pay for legal services in this case, the <u>Davis</u> exception does not apply. It is also undisputed that the hourly rates

Plaintiff is requesting are reasonable D.C. forum rates.  Therefore, Plaintiff's Motion should be granted based on their requested rates.

### 2.    THE REST OF EPA'S ARGUMENTS ARE WITHOUT MERIT

EPA starts off by arguing that they are litigating this motion to protect the public fisc.  EPA Opp. at 1, n. 1.  It is difficult to reconcile this claim with EPA's wasteful practice of violating the mandatory 60-day deadline in Title V of the Clean Air Act almost every single time until hauled into court.  See 1st Ukeiley Decl. ¶¶ 18-19.  This practice results in EPA spending tax payer money on not only Plaintiff's costs of litigation, including attorneys' fees, but also on EPA and Department of Justice personnel defending, that is settling, these lawsuits.   These lawsuits should be unnecessary, if only EPA would comply with the Clean Air Act before being compelled to do so through litigation.

The Clean Air Act requires that would-be citizen plaintiffs send EPA a notice of intent to sue letter 60 days before filing suit.  42 U.S.C. § 7604(b)(2).  The purpose of this requirement is to allow the violator, in this case EPA, to come into compliance with the law and thus "render unnecessary a citizens suit."  Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 60, (1987).  If EPA was really concerned with the public fisc, it would take advantage of the opportunity Congress gave it and comply with its mandatory duty at least during the 60 days following receiving a notice of intent to sue.  EPA would thus not incur liability for Plaintiff's attorneys' fees.  Unfortunately, EPA almost never does this (and did not do so in this case).

EPA goes on to argue that the imposition of a hypothetical market rate in the Eastern District of Kentucky for Mr. Ukeiley is appropriate in this case to avoid a

windfall.  EPA Opp. at 13-15.  EPA's argument makes no sense whether the claimed

windfall is to Plaintiff or Plaintiff's counsel.  As to Plaintiff, as explained above, <u>Davis</u>

was concerned with the rare case where the plaintiff contracts for a rate that is much

lower than what the plaintiff would recover from the court.  Thus the plaintiff would get a

windfall via the difference between what is actually paid to plaintiff's counsel and what is

recovered from defendants.  <u>Davis</u>, 169 F.3d at 758.  That concern has no applicability to

the undisputed facts of this case, where Plaintiff has paid nothing because he is being

represented without charge.  EPA acknowledges that "the right to seek attorneys' fees

under the CAA belongs to the "party," not to counsel, *see* 42 U.S.C. § 7604( d)[.]"  EPA

Opp. at 14.  Thus, according to EPA, the issue must be whether the plaintiff, to whom the

Court would be awarding attorneys' fees, will receive a windfall.  The facts in this case

are undisputed that Plaintiff will not receive a windfall.  Therefore, EPA's argument is

without merit.

　　　　EPA then shifts the argument and claims that Plaintiff's counsel is the one who

will receive a windfall, which justifies departure from the forum rule and in the case of

the Ukeiley Firm, payment of below market rates.  EPA Opp. at 14 ("In any event, the

fact that MacClarence's counsel alone would benefit from this fee award weakens, rather

than strengthens, the argument that higher-than-appropriate rates should apply, because it

only shifts the potential windfall from MacClarence to his counsel.").  This argument

fails on three levels.  First, EPA's concern of a windfall to Plaintiff's counsel has no legal

basis in <u>Davis</u>, which addressed a windfall to the Plaintiff only, or in any other legal

authority.  Rather, it runs counter to the well-established forum rate rule.

Second, EPA's concern is not with a windfall generated by the difference between the Ukeiley Firm's market rates and the rates to be recovered in this case, for they are the same. Rather, EPA's concern is with a windfall generated by the difference between the Ukeiley Firm's market rates and the cost of operation of a law office in Kentucky. EPA Opp. at 14 ("Moreover, by locating in Kentucky, Mr. Ukeiley has been able to take advantage of lower costs for office space, personnel, and other necessary elements for a law practice.") Contrary to EPA's claim, the Supreme Court has rejected the windfall between cost and market rate argument as a factor in deciding reasonable rates for fee shifting cases. Missouri v. Jenkins, 491 U.S. 274, 287 (1989).

Finally, EPA offers no evidence to establish its irrelevant factual claim that costs for the Ukeiley Firm are less because it is in Kentucky versus D.C. The Court cannot base its decision on speculation. While there is some intuitive appeal to the claim that, on average, office rent in Kentucky is less than in D.C., rent is just one cost for a law firm. EPA does not address the major costs. EPA does not suggest, for example, that George Washington University and Lewis and Clark Law Schools forgave Mr. Ukeiley and Ms. Baldwin's student loans, thus allowing them to work for a lower salary because they moved to Kentucky. Furthermore, EPA's argument continues to ignore the undisputed fact that the Ukeiley Firm does not practice cases in the Eastern District of Kentucky. To the extent the cost of business of practicing such cases is cheaper, it would be arbitrary to apply that fact to this case. The Ukeiley Firm's practice is such that it does not allow its major cost, compensation to lawyers, to take advantage of the "local market." In any event, the undisputed fact in this case is that Mr. Ukeiley "ordinarily commands" the rates they are requesting in this case. Id. See also 1st Ukeiley Decl. ¶ 23, 25 (Ukeiley

firm charges and is paid Laffey Matrix rates in its non-*pro bono* cases as is requested in this case).   Why the market accepts these rates is fortunately not an issue the Court need explore.[1]

EPA attempts to characterize Mr. Ukeiley's market rate, as evidenced by his non-*pro bono* work at the U.S. Attorney's Office Laffey Matrix rate, as a "single fortunate case."   EPA Opp., at 8-9.   The undisputed facts are otherwise.   Mr. Ukeiley's firm has handled 14 separate matters at his market rates for a variety of clients since 2003.   1st Ukeiley Decl. ¶ 25.   14 is not one.   Those 14 matters represented 100% of the Ukeiley Firm's non-*pro bono* work, that is market rate work.   The rest of the Ukeiley Firm's work was all done on a *pro bono* or substantially sub-market "low bono" basis. 1st Ukeiley Decl. ¶ 34.   Thus, at 100% of the relevant data points, Mr. Ukeiley's regular work at U.S. Office Attorney's Laffey Matrix rates is a far cry from a single outlier.   The fact that the Ukeiley Firm does so much *pro bono* work cannot be the basis to reduce its rates.   See Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1524 (D.C.Cir.1988).[2]

Moreover, since Plaintiff filed its Motion for Fees and Costs herein, Petitioner Bill MacClarence elected to file in the U.S. Court of Appeals for the Ninth Circuit a petition for review of EPA's order on the Title V petition which this action compelled.   In

---

[1] In addition, the Ukeiley Firm is not receiving a windfall in terms of the difference between its costs of operation and income.  For example, during the entire 42 month period between 12/1/03 and 6/21/07 the Ukeiley Firm's net income was approximately $65,000.  Although an exactly analysis is far more work than merited to respond to this irrelevant point, Mr. Ukeiley estimates that his firm would have had very little net income or even have operated at a loss, if his rates for work in D.C. during this period were at the rates EPA requested for the first time in this case.  2nd Ukeiley Decl. ¶ 13.

[2] During the same 42 month period that the Ukeiley Firm's income from non-*pro bono* clients was $66,000, the Ukeiley Firm's total gross income was approximately $372,000.  ("2nd Ukeiley Decl."), ¶ 3.  Thus, contrary to EPA's unsupported assertion in footnote 6 of its opposition brief, these non-pro bono clients contributed almost 18% of the Firm's total income, which does not constitute one lucky case.  EPA's analysis is flawed because the $66,000 includes associate time and partner time.  ("2nd Ukeiley Decl."), ¶ 4.

that case, Mr. MacClarence will pay Mr. Ukeiley at his full U.S. Attorney's Office Laffey Matrix rate of $375 per hour. Second Declaration of Robert Ukeiley in Support of Plaintiff's Motion for Award of Attorneys' Fees and Costs ("2ⁿᵈ Ukeiley Decl."), ¶ 2.

In short, recovery of one's ordinary rate is certainly not a windfall. However, recovery of significantly less than one's ordinary rate is effectively penalizing counsel for taking a public interest case on a *pro bono* basis.

EPA goes on to cite <u>Palmer v. Rice</u>, 2005 WL 1662130, at *20 (D.D.C. July 11, 2005) as further support. <u>See</u> EPA Opp. at 4-5. However, if anything <u>Palmer</u> supports Plaintiff's position. <u>Palmer</u> is a magistrate judge's report and recommendation. In Palmer, one attorney, Wagner, was from Massachusetts. Wagner charged the principle law firm in the case $85 for her work on that case and her actual billing rate for clients was $140. <u>Palmer</u>, 2005 WL 1662130, at *5. The magistrate judge recommended that Wagner be compensated at "her normal market rate," that is $140 per hour. <u>Id.</u> at *10. The court did not consider case law discussing what other Massachusetts attorneys have recovered in various cases.

In this case, the undisputed evidence is that the Ukeiley Firm's normal market rates are the rates Plaintiff seeks in this case. Thus, following the holding in <u>Palmer</u> would lead to the conclusion that the Ukeiley Firm should be awarded the hourly rates Plaintiff has requested.

EPA also cites to <u>Avera v. Secretary of HHS</u>, 75 Fed. Cl. 400, 405 (Fed. Cl. 2007) but the analysis of the applicability of that case to this case is the same as in <u>Palmer</u> and <u>Davis</u>. EPA Opp. at 4-5, n. 5. In <u>Avera</u>, the plaintiffs' attorney from Wyoming originally requested $200 per hour. He explained in a sworn affidavit that "the rates my

8

firm has charged in this case [$200 per hour] are the same as we charge all other clients for the nature of services rendered." Avera, 75 Fed. Cl. at 401.  However, subsequently plaintiffs' attorney revised his request to rates of $574 - $598, based on the adjusted Laffey Matrix, without any claim that the higher rates were what he ordinarily commands.  Id. at 401-402.[3]  The court rejected this request and paid the attorney based on what he normally charges, $200 per hour.  Id. at 405.  That is exactly what Plaintiff is requesting in this case; to obtain a fee award based on the rate that Mr. Ukeiley normally charges.  In any event, Avera is of no moment as the U.S. Court of Federal Claims does not use the "forum rule" while the D.C. Circuit does.  Id. at 403.

EPA goes on to argue that:

> Under *Davis County*, therefore, in order to establish entitlement to District of Columbia rates, MacClarence should have introduced evidence to show that the rates in the Eastern District of Kentucky and in the District of Oregon are not substantially lower than District of Columbia rates.

EPA Opp. at 7.  This argument is invalid in numerous ways.  To begin, as explained above, Davis does not apply to the facts of this case in which the Plaintiff will not receive a windfall and there is no significant difference between the rates Plaintiff's attorneys normally command and the U.S. Attorney's Office Laffey Matrix rates.  Moreover, there is no rational reason to pick the Eastern District of Kentucky as the controlling market.  It is undisputed that Mr. Ukeiley has never participated in a case in that court so it is simply factually wrong to call it Plaintiff's attorneys home forum, just as it would be wrong to call Maryland, Virginia or even West Virginia the home forum of the many attorneys who practice in this Court but live in those states.

---

[3] Plaintiff had actually lost in this case but the Vaccine Act allows recovery of fees even when the plaintiff loses.  The court used this as one basis for rejecting the forum rule, which it explained applies in cases where plaintiffs only recover if they prevail.  Id. at 403.

It is worthwhile noting that the Eastern District of Kentucky is not even necessarily the closest court to Berea, Kentucky, where Mr. Ukeiley lives. For example, according to the web page "mapquest.com" the Southern District of Ohio's Cincinnati Division is closer to Berea, Kentucky than the Ashland Division and the Pikeville Division of the Eastern District of Kentucky (although the Lexington Division of the Eastern District of Kentucky is closer than Cincinnati). See 2nd Ukeiley Decl. ¶ 5. Choosing the Southern District of Ohio as the relevant market to set rates in this case would not make much sense either -- but at least Mr. Ukeiley has actually practiced in that Court. Mr. Ukeiley's requested rates of between $360 - $375 and Ms. Baldwin's requested rate of $205 are under the highest rate charged for Cincinnati partners and associates, according to the national attorney rate survey the Department of Justice lawyers provided to Plaintiff's counsel. See 1st Ukeiley Decl., Ex. A, page 5 of 12 (Cincinnati partner charging up to $435 per hour, associates up to $280).

EPA's argument also fails because to the extent EPA was correct that the Ukeiley Firm's home forum was the Eastern District of Kentucky, then the Ukeiley Firm's actual rates would be the best indication of what is a reasonable rate for highly specialized Clean Air Act firms in that forum. Since the Ukeiley Firm is seeking the rates in this case that it normally commands, those rates are reasonable rates from Ukeiley's home forum.

EPA claims that the attorneys' rates survey provided with Plaintiff's Motion does not contain any rates for Kentucky. EPA Opp. at 12, n. 7. EPA is wrong. The survey does include rates for a firm in Louisville, Kentucky with rates that are higher than the

rates the Ukeiley Firm is requesting for both a partner and associate.  See 1st Ukeiley

Decl., Ex. A, page 12 of 12 (partners at up to $400 and associates up to $235).[4]

Likewise, the rate sought for Mr. Eddie's time ($305 per hour, based on the U.S.

Attorney's Office Laffey Matrix) is comfortably in the range of rates charged by partners

in Portland, Oregon law firms.  Id. at 4, 11 (Portland partners charging $225 to $475).

EPA concedes that a rate of $250 per hour for Mr. Eddie's time would be reasonable in

the Portland forum, but objects to the requested rate of $305 per hour.  Plaintiff merely

asks the Court to consistently apply the forum rule in this District as provided in

Covington v. District of Columbia, 57 F.3d 1101, 1105, & n. 14 (D.C. Cir. 1995).   Not

only does the Davis exception to the forum rule not apply here because there is no risk of

a windfall to Plaintiff, but even if it did apply the difference of $55 per hour between

D.C. and Portland rates simply does not rise to the level of a "*very significant* difference

in compensation favoring D.C." as articulated in Davis.  169 F.3d. at 758 (emphasis in

original).  The Davis court required the difference to be not merely "significant," but used

italics to emphasize the required difference as "*very significant*."  Here, the difference is

modest.

Finally, Plaintiff notes that while EPA is correct that at the time of the preparation

of Plaintiff's opening brief, none of the work had been preformed in Washington, D.C.,

Mr. Ukeiley's work on this reply brief was done in Berkeley, California. 2nd Ukeiley

Decl., ¶ 6.  Plaintiff offers this fact not to claim that the work done in Berkeley should be

based on Berkeley rates but rather to demonstrate that it would be arbitrary to chose the

Eastern District of Kentucky as the "home" forum for attorneys who do not practice in

that court and very rarely participate in proceedings in that state.

---

[4] Louisville is in the Western District of Kentucky.

EPA argues that "If the appropriate rate is the forum rate in every case, regardless of where counsel is located, then a 'nationwide practice' is no more than a license to shop for a forum in which local lawyers earn high fees, like the District of Columbia." EPA Opp. at 10. The forum rate is the appropriate rate except for the rare case with facts similar to the <u>Davis</u> case or the other exceptions which no one has claimed apply to this case. EPA has no basis to ask the Court to overturn the forum rule.

Moreover, any implication that D.C. was chosen as the forum for this case based on attorneys fees rates rather than the merits of the case is completely misplaced. As explained before, EPA has a pattern and practice of violating its mandatory 60-day deadline for responding to Title V petitions. It is the EPA Administrator himself who signs, or fails to sign, the response. <u>See</u> 2nd Ukeiley Decl., Ex. D. The authority to respond to Title V petitions has <u>not</u> been delegated from the EPA Administrator, who is of course in Washington, D.C. Furthermore, EPA Region 10, which covers Alaska, is in Seattle, Washington, not Alaska but EPA does not suggest Seattle as the forum.

Even before this case was filed, EPA's Office of General Counsel in Washington, D.C. provided the acknowledgment of the notice of intent to sue letter. <u>See</u> 2nd Ukeiley Decl., Ex. E. The letter indicated that this matter was being staffed by Sara Laumann, who is an EPA employee in Denver, Colorado, not Alaska. <u>See</u> 2nd Ukeiley Decl., Ex. E, ¶ 7.[5] [6]

---

[5] Plaintiff is not certain why a Region 8 person was assigned to this case but it is likely because this case raises the issue of "aggregation," which is an issue that Region 8 is extensively involved in. In any event, the key fact was that the case was not assigned to a person in Alaska despite EPA's litigation position for the purpose of this motion that Alaska is where this case should have been filed. .

[6] Ms. Laumann is staffing another case in which Mr. Ukeiley is counsel. That case involves the attainment status of Denver, Colorado. Ironically, however, EPA requested and thus Petitioners filed that case in the D.C. Circuit rather than in the 10th Circuit. 2nd Ukeiley Decl. ¶ 8.

Most importantly, the delay in EPA's response to Title V petitions is usually caused by EPA Headquarters, which includes personnel in Washington, D.C. and sometimes in Research Triangle Park, North Carolina. 2nd Ukeiley Decl., ¶ 9. In addition, the Department of Justice attorney litigating this case is in D.C. Thus, because the evidence relevant to EPA's failure to respond to the petition was mostly in Washington, D.C. and because the agency personnel working on the case were in Washington, D.C. and Denver, Colorado, the most efficient forum to file this case in is Washington, D.C.[7]

**B.     DEFENDANT HAS FAILED TO SHOW THAT PLAINTIFF IS REQUESTING AN UNREASONABLE NUMBER OF HOURS.**

EPA has provided no basis to reduce the hours in this case. EPA asks for a reduction of 10% across the board because the documents in this case include items cut and pasted out of other cases. However, EPA has absolutely no evidence that time in this case includes time actually spent drafting documents in other cases, which is not the case at all. 2nd Ukeiley Decl. ¶ 10.

EPA does not acknowledge that Plaintiff has already reduced the hours for which an award is sought by 15%. Thus, it appears that EPA has already obtained more than the relief it requested.

Moreover, EPA complains that Mr. Ukeiley's 2.5 hours working on the complaint, in conjunction with Mr. Eddie's 7.9 hours, is unreasonable. 10.4 hours on a complaint, which includes unique factual issues such as standing and the timing of

---

[7] One of the D.C. Circuit's rationales for the forum rule, that it is evenhanded as it sometime results in lower rates and sometimes results in higher rates, applies to Title V petition deadline suits. For example, New York Public Interest Research Group v. Whitman, 214 F.Supp.2[nd] 1 (D.D.C. 2002) was a Title V deadline suit that could have been filed in NY, a more expensive legal market than D.C., but was filed in D.C. because D.C. is the most appropriate forum.

actions in this case, is not unreasonable.  In any event, Plaintiff has already reduced Mr.

Ukeiley's time by 3.4 hours which is more than the 2.5 hours EPA is complaint about.

See 1st Ukeiley Decl. ¶ 12-13.

Mr. Eddie has already reduced his hours by 4.4 hours.  See 1st Eddie Decl. ¶ 10.

Combined, Plaintiff has reduced Mr. Eddie and Mr. Ukeiley's billable time by 7.8 hours.

Subtracting 7.8 from the total 10.4 hours spent on the complaint leaves only 2.6 hours.

Surely, EPA is not arguing that gathering the factual information and putting it into a

complaint, conducting any additional legal research including legal research on the

rapidly changing law of standing from global contaminants, can actually be done in less

than 2.6 billable hours.

The minimal hours in this case is precisely because, in part, documents can be

used from other cases.  But of course all documents need to be changed to reflect the

facts of the current case.   It is only because Mr. Ukeiley has previously handled similar

cases that Plaintiff's counsel were able to spend so little time, in the relative sense, on this

case.   Finally, EPA's argument makes absolutely no sense for it is asking for a 10%

reduction across the board which would include a 10% reduction for entries like specific

telephone calls and e-mails with defense counsel and clients in this case.

###    C.    PLAINTIFF REQUESTS ADDITIONAL FEES FOR THIS
####          REPLY BRIEF.

For work on this reply brief, Plaintiff requests an additional 3.3 hours of Robert

Ukeiley's time at $375 per hour and 3.2 hours of William Eddie's time at $305 per hour.

See 2nd Ukeiley Decl. ¶ 11-12; 2nd Eddie Decl. ¶ 3.  This reflects a 15% reduction in the

actual billable time spent by Mr. Ukeiley and Mr. Eddie and a waiver of all the time spent

by Mr. Ukeiley's staff on this reply brief.  Id.  This comes to an additional $2213.50.

**III.     CONCLUSION**

Therefore, for the reasons stated above and in the opening brief, Plaintiff requests

a total of $18,711.60 in costs of litigation, including attorneys' fees in this case.


Respectfully submitted,

**/s/**_____

Robert Ukeiley
Law Office of Robert Ukeiley
435R Chestnut Street, Ste. 1
Berea, KY 40403
T: (859) 986-5402
F: (866) 618-1017
E-mail: rukeiley@igc.org

Counsel for Plaintiff

Dated: August 10, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BILL MacCLARENCE, P.E.<br>10840 Glazanof Drive<br>Anchorage, AK 99507,<br><br>v.<br><br>STEPHEN L. JOHNSON, in his official<br>Capacity as Administrator, United States<br>Environmental Protection Agency,<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460,<br><br>EPA. | )<br>)<br>)<br>)    Civ. No. 1:07-cv-00055(RWR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### SECOND DECLARATION OF WILLIAM M. EDDIE IN SUPPORT OF

### PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES AND COSTS

I, William M. Eddie, do declare and if called as a witness would testify as follows:

      1.     I previously provided a declaration in this case in support of Plaintiff's motion for attorney fees and costs.  I have personal knowledge of the facts set forth herein and am competent to testify as to them if called as a witness.

      2.     I am handling this case on a *pro bono* basis, on expectation of the likelihood of recovering attorney fees under Clean Air Act's fee-shifting provision.

      3.     I provided my hours for the bulk of this litigation as Exhibit 3 to my first Declaration.  I expended an additional 3.8 hours working on the reply briefing on Plaintiff's motion for attorney fees and costs.  To avoid wasting judicial resources arguing over trivial amounts, I am exercising my billing discretion and reducing my hours by approximately 15% to 3.2 hours.  A true and correct copy of my

SECOND DECLARATION OF WILLIAM M. EDDIE -- 1

contemporaneous time records is attached as Exhibit 1 to this Declaration.  At a rate of

$305 per billable hour, the lodestar for my additional work on this case comes to $976.00.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

_8/7/07_
Date

William M. Eddie

SECOND DECLARATION OF WILLIAM M. EDDIE -- 2

SECOND DELCARATION OF WILLIAM M. EDDIE

# EXHIBIT 1

**Hours Expended by William M. Eddie**
**MacClarence v. Johnson Title V Petition Matter**

**(Reply briefing only)**

| | | |
|---|---|---|
| 8/6/2007 | Review EPA response brf; email to R.Ukeiley re: same | 0.7 |
| 8/7/2007 | email corresp w/ R.Ukeiley re: reply; draft and edit reply brief on fees | 3.1 |
| | **Total =** | **3.8** |
| | **Total less 15% =** | **3.23** |



EXHIBIT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BILL MacCLARENCE, P.E.,         )
                                   )
        Plaintiff,          )
                                   )    Civ. No. 1:07-cv-00055(RWR)
v.                             )
                                   )
STEPHEN L. JOHNSON, in his official   )
Capacity as Administrator, United States  )
Environmental Protection Agency,      )
                                   )
        Defendant.      )
_____)

**<u>SECOND DECLARATION OF ROBERT UKEILEY IN SUPPORT OF</u>**

**<u>PLAINTIFF'S MOTION FOR  AWARD OF ATTORNEYS' FEES AND COSTS</u>**

I, Robert Ukeiley, do declare and if called as a witness would testify as follows:

     1.     I am an attorney of record in this case.  I have previously submitted a declaration in this case.  I am submitting this, my second declaration, in support of Plaintiff's motion for reasonable attorneys' fees and costs.   I have personal knowledge of the facts set forth herein and am competent to testify as to them if called.

     2.     Since Plaintiff filed his motion for fees and costs, Petitioner Bill MacClarence has elected to file in the U.S. Court of Appeals for the Ninth Circuit a petition for review of EPA's order on his the Title V petition which this action compelled.  In that case, Mr. MacClarence will pay me at my market rate of $375 per hour which is also the rate listed for an attorney of my experience in the U.S. Attorney's Office Laffey matrix.

3.      During the same 42 month period that my Firm's income from non-*pro bono* clients was $66,000, my Firm's total gross income was approximately $372,000. ("2nd Ukeiley Decl.").  Thus, this work, for which I was paid at rates that are the same or almost the same as the U.S. Attorney's Office Laffey Matrix rates constituted almost 18% of my Firm's total gross income during this period.  The rest of the Firm's income was from cases I was handling for clients on a *pro bono* basis as described in my first declaration.

4.      EPA's analysis in its opposition brief about how much billable time the $66,000 represents is flawed because the $66,000 includes associate time, summer law clerk time, and partner time.

5.      The Eastern District of Kentucky is not even necessarily the closest court to Berea, Kentucky where I live.  For example, according to the web page "mapquest.com" the Southern District of Ohio's Cincinnati Division is closer to Berea, Kentucky than the Ashland Division and the Pikeville Division of the Eastern District of Kentucky (although the Lexington Division of the Eastern District of Kentucky is closer than Cincinnati).  At least I have actually practiced in the Southern District of Ohio.

6.      My work on this reply brief was done in Berkeley, California.

7.      Attached as exhibit E to this declaration is a letter sent by EPA in response to the notice of intent to sue letter that Mr. MacClarence sent as a prerequisite to filing this case.  The letter indicated that this matter was being staffed by Sara Laumann. EPA's web page indicates that Ms. Laumann is an EPA employee in Denver, Colorado, not Alaska.

8.      Ms. Laumann is staffing another case I am working on.  That case involves the attainment status of Denver, Colorado.  Ironically, EPA requested and thus we filed that case in the D.C. Circuit rather than in the 10th Circuit.

9.      In my experience, the delays in EPA's response to Title V petitions is usually caused by EPA Headquarters, which includes personnel in Washington, D.C. and sometimes in Research Triangle Park, North Carolina.

10.      None of the billable hours for which Plaintiff is requesting compensation in this case was time actually spent drafting documents in other cases.

11.      I provided the bulk of my billable hours in Exhibit C to my first declaration in this case.  I expended an additional 3.9 billable hours with regard to reply briefing.  However, in order to avoid wasting judicial resources over trivial amounts, I am exercising my billing discretion to reduce my billable hours by approximately 15% to 3.3 hours.  I am also exercising my billing discretion to not request recovery of the time my legal assistant and summer law clerk spent on reply briefing.  A detailed account of my billable hours created from my contemporaneous records is below in paragraph 12.  At $375 per hour, my loadstar for work on the reply brief is $1237.50.

12.      My time spent on reply briefing is as follows:

8/6/07  0.4      Review opposition brief.  E-mail to Bill Eddie regarding drafting reply

8/7/07  0.2      E-mails with Bill Eddie re: arguments for reply brief.

8/8/07  1.9      Edit reply brief.  Draft declaration.

8/9/07  1.4      Edit reply brief.  Draft declaration.

13.      My Firm is not receiving a windfall in terms of the difference between its costs of operation and income.  For example, during the entire 42 month period between

12/1/03 and 6/21/07 the Ukeiley Firm's net income was approximately $65,000. An

exactly analysis is far more work than merited to respond to this irrelevant point.

However, I estimate that my Firm would have had very little net income or even have

operated at a loss during this 42 month period if the Firm's rates for work in D.C. during

this period were at the rates EPA requested for the first time in this case.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

$8/10/07$

Date

Robert Ukeiley

SECOND DELCARATION OF ROBERT UKEILEY

# EXHIBIT D

**BEFORE THE ADMINISTRATOR**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

|  |  |  |
|---|---|---|
| IN THE MATTER OF | ) | |
| BP Exploration (Alaska), Inc. | ) | |
| GATHERING CENTER #1 | ) | ORDER RESPONDING TO PETITIONER'S |
|  | ) | REQUEST THAT THE ADMINISTRATOR |
| Permit No. 182TVP01 | ) | OBJECT TO ISSUANCE OF A STATE |
| (Revision 1) | ) | OPERATING PERMIT |
| Issued by the Alaska Department | ) | |
| of Environmental Conservation | ) | |
|  | ) | |

## ORDER DENYING PETITION
## FOR OBJECTION TO PERMIT

On February 17, 2004, the State of Alaska Department of Environmental Conservation (ADEC) issued Revision 1 to the State operating permit to BP Exploration (Alaska), Inc. - Gathering Center #1 (GC1) at Prudhoe Bay, Alaska (Revision 1 to the GC1 Permit or Revision 1), pursuant to title V of the Clean Air Act (CAA), 42 U.S.C. §§ 7661-7661f, CAA §§ 501-507. On April 14, 2004, the Environmental Protection Agency (EPA) received a petition from Public Employees for Environmental Responsibility on behalf of Bill MacClarence (Petitioner) requesting that EPA object to the issuance of this permit pursuant to section 502(b)(2) of the CAA, the federal implementing regulations, 40 C.F.R. part 70, and the State of Alaska implementing regulations, 18 Alaska Administrative Code (AAC) Ch. 50.

The petition alleges that:

(1) Revision 1 to the GC1 Permit violates title V of the CAA because Revision 1 does not explain the departure from ADEC's March 7, 2003 draft permit and because the provisions of Prevention of Significant Deterioration (PSD), National Emission Standards for Hazardous Air Pollutants (NESHAP), and New Source Performance Standards

PAGE 1

(NSPS) are all based on the aggregated impact of air emissions and this permit did not aggregate all facilities within the Prudhoe Bay Unit (PBU);

(2) The pollution consequences of this violation are significant because elevated levels of nitrogen oxide on the North Slope of Alaska present a serious health problem for workers and native communities in the region and have been created by not aggregating facilities within the PBU; and

(3) ADEC and EPA failed to exercise proper regulatory oversight in this matter by issuing the final permit with no public notice or discussion.

The Petitioner has requested that EPA object to the issuance of Revision 1 to the GC1 permit pursuant to section 505(b)(2) of the CAA for the reasons identified above.

Based on a review of available information, including Revision 1 to the GC1 Permit; the statement of basis for Revision 1; the original GC1 Permit and statement of basis; the permit application; and information provided by the Petitioner in his petition, EPA denies the petition.

## I.    **STATUTORY AND REGULATORY FRAMEWORK**

Section 502(d)(1) of the CAA requires each state to develop and submit to EPA an operating permit program to meet the requirements of title V. EPA granted interim approval to the title V operating permit program submitted by the State of Alaska effective December 5, 1996, 61 FR 64463 (December 5, 1996), and full approval effective November 30, 2001, 66 FR 63184 (December 5, 2001). See 40 C.F.R. part 70, appendix A. Major sources of air pollution and other sources covered by title V are required to obtain an operating permit that includes emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the CAA. See CAA §§ 502(a) and 504(a).

The title V operating permit program does not generally impose new substantive air quality control requirements (which are referred to as "applicable requirements"), but does require that permits contain monitoring, recordkeeping, reporting, and other compliance requirements when not adequately required by existing applicable requirements to assure compliance by sources with existing applicable emission control requirements. 57 FR 32250, 32251 (July 21, 1992). One purpose of the title V program is to enable the source, the permitting authority, EPA, and the public to better understand the applicable requirements to which the

PAGE 2

source is subject and whether the source is meeting those requirements. Thus, the title V operating permits program is a vehicle for ensuring that existing air quality control requirements are appropriately applied to facility emission units and that compliance with these requirements is better assured.

Under section 505(a) of the CAA, permitting authorities are required to submit all proposed title V operating permits to EPA for review. Section 505(b)(1) of the CAA authorizes EPA to object if a permit contains provisions not in compliance with applicable requirements. Section 505(b)(2) of the CAA states that if EPA does not object to a permit, any person may petition the Administrator, within 60 days of the expiration of EPA's 45-day review period, to object to the permit. To justify exercise of an objection by EPA to a title V permit pursuant to section 505(b)(2), a petitioner must demonstrate that the permit is not in compliance with the requirements of the CAA. See 40 C.F.R. § 70.8(c)(1); NYPIRG v. Whitman, 321 F.3d 316, 333 n.11 (2d Cir. 2003).

Petitions must be based "only on objections to the permit that were raised with reasonable specificity during the public comment period...unless the petitioner demonstrates that it was impracticable to raise such objections within such period, or unless the grounds for the objection arose after the public comment period." 40 C.F.R. § 70.8(d); see also CAA § 505(b)(2). A public petition for administrative review does not stay the effectiveness of the permit or its requirements if the permit was issued after the expiration of EPA's 45-day review period and before receipt of the objection. 40 C.F.R. § 70.8(d). If EPA objects to a permit in response to a petition and the permit has been issued, the permitting authority or EPA will modify, terminate, or revoke and reissue such a permit using the procedures in 40 C.F.R. § 70.7(g) for reopening a permit for cause. The permitting authority has 90 days from receipt of EPA's objection letter to propose a determination of termination, modification, or revocation and reissuance, as appropriate, in accordance with EPA's objection. 40 C.F.R. § 70.7(g)(4). If the permitting authority fails to resolve EPA's objection, EPA will terminate, modify, or revoke and reissue the permit after providing at least 30 days' notice to the permittee. 40 C.F.R. § 70.7(g)(5)(i).

## II.    BACKGROUND

BP Exploration (Alaska), Inc. - Gathering Center #1 (GC1) is an existing oil and gas production facility within the PBU on the North Slope of Alaska. GC1 processes crude oil production fluids from various crude oil accumulations on the North Slope, primarily well pads D, E, F, G, K, Y, and P. Since April 2002, BP Exploration (Alaska), Inc. (BPX) has operated the entire PBU on behalf of the other owners in accordance with a mutual agreement. According to Alaska's Department of Natural Resources, BPX currently has a 26.35% ownership interest in the PBU; the other owners are: ExxonMobil (36.40 %), ConocoPhillips Alaska (36.07%), ChevronTexaco (1.16%), and Forest Oil (0.02%).[1]

Three-phase crude oil is extracted from the ground at 38 individual drill sites and pumped to one of six dedicated production centers within the PBU (GC1, GC2, GC3, FC1, FC2, and FC3). At the production centers, the three-phase crude oil is separated into crude oil, produced water, and hydrocarbon gases. The crude oil is distributed to the Trans-Alaska Pipeline for sale; the produced water is pumped into disposal wells or injected back into the production reservoir on the well pads, and the hydrocarbon gases are dispatched to both the central gas facility and central compressor plant for further processing prior to reinjection. Other facilities located within the PBU include a central power station that generates electricity for the entire PBU; seawater treatment and injection plants to enhance oil recovery; a crude oil topping unit that supplies diesel fuel throughout the PBU and greater North Slope; an operations center that includes administrative offices, water and waste-water treatment plants, emergency power generation, health and safety facilities, repair and storage facilities, and dining and recreational facilities for up to 450 camp residents; and a main camp that provides dining, health, recreational, and other facilities for up to 675 camp residents.

ARCO, then the owner/operator of GC1, submitted a title V permit application to ADEC in November 1997. ADEC issued a draft permit for public comment on February 22, 2002, and the Petitioner submitted comments on March 23, 2002. In the initial draft permit, ADEC did not aggregate GC1 with any other facilities in the PBU for purposes of title V or for other CAA programs. ADEC issued a revised draft permit on March 6, 2003, in which ADEC aggregated

<hr>

[1]http://www.dog.dnr.state.ak.us/oil/products/maps/northslope/images/NS_%20Pool_Ownership.pdf

GC1 with the other oil production facilities in the PBU operated by BPX for purposes of determining the applicability of the modification requirements of ADEC's new source review regulations, including the PSD program. The public comment period on the revised draft permit closed on May 7, 2003, and Petitioner did not submit comments during that time.

After responding to comments received on the revised draft CG1 permit, ADEC further revised the draft permit and submitted to EPA a proposed title V permit dated July 2, 2003, which EPA received on July 9, 2003. In that July 2003 proposed permit, ADEC did not aggregate GC1 with any other facilities in the PBU. After discussions with EPA regarding the proposed permit and other title V permits for North Slope operations, ADEC issued the final permit for GC1 on October 20, 2003, which EPA received on October 23, 2003. In the final GC1 Permit, ADEC made revisions to the statement of basis for the GC1 Permit to clarify that ADEC considered the stationary source for purposes of the title V permit to be GC1 and all surface structures with their associated emission units located on the GC1 production pad, as well as well pads D, E, F, G, Y, and P, and to explain its approach to aggregating facilities within the PBU.[2] However, ADEC did not make any changes to the terms and conditions contained in the July 2003 proposed permit when issuing the October 2003 GC1 Permit, because ADEC determined that emission units on the well pads, if any, were not subject to any emission unit-specific applicable requirements.

In response to an inquiry from the Petitioner, Region 10 advised the Petitioner that, because of changes ADEC made to the statement of basis between the proposed permit sent to EPA on July 9, 2003, and the final permit issued on October 20, 2003, EPA considered the permit issued by ADEC on October 20, 2003, and received by EPA on October 23, 2003, to be the proposed permit for purposes of filing a petition under section 505(b) of the CAA. Region 10 further advised the Petitioner that it would consider the Petitioner's petition to be timely if received by EPA within 105 days (45 days for EPA review plus the 60 day petition period) of EPA's receipt of the final GC1 Permit on October 23, 2003. On February 5, 2004, EPA received

---

[2] On August 26, 2005, ADEC again revised the title V permit for GC1 to add well pad K to the GC1 "major source"/"major stationary source" after BPX and ADEC realized that BPX's title V application and the GC1 permit mistakenly omitted well pad K. ADEC stated that there was no need to modify any permit conditions because no significant emission units are located on well pad K. According to ADEC, the only changes to the permit and

Petitioner's request that EPA object to the October 20, 2003 GC1 Permit (February 2004 Petition). The February 2004 Petition alleged that:

> (1) The GC1 Permit violates title V of the CAA because the provisions of PSD, NESHAPS, and NSPS are all based on the aggregated impact of air emissions and this permit did not aggregate all facilities within the PBU;
>
> (2) The pollution consequences of the violation are significant because elevated levels of nitrogen oxide on the North Slope of Alaska present a serious health problem for workers and native communities in the region and have been created by not aggregating facilities within the PBU; and
>
> (3) ADEC and EPA failed to exercise proper regulatory oversight in this matter by issuing the final permit with no public notice or discussion.

On December 31, 2003, ADEC forwarded to EPA a proposed Revision 1 to the GC1 Permit for EPA's 45 day review period. The proposed Revision 1 added to the permit itself the definition of the title V source, which was previously only in the statement of basis; added language to the permit and to the statement of basis stating that the permit did not apply to temporary emission units and facilities, such as drill rigs and associated activities and equipment that periodically operates at the well pads covered by the permit; made minor changes to the aggregation discussion in the statement of basis; and made revisions to three permit terms to make them consistent with other permits issued to BPX sources. ADEC stated that it was revising the permit under its informal agency review provisions of 18 AAC 15.185. ADEC issued the final Revision 1 to GC1 Permit on February 17, 2004, and the Petitioner filed the instant petition on April 14, 2004 (April 2004 Petition). The April 2004 Petition stated that, because Revision 1 did not explain the departure from ADEC's March 7, 2003 draft permit for GC1 that proposed to aggregate all facilities within the PBU and did not address the Petitioner's original objections to the October 2003 GC1 final permit, the Petitioner was resubmitting the objections raised in his February 2004 Petition.

---

statement of basis were the listing of well pad K as within the group of well pads associated with GC1, and an updated website reference in Condition 66 regarding the location of forms

EPA's 45-day review period for Revision 1 ended on February 14, 2004. The 60th day following that date was April 14, 2004. Accordingly, EPA finds that the April Petition was timely filed.[3]

## III. ISSUES RAISED BY THE PETITIONER

### A. Aggregation of Oil and Gas Facilities in the PBU

The Petitioner alleges that Revision 1 violates title V because, as explained in his comments on the initial draft permit, the permit did not aggregate all facilities within the PBU. The Petitioner argues this failure is important because the provisions of PSD, NESHAP, and NSPS are all based on the aggregated impact of air emissions at the source. February 2004 Petition, p. 2 (incorporated by reference in the April 2004 Petition). According to the Petitioner, the analysis ADEC included with the draft permit ADEC proposed on March 7, 2003, which called for the aggregation of all facilities in the BPU, complies with federal requirements for aggregation and is based on EPA directives, whereas the permit decisions referenced by ADEC in the final permit are at variance with EPA guidance on aggregation. February 2004 Petition, p. 2 (incorporated by reference in the April 2004 Petition). In his comments on the initial February 2002 draft permit during the State public comment process, which Petitioner refers to in the February 2004 Petition, the Petitioner stated that all of the facilities within the PBU are under common control, are interdependent, and share the same SIC code and pointed to language from the Statement of Basis for the draft February 22, 2002 permit stating that GC1 processes fluids received from other well pads and other production centers within the PBU. Thus, the Petitioner asserts, "Gathering Center 1 should not be identified as the 'facility,' but rather, as a unit of the Prudhoe Bay Facility." E-Mail from Bill MacClarence to John Kuterbach and Kathy Stringham, dated March 23, 2002.

After consideration of all available information, EPA concludes that the Petitioner has failed to provide adequate information to support his claim that the entire PBU should be

---

[3] In EPA's April 23, 2004 letter to Petitioner acknowledging receipt of the April 2004 Petition, EPA stated that it did not intend to take further action on the February 2004 Petition, since the April 2004 Petition resubmitted, in full, the February 2004 Petition.

aggregated and has also failed to demonstrate that the failure to aggregate all facilities within the PBU has led to a deficiency in the content of the permit. As discussed above, ADEC initially took public comment on a draft permit which did not aggregate GC1 with any other facilities within the PBU and then took public comment on a draft permit that aggregated GC1 with most other facilities within the PBU for PSD purposes. In issuing the final permit in October 2003 and Revision 1 in February 2004, ADEC aggregated GC1 with its associated well pads, but not with any other facilities within the PBU. Statement of Basis, p. 2; Revision 1 Statement of Basis, p. 2. ADEC provided a detailed explanation of its aggregation decision in the statement of basis for the final permit for GC1 issued in October 2003, as well as in the statement of basis for Revision 1 issued in February 2004. ADEC discussed in great detail why it decided, based on the applicable statutes, regulations, and EPA guidance and the specific facts before ADEC, that it was not appropriate to aggregate all facilities within the entire PBU.

The April 2004 Petition, as well as the February 2004 Petition and Petitioner's March 2002 comments on the February 2002 initial draft permit, make only generalized statements that all facilities in the PBU must be aggregated and do not provide adequate references, legal analysis, or evidence in support of these general assertions. In arguing that such aggregation is necessary, the February and April 2004 Petitions generally point to the Statement of Basis provided in support of the March 2003 revised draft permit, but Petitioner does not provide any argument as to why ADEC's decision not to aggregate, which is described in great detail in the Statement of Basis for the final Revision 1 permit, is unreasonable. Moreover, neither Petition identifies any flaw under the Clean Air Act in the Revision 1 permit that resulted from the allegedly deficient decision not to aggregate all facilities in the PBU.

As discussed above, Section 502(b)(2) of the CAA places the burden on the petitioner to "demonstrate[] to the Administrator that the permit is not in compliance" with the applicable requirements of the CAA or the requirements of part 70. See also 40 C.F.R. § 70.8(c)(1); NYPIRG, 321 F.3d at 333 n.11. I find that the general allegations of the Petitioner in the April 2004 Petition, which incorporates the February 2004 Petition and his March 2002 comments, fail to demonstrate a basis for Petitioner's claim that Revision 1 to the GC1 Permit violates the CAA, because the permit fails to aggregate all facilities within the PBU for purposes of PSD, NESHAPS, and NSPS. Therefore, EPA denies the Petition on this issue. See Tesoro Refining

and Marketing Co., Petition No. IX-2004-6, at 11 (March 15, 2005) (denying title V petition where petitioner failed to substantiate its "generalized contention" that the permit was flawed and the permit's statement of basis provided an explanation of the allegedly flawed permit requirement).

### B. Pollution Consequences of Not Aggregating All Facilities Within the PBU

The Petitioner asserts that the pollution consequences of not aggregating all facilities within the PBU are significant because elevated levels of nitrogen oxide and other pollutants on the North Slope of Alaska present a serious health problem for workers and native communities in the region and have been created by not aggregating facilities within the PBU. February 2004 Petition, pp. 2-3 (incorporated by reference in the April 2004 Petition).

Petitioner's second claim is in essence an extension of the first issue raised by the Petitioner: that the Clean Air Act requires aggregation of all facilities within the PBU. As discussed above, Petitioner has failed to provide adequate information to support his claim that the entire PBU should be aggregated and has also failed to demonstrate that failure to aggregate all facilities within the PBU has led to a deficiency in the content of the permit, i.e. that a CAA applicable requirement is missing from the Revision 1 permit.

Moreover, title V does not authorize a permitting authority to impose substantive new requirements on a permittee, see 40 C.F.R. § 70.1(b), and Petitioner again fails to provide support for his claim that the alleged pollution consequences arising from ADEC's failure to aggregate all facilities within the PBU are significant and result in a permit that is not in compliance with the requirements of the CAA. Therefore, to the extent that Petitioner's pollution consequences allegation could be read to raise an issue separate and apart from his first claim, EPA denies the Petition on this issue. See generally Shintech, Inc., Permit Nos. 2466-VO, 2467-VO, 2468-VO (Sept. 10, 1997) (denying petitioners' claims with regard to various alleged permit deficiencies, including those resulting in negative health consequences, because

petitioners had failed to provide specific information demonstrating how the permits' provisions did not comply with the Clean Air Act).[4]

### C. Alleged Lack of Public Notice or Discussion

The Petitioner alleges that the proposed permit issued on July 3, 2003,[5] was issued without public notice and with no public discussion of the pollution consequences of the permit or the decision not to aggregate all facilities within the PBU. The Petitioner contends that ADEC's decision not to aggregate all facilities within the PBU and EPA's acquiescence in that decision occurred behind closed doors in consultation with the oil and gas industry. The Petitioner further asserts that EPA reversed its position on this permit due to aggressive lobbying of the Alaska oil and gas industry, because an August 14, 2003, letter from EPA to ADEC expressed reservations about ADEC's decision not to aggregate all facilities within the PBU. The Petitioner concludes that proper regulatory oversight was lost because EPA did not object to issuance of the permit. February 2004 Petition, pp. 3-4 (incorporated by reference in the April 2004 Petition).

At the outset, it is important to note that the procedural concerns raised by the Petitioner in his petition relate to the process of issuing the initial GC1 Permit on October 23, 2003, and not to the issuance of Revision 1 of the GC1 Permit on February 17, 2004. As discussed above, ADEC issued an initial draft permit for public comment in February 2002 in which ADEC proposed to consider GC1 as a separate title V and PSD source and not to aggregate GC1 with any other facilities in the PBU. In response to public comment on the initial draft permit, including those made by Petitioner, ADEC issued for public comment a revised draft permit in March 2003 in which ADEC proposed to aggregate GC1 with essentially all facilities within the PBU. After considering public comment on the second draft permit, including comments from the permit applicant arguing that aggregation of all facilities within the PBU was inconsistent with the Clean Air Act as well as impractical, ADEC submitted a proposed title V permit to EPA

---

[4] EPA also notes that the North Slope of Alaska is currently designated attainment with the National Ambient Air Quality Standards (NAAQS) for all criteria pollutants, including nitrogen dioxide.
[5] The petition states that the proposed permit was issued on July 3, 2002. The proposed permit was in fact issued on July 3, 2003 and received by EPA on July 9, 2003

for review in July 2003 in which ADEC aggregated GC1 with well pads D, E, F, G, Y, and P, but not with any other facilities in the PBU.

Thereafter, in response to further discussions with EPA, ADEC issued a final permit for GC1 on October 20, 2003, which EPA received on October 23, 2003. In the final GC1 Permit, ADEC made revisions to the Statement of Basis for the GC1 Permit to clarify that ADEC considered the stationary source for purposes of title V and PSD to be GC1 and all surface structures with their associated emission units located on the GC1 production pad, as well as well pads D, E, F, G, Y, and P, and to explain its approach to aggregating facilities within the PBU. However, ADEC did not make any changes to the terms and conditions contained in the July 2003 proposed permit when issuing the October 2003 GC1 Permit, because ADEC determined that emission units on the well pads, if any, were not subject to any emission unit-specific applicable requirements.

EPA believes that, in issuing the final GC1 Permit in October 2003, ADEC complied with the public notice and comment requirements of title V and ADEC's title V regulations. Part 70 requires that issuance of a title V permit be subject to adequate procedures for public notice, including offering an opportunity for public comments and a hearing on the draft permit. ADEC's approved title V program requires public notice and a 30 day public comment period on draft permits as do the new title V regulations recently adopted by Alaska. See 18 AAC 50.340(e)(2000); 18 AAC 50.040(2005); 18 AAC 50.326(k)(2005). The Alaska Supreme Court has held that a final agency decision subject to public notice and comment requirements can vary from the original proposal if the subject matter remains the same and the public has been reasonably notified that the proposed action might affect its interests. Trustees for Alaska v. State Department of Natural Resources, 795 P.2d 805, 808 (Alaska 1990). The court specifically noted that Alaska law on this point is similar to the approach followed by federal courts in reviewing the actions of federal agencies, which is referred to as the "logical outgrowth" test. The question under the "logical outgrowth" test is whether the final action is in character with the original proposal and a logical outgrowth of the notice and comments. Environmental Defense Center, Inc. v. U.S. E.P.A., 344 F.3d 832, 837 (9th Cir. 2003); Hodge v. Dalton, 107 F.3d 705, 712 (9th Cir. 1997). Accordingly, a new opportunity for public comment is not generated every time the agency reacts to public comments that it receives. Id.

PAGE 11

In this case, ADEC provided two opportunities for public comment on two different versions of the permit: one version considering GC1 a source in and of itself and another version aggregating GC1 with essentially all other facilities within the PBU. In the end, the final permit issued by ADEC fell between the two alternative proposals: the final permit aggregated GC1 with well pads D, E, F, G, Y, and P, but not with any other facilities within the PBU. During both opportunities for public comment, the issue of how GC1 should be aggregated under the various CAA programs was clearly an issue ripe for comment. In fact, ADEC considered all public comments it received regarding aggregation and, in issuing the final permit, explained why the final permit did not aggregate all facilities within the PBU into a single facility. Because the aggregation decision contained in the October 2003 GC1 Permit was a logical outgrowth of the prior draft permits and related public comments, EPA believes that ADEC satisfied the public notice and comment requirements of title V and ADEC's approved title V program in issuing the final GC1 Permit in October 2003. Accordingly, EPA denies the Petition on this issue.[6]

## III.    CONCLUSION

For the reasons set forth above and pursuant to section 505(b)(2) of the Clean Air Act, EPA is denying the Petitioner's petition requesting the Administrator to object to the issuance of Revision 1 of the GC1 Permit.

APR 2 0 2007
Dated

Stephen L. Johnson
Administrator

---

[6] Furthermore, EPA disagrees that it altered its position on aggregation on the North Slope because of aggressive lobbying by the Alaska oil and gas industry or failed to exercise proper regulatory oversight because it did not object to the October 2003 GC1 Permit. EPA did meet with the applicant, at the applicant's request, on two occasions to discuss aggregation of facilities within the PBU. Notes of the meetings are in the record for this petition response. On each occasion, EPA advised the applicant that because of the procedural posture of the permitting decisions and pending title V petitions raising aggregation issues, EPA would listen to the applicant's concerns and would take notes of the meeting, but EPA could not respond to the merits of the applicant's presentation as it related to aggregation of sources

SECOND DELCARATION OF ROBERT UKEILEY

# EXHIBIT E

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

NOV  - 1  2006

OFFICE OF
GENERAL COUNSEL

William M. Eddie
Law Office of William M. Eddie
610 SW Alder Street, Suite 910
Portland, OR  97205

Dear Mr. Eddie:

    I am writing in response to your letter dated October 9, 2006, in which you indicate that Bill MacClarence intend to file a citizen suit against EPA under the Clean Air Act ("CAA").  Your letter alleges that EPA failed to perform a nondiscretionary duty by not granting or denying within 60 days the Petition asking the Administrator to object to the Title V Operating Permit for the BP Exploration Inc. Gathering Center #1 that was issued by the Alaska Department of Environmental Conservation.

    Your letter has been assigned Citizen Suit No. NCS-06-19.  Please use the file number in any future correspondence concerning this matter.  We would appreciate it if you would send this office copies of any correspondence or papers that you may ultimately file in this matter.  Please address such materials to the attention of Sara Laumann.

                    Sincerely,

                    David P.W. Orlin
                    Acting Assistant General Counsel
                    Air and Radiation Law Office

*Printed on Recycled Paper*